**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STEVEN LONG, Individually and on Behalf of All Others Similarly Situated,<br><br>                   Plaintiff,<br><br>    v.<br><br>STELLANTIS N.V., CARLOS TAVARES, and NATALIE M. KNIGHT,<br><br>                   Defendants. | Case No.<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**CLASS ACTION**<br><br><u>Demand for Jury Trial</u> |

Plaintiff Steven Long ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges in this Complaint for violations of the federal securities laws (the "Complaint") the following based upon knowledge with respect to their own acts, and upon facts obtained through an investigation conducted by his counsel, which included, inter alia: (a) review and analysis of relevant filings made by Stellantis N.V. ("Stellantis" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of Stellantis' public documents, conference calls, press releases, and stock chart; (c) review and analysis of securities analysts' reports and advisories concerning the Company; and (d) information readily obtainable on the internet.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of all investors who purchased or otherwise acquired Stellantis' securities between February 15, 2024 to July 24, 2024, inclusive

(the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws (the "Class").

2.      Defendants provided investors with material information regarding Stellantis' expected revenue for the full year 2024. Defendants' statements included, among other things, Stellantis' reduction of inventory levels, pricing improvements, and expansion of its product offering thereby supporting Defendants' decision to forecast double-digit adjusted operating income (AOI) margin in 2024, as well as positive industrial free cash flow.

3.      Defendants provided these overwhelmingly positive statements to investors while, at the same time, disseminating materially false and misleading statements and/or concealing material adverse facts concerning inventory levels, pricing and market share stabilizations. This caused Plaintiff and other shareholders to purchase Stellantis' securities at artificially inflated prices.

4.      The truth emerged on July 25, 2024 when Defendants issued a press release announcing their financials for the first half of 2024. In pertinent part, Defendants results missed consensus and were expected a disappointing "near – term outlook."

5.      Investors and analysts reacted immediately to Stellantis' revelation. The price of Stellantis' common stock declined dramatically. From a closing market price of $19.60 per share on July 24, 2024 to $17.66 per share on July 26, 2024.

## JURISDICTION AND VENUE

6.      Plaintiff brings this action, on behalf of himself and other similarly situated investors, to recover losses sustained in connection with Defendants' fraud.

7.      The claims asserted herein arise under and pursuant to §§10(b) and 18 of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

8.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

9.      Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as Stellantis is headquartered in this District and a significant portion of its business, actions, and the subsequent damages to Plaintiff and the Class, took place within this District.

10.      In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## THE PARTIES

11.      Plaintiff purchased Stellantis' common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Plaintiff's certification evidencing his transaction(s) in Stellantis is attached hereto.

12.      Stellantis is a Dutch corporation with its principle executive offices located at Taurusavenue 1, 2132 LS Hoofddorp, The Netherlands. During the Class Period, the Company's common stock traded on the NYSE under the symbol "STLA".

13.      Defendant Carlos Tavares ("Tavares'") was at all relevant times, the Executive Director and Chief Executive Officer of Stellantis.

14.      Defendant Natalie M. Knight ("Knight") was at all relevant times, the Executive Vice President and Chief Financial Officer of Stellantis.

15.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Stellantis' reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

16.     Stellantis is liable for the acts of the Individual Defendants, and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

17.     The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to Stellantis under respondeat superior and agency principles.

## SUBSTANTIVE ALLEGATIONS

### A.    Company Background

18.     Stellantis designs, engineers, manufactures, distributes and sells vehicles across five portfolios: (i) luxury vehicles under the Maserati brand; (ii) premium vehicles covered by Alfa Romeo, DS and Lancia brands; (iii) global sport utility vehicles under the Jeep brand; (iv)

American brands covering Dodge, Ram and Chrysler vehicles and (v) European brands covering Abarth, Citroën, Fiat, Opel, Peugeot and Vauxhall vehicles.

19.    The Company centralizes design, engineering, development and manufacturing operations, to allow it to efficiently operate on a global scale. Stellantis supports its vehicle shipments with the sale of related service parts and accessories, as well as service contracts, worldwide. Stellantis makes retail and dealer financing, leasing and rental services available through its subsidiaries, joint ventures and commercial arrangements with third party financial institutions.

**B.**    **The Defendants Materially Misled Investors Concerning Stellantis' Full Year Outlook for 2024**

*February 15, 2024*

20.    On February 15, 2024, Defendants issued a press release announcing its full year 2023 financial results. The press release also provided Stellantis' expected full year guidance for 2024, stating in pertinent part:

> Net revenues of €189.5 billion, up 6% compared to 2022, with consolidated shipment volumes increasing 7%; Net profit grew 11% to €18.6 billion. Adjusted operating income[1] rose 1% to €24.3 billion, with AOI margin of 12.8%; Industrial free cash flows[2] of €12.9 billion, an increase of 19% compared to 2022; Strong balance sheet, with Industrial available liquidity at €61.1 billion; LEV sales up 27% in 2023, with PHEVs at #1 in U.S. and #2 for LEVs in U.S.[3]; 21% increase in global BEV sales in 2023.
> . . .
>
> As we just passed the three-year mark since Stellantis' inception, I warmly thank our teams who are executing at the highest levels and contributing greatly to our growth story, even in the strongest of headwinds. Today's record financial results are proof that we have become a new global leader in our industry and will remain rock solid as we look to a turbulent 2024. Thanks to our flexible technology and product roadmap, we are prepared to address the various scenarios that could arise and to continue delivering on our Dare Forward 2030 targets.
> . . .

Building on 2023 momentum, management notes a number of factors could create a supportive revenue backdrop in 2024, including reduced supply and logistical constraints, stabilizing and potentially reduced interest rates, and the benefits of the Company's expected expansion of its product offering. The Company is reiterating a minimum commitment of double-digit adjusted operating income (AOI) margin in 2024, as well as positive industrial free cash flow, despite macroeconomic uncertainties.

21.     On the same day, Defendants an earnings call that included Defendants Tavares and Knight on behalf of Stellantis. During the call, the Individual Defendants provided analysts with detailed information concerning the Company's ability to deliver on its financial, operational and strategic commitments despite the continued macroeconomic challenges. Defendants Tavares and Knight commented on Stellantis' strong pricing and product expansion which led to record financial results. These statements misled investors by failing to disclose material information concerning Defendants' inability to accurately project sales and revenue.

22.     During opening remarks, Tavares stated, in part, as follows:

North America has delivered a very robust 15.4% AOI margin despite everything you know about the events in September and October 2023, we are able to protect 15.4%, which is 100 basis points less than last year, which I believe is a very robust result given what has happened, and I want to take this opportunity to convey to our North American teams my warm thanks and a very sincere appreciation for everything that has been done.
. . .

**We are able to ramp up. We are ready for this competition, and we are gaining significant volume in '23. We expect to gain more volume in '24. And last but not least, in terms of pickup trucks, which is, as you know, a big profit provider for our operations in North America, we have presented to you and to the world, the large spectrum of our technologies.**

We believe we have the largest, the most efficient market coverage in pickup trucks in the U.S. So, great results, robust results in North America and opportunities to do even better, mostly in U.S. and Canada.
. . .

If we move from here and have a look at Europe, the first great thing about Europe is that, Europe was able to sustain a stable 9.8% AOI margin and grew the profit to EUR 6.5 billion. This is good because the competition was much more sharp than

it was in the previous years and because we had a significant increase on our LEV sales and BEV sales.

So, the mix of electrified sales increased significantly. And at the same time, we could maintain the AOI margin and at the same time, we could grow the amount of profit. So, a great performance there.

Even though a little bit like in the U.S., we suffered on the share, we lost 140 basis points. We believe that this is coming back quite strongly, and we'll have the opportunity to discuss because we see that our order book is now being filled in a very efficient manner.

One thing that we see in Europe, which is quite stunning and quite demonstrative of the power of our products, the power of the appeal of our products and the power of our technology is that as soon as we communicate a little bit more on marketing communications, we have a very good response from the market.
. . .

***We are at $7 billion of receivables. We expect that this sale is going to exceed the EUR 10 billion target of 2024. And this already represents a tripling of what we did in 2022. So, very fast growth, very efficient growth, and this is going to give us a very important tool on the come back on the share that we expect in North America, in the U.S.***

It's an important tool for ourselves and marketing, as you know. Now we have it. Now it's growing and now it's competitive to support our sales and marketing teams. We have also completely concluded the restructuring of our European financial services.

They are now much more simple. One financial service per country. We have been improving our receivables and now we are at EUR 56 billion of receivables. It is 21% more than last year. So growing now totally live and totally efficient, and we have also reinforced our presence in Brazil.

On the circle economy business, this is really a fantastic opportunity for us. As you know, we have created the first circular economy hub in Italy. We will soon announce another one. And we are so excited about this for a very simple reason. It's a growing business. We grew by 18%, and it's extremely accretive to our overall AOI margin of the company, very accretive, putting us up.

And we see that there is a lot of growth that we are ahead of us. I would mention there manufacturing with a 14% sales increase with 38 product lines that we remanufacture. The reuse where we increased by 63% our sales in 160 countries. We have now set up in the repair 24 battery repair centers across mostly Europe and the recycle, where we increased by 84% the number of parts that we are recovering for recycling."

(Emphasis added.)

23.     Defendant Knight highlighted Stellantis' pricing improvements and inventory levels throughout the year stating, in pertinent part:

> This, along with our full year pricing improvements of 4% allowed us to offset significant FX headwinds due to the strengthening euro versus the Turkish lira, the U.S. dollar, the Argentine peso, which reduced revenue by EUR 6.5 billion.
> . . .
>
> With respect to H2, and you can see that along the bottom of the chart, you see that revenues were essentially unchanged due to higher FX impacts and some pricing moderation. Now, let's shift our attention to AOI, which came in at EUR 24.3 billion. The main positive driver here is the strong pricing I just mentioned, bringing an additional EUR 6.7 billion margin benefit.  They had mentioned that the main positive driver in their sales was the strong pricing which they had.
> . . .
>
> Now, let's move on to inventories. Inventories at year-end rose by 72,000 units sequentially or 5% compared to the end of the third quarter. This represents the net impact of a 15% reduction in company inventories due to improved delivery logistics in Europe, but at the same time, higher dealer inventories due in large part to changes in the EV production schedules and regulation.
>
> On a year-over-year basis, where we were higher than we had been at the end of '22, inventories still remain below the levels of our premerger predecessor companies. I think that's important to note.
>
> ***Going forward, despite our continued focus on pricing discipline, we don't expect further inventory increases of any materiality in 2024. So, let's focus now on industrial free cash flow, which reached that EUR 12.9 billion. It's up 19% versus 2022 and EUR 5 billion versus 2021.***"

(Emphasis added.)

24.     In regards to the Company's outlook for 2024, CEO Knight stated, in pertinent part:

> As we begin '24, let me emphasize that we see a largely supportive revenue backdrop for the industry. With moderating interest rates as the year progresses, which should support improving affordability and therefore, higher consumer demand.
>
> We also believe supply conditions are nearing pre-COVID and semiconductor crisis levels and that our own delivery logistics have improved significantly. And now, most importantly, we have a strong product portfolio lined up.

You've heard all about it from Carlos, including not only these expanded EV lineup that addresses what was previously untapped segments but also with updates to some of our most important ICE products.

So, moving next to AOI where we are reiterating our commitment to a double-digit margin in 2024. While we are always working to maintain or improve our performance, we know that '24 results will be subject to the impacts of significant headwinds, some of which I'll detail in just a moment.
But let me start with the positives. Lower raw material costs are expected to be positive, an amount of about EUR 1 billion to our AOI over the course of 2024. Our logistic costs should also continue to improve.

In the second half, we'll lap the EUR 1.1 billion of strike impacts and new contract expenses of 2023. While those are all important 2024 positives for Stellantis, there are also several AOI headwinds, which we'll be working hard to mitigate.

(Emphasis added.)

25.    During the question-and-answer segment of the call, Defendant Tavares continued the false impression given to investors during his opening remarks. For example, when asked by an analyst as to Stellantis' profitability in the upcoming year, Defendant Tavares stated in pertinent part as follows:

<Q: Daniel Roeska - Sanford C. Bernstein – Analyst> Carlos, market shares have declined in some parts of the business. And I was just wondering how important is it for your long-term positioning to, let's say, carefully regain some of those points?

<A: Carlos Tavares> We committed to you that we would double the net revenue of the company by 2030 compared to 2021. So, it is very important for us to protect our share. And we want to do it in a way that is going to be respectful of the net revenues and respectful of the profitability. So, to be very clear, it is important for us, and we are now reacting to that. You have a first answer in the share that we delivered in January 2024 in Europe, which is much better than it was by the end of 2023.

So, to be very clear, it is important for us, and we are now reacting to that. You have a first answer in the share that we delivered in January 2024 in Europe, which is much better than it was by the end of 2023.
And we want to regain that share in a way which is respective of the value that we create, which means protecting the profitability and at the same time, making sure that it is sustainable. This is what we want to do.

The good thing is that in 2023, we did many things wrong. And I can tell you that many of our business reviews were not a walk in the park, which means that we are starting 2024 with a significant number of things that we can do better.

We can also benefit from the fact that we have fresh products coming, not only about new models, but also about new powertrains like, for instance, right now, we are deploying in Europe across the different brands, a fantastic mild hybrid technology that is going to support a lot of additional profitable sales at the core of the market.

So, this is to answer your question, yes, it is important to regain market share because we do not have a shrinking strategy, and this is visible in the commitment of doubling the net revenues by 2030.

And we want to do it in a wise way, which is protecting the profitability and protecting the value of our brands and the brand equity that we have for supporting the pricing power.

(Emphasis added.)

39.     The above statements in Paragraphs 20 to 38 were false and/or materially misleading. Defendants provided investors with materially misleading and/or failed to disclose important information pertinent to the investors, which included Defendant's financial and operational problems, revenue lower than expected and expansions of the business not turning in their favor.

**C.  Stellantis Reveals First Half Revenue Results That Missed Consensus**

*July 25, 2024*

40.     On July 25, 2024, Stellantis issued a press release announcing their first half 2024 financial results and disappointing near-term revenue outlook. The press release stated, in pertinent part, that:

> Net revenues of €85.0 billion, down 14% compared to H1 2023, primarily due to the decline in volume and mix; net profit of €5.6 billion, down 48% compared to H1 2023, primarily due to lower volume and mix, headwinds from foreign exchange and restructuring costs; adjusted operating income[1] of €8.5 billion, down €5.7 billion compared to H1 2023, primarily due to decreases in North America.
> . . .

Management taking decisive actions to address operational challenges, including North American share and inventory performance.

. . .

The Company's performance in the first half of 2024 fell short of our expectations, reflecting both a challenging industry context as well as our own operational issues. While corrective actions were needed and are being taken to address these issues, we also have initiated an exciting product blitz, with no fewer than 20 new vehicles launching this year, and with that brings bigger opportunities when we execute well. We have significant work to do, especially in North America, to maximize our long-term potential. I want to thank every employee for their teamwork and commitment during this very consequential chapter of our story.

41.    On an earnings call the same day, the Defendant Tavares discussed the disappointing revenue results for the first half of 2024, specifically addressing the Company's inventory issues stating, in pertinent part:

One of the things that we need to say here is that the major topic to be addressed is, of course, the inventory. This is what you have been highlighting, and rightly so. By the end of June, we are at 94 days of supply, quite similar to our closest U.S. competitor, same ballpark of inventory, but still too high, and this is what we are now addressing.

We see that we are going to work on 3 different directions. One is to make sure that we are aligning our production planning mix to the market mix. And we see that what we have in inventory is not always aligned with what the market mix requires. That means that we need to make sure that we bring all the versions that the market is asking from us. And the perfect example is the new Ram 1500 DT version where some of the highest output versions were not available. Some of the highest stream levels were not available on the right timing. This has created a distortion in the inventories that are sticking, and this is what we are correcting right now, now that we have validated all the versions that we need to make the market response be more appropriate…I will go to the U.S. in the next couple of weeks to spend time with my U.S. teams so that together, we find the most appropriate reaction to the inventory problem that was fixed in Europe, but not in the U.S., and this is going to be the #1 priority moving forward…In the meanwhile, we are also progressing on the best cost country content for the parts we buy, because we need to generate more cost reduction to give back to the market what the market needs, while protecting the margins of our business. So these are some of the actions that we are now preparing for and the next few weeks with our North American team we will be deciding most of these actions, if not all, to fix the inventory issue of North America that we fully recognize and that we are going to fix as our #1 priority moving forward.

42.    On the same call, Defendant Knight commented on the "toughening pricing environment" stating:

> Now I've covered the volume, the mix, the FX on the preceding slide. So here, I'd like to just spend a moment talking about pricing. This was something that was marginally positive for us in the first half. But let me make clear, this is because of the strong performance of the third engine markets in both North America and Europe, pricing was negative.
>
> When I come to a couple of the other items on the chart; first, starting with the industrial cost, you see that it was about EUR 159 million higher than it had been in the prior year. This is despite lower raw material costs and logistics expenses, but those were offset by, on the one hand, higher warranty costs, but in particular, just higher manufacturing fixed costs against lower volume environment.

43.    During the question-and-answer segment of the call, the Individual Defendants were asked about the Company's financials, operational structure and long term growth:

> <Q: Michael Shawn Jacks - Bank of America - Analyst> Carlos, unfortunately, I'm going to touch on one of your favorite topics again, pricing, but can't help but notice the significant deterioration in pricing in Europe, North America and South America in Q2. How much of this can we attribute to working through old model year inventories?
>
> <A: Carlos Tavares> "In terms of pricing power, what we believe is that pricing power is not an absolute concept. It is about when you are in a price band with your competition, making sure that through the appeal of the products and through the quality of the products, you can be positioning yourself in the high end of the related price band. So it's a relative concept where in the price band where you are competing, you look at your competitors in that segment and for the price band that, that segment represents, you want to monetize the value that you have created and the appeal that you have created with your teams…In the U.S., the situation is different. And you can see that for the time being, the results of our competitors are not demonstrating that price pressure is going to vanish. So we will just try to be smarter in our marketing tactics. And we will adjust in a nondogmatic way, wherever we have to adjust, but still keeping in mind that for a given segment, for the competitive set of that segment, there is a price band and in that price band, we'll be trying to position ourselves at the high end of that price band with the appeal of the products that we bring to the market."

44.     The aforementioned press release and statements made by the Individual Defendants are fraudulent and in direct contrast to statements they made during the February 15, 2024 earnings call. On that call, Defendant Knight specifically commented on Stellantis' pricing improvements made throughout the year which allowed the Company to offset significant headwinds. In addition, Defendant Knight noted that "inventories still remain below the levels of our premerger predecessor companies. I think that's important to note…***Going forward, despite our continued focus on pricing discipline, we don't expect further inventory increases of any materiality in 2024***."

45.     Investors and analysts reacted immediately to Stellantis' revelation. The price of Stellantis' common stock declined dramatically. From a closing market price of $19.60 per share on July 24, 2024 to $17.66 per share on July 26, 2024.

46.     A number of well-known analysts who had been following Stellantis downgraded the Company's stock and/or lowered their price targets in response to Stellantis' disclosures. For example, Deutsche Bank commented "We fear that this is only the beginning as most of the key issues are just starting to appear: inventory, pricing, lack of model age versus peers... That said, we do not believe that the company will be able to tackle all these issues in a tougher environment and see guidance at risk."

47.     Similarly, ODDO BHF stated that "As we indicated in our preview note and even more today, it seems to us that it is now all about execution (inventories reductions, flawless launches, market share stabilizations or gains, industrial issues in NA fixed) with investors likely to wait for clear signals on that front to jump back in, provided macro does not deteriorate further."

48.     Barclays also commented on the aforementioned stating "Addressing US inventory was going to require price-mix rebalancing – something that STLA had been unwilling to do so

far. STLA's share price underperformed the sector post-CMD as its 'bones' remained strong, but the market remained concerned about the near term. STLA had communicated constructively on several core parts of the 12-24M investment case, which we found - and still find – very attractive, but didn't fully live up to all market hopes in terms of near-term updates.”

49.     The fact that these analysts, and others, discussed Stellantis' inventory issues and pricing problems shows that the investing public placed great weight upon Stellantis' prior revenue and sales estimates. The frequent, in-depth discussion of Stellantis' guidance confirms that Defendants' statements during the Class Period were material.

**D.  Loss Causation and Economic Loss**

50.      During the Class Period, as detailed herein, Stellantis and the Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Stellantis' common stock and operated as a fraud or deceit on Class Period purchasers of Stellantis' common stock by materially misleading the investing public. Later, when Stellantis and Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Stellantis' common stock materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases of Stellantis' common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

51.     Stellantis' stock price fell in response to the corrective event on July 25, 2024, as alleged *supra*. On July 25, 2024, Defendants disclosed information that was directly related to their prior misrepresentations and material omissions concerning Stellantis' revenue outlook for 2024.

52.     In particular, Stellantis announced first half 2024 net revenues of €85.0 billion, down 14% compared to H1 2023 and net profit of €5.6 billion, down 48% compared to H1 2023.

**E.  Presumption of Reliance; Fraud-On-The-Market**

53.     At all relevant times, the market for Stellantis' common stock was an efficient market for the following reasons, among others:

(a)     Stellantis' common stock met the requirements for listing and was listed and actively traded on the NYSE during the Class Period, a highly efficient and automated market;

(b)     Stellantis communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c)     Stellantis was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d)     Unexpected material news about Stellantis was reflected in and incorporated into the Company's stock price during the Class Period.

54.     As a result of the foregoing, the market for Stellantis' common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in Stellantis' stock price. Under these circumstances, all purchasers of

Stellantis' common stock during the Class Period suffered similar injury through their purchase of Stellantis' securities at artificially inflated prices, and a presumption of reliance applies.

55. Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

**F.  No Safe Harbor; Inapplicability of Bespeaks Caution Doctrine**

56. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. As alleged above, Defendants' liability stems from the fact that they provided investors with revenue projections while at the same time failing to maintain adequate forecasting processes. Defendants provided the public with forecasts that failed to account for this decline in sales and/or adequately disclose the fact that the Company at the current time did not have adequate forecasting processes.

57. To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

58. Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the

"forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Stellantis who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

59.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Stellantis' securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

60.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Stellantis' securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Stellantis' or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in

securities class actions. As of December 31, 2023, there were approximately 3 billion shares of outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

61.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

62.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

63.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Stellantis;

(c)     whether the Individual Defendants caused Stellantis to issue false and misleading financial statements during the Class Period;

(d)     whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e)     whether the prices of Stellantis' common stock during the Class

Period were artificially inflated because of the Defendants' conduct

complained of herein; and

(f)     whether the members of the Class have sustained damages and, if

so, what is the proper measure of damages.

64.     A class action is superior to all other available methods for the fair and efficient

adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the

damages suffered by individual Class members may be relatively small, the expense and burden

of individual litigation make it impossible for members of the Class to individually redress the

wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### *Against All Defendants for Violations of*
### *Section 10(b) and Rule 10b-5 Promulgated Thereunder*

65.     Plaintiff repeats and realleges each and every allegation contained above as if fully

set forth herein.

66.     This Count is asserted against defendants and is based upon Section 10(b) of the

Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

67.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and

course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions,

practices and courses of business which operated as a fraud and deceit upon. Plaintiff and the other

members of the Class; made various untrue statements of material facts and omitted to state

material facts necessary in order to make the statements made, in light of the circumstances under

which they were made, not misleading; and employed devices, schemes and artifices to defraud in

connection with the purchase and sale of securities. Such scheme was intended to, and, throughout

the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Stellantis common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Stellantis' securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

68.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Stellantis' securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

69.    By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

70.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or

directors of the Company, the Individual Defendants had knowledge of the details of Stellantis' internal affairs.

71.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Stellantis' businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Stellantis' common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Stellantis' common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

72.     During the Class Period, Stellantis' common stock was traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Stellantis' common stock at prices artificially inflated by defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff

and the Class, the true value of Stellantis' common stock was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Stellantis' common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

73.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

74.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

*Against the Individual Defendants*
*for Violations of Section 20(a) of the Exchange Act*

75.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

76.    During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about Stellantis' misstatements.

77.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by Stellantis which had become materially false or misleading.

78.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Stellantis disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Stellantis to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Stellantis' common stock.

79.     Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause Stellantis to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

80.     By reason of the above conduct, the Individual Defendants and/or Stellantis are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demand judgment against defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representatives;

B.      Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.


Dated: August 15, 2024          Respectfully submitted,


**LEVI & KORSINSKY, LLP**


 s/ Adam M. Apton
Adam M. Apton
33 Whitehall Street, 17th Floor
New York, New York 10004
Tel.: (212) 363-7500
Fax: (212) 363-7171
Email: aapton@zlk.com

*Attorneys for Plaintiff*