**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STEVEN LONG, Individually and on Behalf of All Others Similarly Situated,<br><br>            Plaintiff,<br><br>            v.<br><br>STELLANTIS N.V., CARLOS TAVARES, and NATALIE M. KNIGHT,<br><br>            Defendants. | Case No. 1:24-cv-06196-JHR-GS<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br><u>DEMAND FOR JURY TRIAL</u> |

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ............................................................................................................... 1

II. JURISDICTION AND VENUE .......................................................................................... 5

III. PARTIES ............................................................................................................................ 6

    A. Lead Plaintiff ......................................................................................................... 6

    B. Defendants ............................................................................................................. 6

IV. SUMMARY OF THE FRAUD ......................................................................................... 8

    A. Defendant Tavares Promises Investors That He Will Maintain Double-Digit Adjusted Operating Income Margins And "Transform" Stellantis......................... 8

    B. Prior To The Start Of The Class Period, Defendant Tavares Reports Double-Digit AOI Margins, But The Market Begins To Question Whether Stellantis's Pricing And Inventory Levels Are Sustainable .................................................................... 11

    C. At The Start Of The Class Period, Defendants Assure Investors That Stellantis Has A "Carefully Calibrated" Pricing Strategy That "Has Been Working" To Support "Healthy" Profitability And "Significantly Tightened" Inventory ......... 12

    D. Defendants Continue To Tout Sustainable Pricing And The Stability Of Inventories When Stellantis Reports Its Full Year 2023 Results.......................... 16

    E. In Truth, Defendants Knew By The Start Of The Class Period That Stellantis's Prices Were Not "Sustainable" Or "Carefully Calibrated" As Inventory Ballooned At U.S. Dealers' Lots.............................................................................................. 17

        1. To Meet Defendant Tavares's AOI Targets, Defendants Employ An Unsustainable Pricing Strategy And Stuff The Channel With Inventory Levels That Are Out Of Control ............................................................... 18

        2. Defendants' Pricing Tactics, Incentives, And The Resulting Pile Up Of Inventory Causes A "Mutiny" Among Dealers ....................................... 28

        3. Defendants Hide The Truth About Inventory And Force Dealers To Accept Even More Inventory Through Unusual And Illegal Incentives .. 31

            a. Stellantis Uses The CTP Play To Hide Excess Inventory And Misleadingly Record It As Sales.................................................. 32

            b. Stellantis Offers A Coupon Incentive Designed To Punish Dealers Who Would Not Take On Additional Inventory ......................... 34

c. Stellantis Illegally Puts New Stickers On Its Cars, Instead Of Offering Customer Facing Rebates.................................. 35

d. In Spring 2024, Stellantis Pays Dealers To Take On Even More Overpriced Inventory That They Cannot Sell, And Meets With Dealers Regarding Dealers' Concerns ......................................... 37

F. Defendants Disclose Declining Sales For The First Quarter Of 2024, But Continue To Falsely Assure Investors That Inventory Is At "Healthy" Levels ... 40

G. Defendants Disclose In June 2024 That Inventory Is Rising And Admit That They Were "Arrogant," But Downplay The Rise In Inventory As Not Indicative Of Any Pattern ..................................................................................................... 41

H. Defendants Disclose Market Share And Inventory Issues, But *Again* Reaffirm Double Digit AOI Guidance ................................................................. 42

I. The September 10, 2024 Dealer Council Letter Describes How For The Prior Two Years, Dealers Had "Sounded The Alarm" To Stellantis .................................... 45

J. Defendant Knight Reiterates "North Star" Of 10% AOI Margin And Then, Days Later, Slashes AOI Guidance ................................................................. 47

V. POST-CLASS PERIOD EVENTS CONFIRM THE FRAUD ......................................... 49

A. Defendant Knight Is Fired And Defendant Tavares Is "Retired" ......................... 49

B. Dealerships Continue To Lament Defendants' Failed Pricing Strategy And Elevated Inventory Levels ........................................................................ 50

C. Defendant Tavares Abruptly "Resigns" Because Of "Unrealistic" And "Destructive" Financial Targets ......................................................................... 50

D. Stellantis Reports Significantly Reduced Shipments And Confirms 5.5% AOI Margin ................................................................................................................ 52

VI. DEFENDANTS' FALSE AND MATERIALLY MISLEADING STATEMENTS ........ 53

A. October 31, 2023: Q3 2023 Sales And Revenue Call ......................................... 53

B. December 6, 2023: Goldman Sachs Global Automotive Conference .................. 55

C. February 15, 2024: Full Year 2023 Earnings Call And Press Release, And Wolfe Research Global Auto And Auto Tech Conference ............................................. 56

D. April 30, 2024: Q1 2024 Shipments And Revenues Press Release And Earnings Call ...................................................................................................................... 60

E. June 13, 2024: Investor Day Call ....................................................................... 62

F.     July 25, 2024: Q2 2024 Earnings Call And Press Release ................................ 62

G.     September 23, 2024: Bank Of America European Autos And Future Car Conference .................................................................................................. 64

VII.   LOSS CAUSATION ................................................................................................ 64

A.     April 30, 2024: First Quarter 2024 Shipments And Revenues Disclosures ......... 65

B.     June 13, 2024: Stellantis Investor Day Disclosures ............................... 66

C.     July 25, 2024: First Half 2024 Results Disclosures ............................... 68

D.     September 30, 2024: Full Year Updated Financial Guidance Disclosures ........... 70

VIII.   ADDITIONAL SCIENTER ALLEGATIONS ................................................... 71

IX.   THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ................................................................ 86

X.   THE PRESUMPTION OF RELIANCE ............................................................ 87

XI.   CLASS ACTION ALLEGATIONS .................................................................. 88

XII.   CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT ............................... 89

XIII.   PRAYER FOR RELIEF ................................................................................... 94

XIV.   JURY DEMAND ............................................................................................. 94

Court-appointed Lead Plaintiff Boston Retirement System, by and through its undersigned counsel, brings this action for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5 against Stellantis, N.V. ("Stellantis" or the "Company"), Carlos Tavares, and Natalie Knight. Lead Plaintiff brings these claims on behalf of itself and a class of investors who purchased or otherwise acquired Stellantis securities between October 31, 2023 and September 27, 2024, inclusive (the "Class Period"), in domestic transactions or on U.S. exchanges, and were damaged thereby.

Lead Plaintiff alleges the following based upon personal knowledge as to itself and its own acts and upon information and belief as to all other matters. Lead Plaintiff's information and belief is based on, among other things, the independent investigation of its undersigned counsel. This investigation included a review and analysis of: (i) Stellantis's public filings with the SEC; (ii) research reports by securities and financial analysts; (iii) records and transcripts of investor conference calls; (iv) publicly available presentations by Stellantis; (v) press releases and media reports; (vi) securities pricing data; (vii) interviews with former Stellantis employees and employees of associated independent dealerships and other individuals; (viii) consultations with experts; and (ix) other material and data identified herein. Lead Counsel's investigation into the alleged factual allegations is continuing, and many of the relevant facts are known only by Defendants and are exclusively within their custody or control.

## I.	INTRODUCTION

1.	Defendant Carlos Tavares assumed the role of CEO and Executive Chairman of Stellantis in 2021. Tavares was renowned in the automative industry as an "iron-disciplined executive" with a "Darwinist" vision for the automotive world where "only the best will survive." Prior to the start of the Class Period, Tavares announced his "Dare Forward 2030" strategic plan,

which he promised would "transform" Stellantis. The lynchpin of Tavares's strategy was his promise to deliver double-digit Adjusted Operating Income (AOI) margins for the Company which, in turn, would result in industry leading share buybacks and dividends to investors.

2. Shortly before the start of the Class Period, Defendant Tavares brought in Defendant Natalie Knight as CFO, to help him execute the ambitious Dare Forward 2030 strategic plan. At the same time, analysts questioned whether Defendants could maintain their double-digit AOI margins and Stellantis's high prices, particularly given their observation that the Company's inventory levels had increased over time.

3. In response, Defendants consistently assured investors that the strategy "***has been working***," representing throughout the Class Period that double-digit AOI margins were secured through the Company's "***carefully calibrated***" and "***sustainable***" pricing strategy and "***significantly tightened***" inventory levels, which supported "***healthy***" profitability. Propelled by these and similar misrepresentations, Stellantis's stock price hit an all-time high of $29.40 in March of 2024.

4. The market was assuaged by Defendants' representations, noting that they had successfully "countered the narrative that pricing must turn negative." Analysts also specifically credited Defendants' repeated reaffirmation of double-digit AOI margins which they attributed to the Company's "strong" pricing. For instance, one analyst observed that Stellantis had "continue[d] to buck the trend vs what we have been hearing from [Stellantis competitors,] F[ord]/GM. We suspect this is partly behind STLA's substantial share price outperformance vs GM/F[ord]. Pricing continues to be strong."

5. In truth, Defendants had raised the prices of Stellantis vehicles to unsustainably high levels and stuffed the channel by forcing U.S. car dealerships to accept massive amounts of

inventory that they could not sell. As confirmed by multiple former employees of Stellantis and U.S. dealers interviewed in Lead Counsel's investigation, Defendants' tactics reduced customer demand and resulted in levels of inventory that were out of control, but they allowed Defendants to continue to report double-digit AOI metrics to investors in the short term.

6. Stellantis's temporarily inflated AOI margins personally and directly benefited Defendant Tavares, whose record-breaking compensation heavily depended on reporting AOI margins above 10 percent. Indeed, following record-setting double-digit AOI margins reported by Stellantis in 2023, Tavares was recognized as the highest paid traditional automotive executive in the world, earning approximately $40 million, a massive 55.6% increase over his 2022 compensation.

7. As Defendant Tavares later admitted, by the start of the Class Period in the fall of 2023, Stellantis dealers had reported to the Company through a variety of channels that prices were unsustainably high, and that ballooning inventory required substantial discounting. Former employees of Stellantis and associated independent dealerships uniformly report that Stellantis had priced its customers out of the market through repeated price increases that were specifically engineered by Tavares and his direct reports to hit revenue and margin targets.

8. The former employees also explained that in fact, Stellantis's pricing was not "sustainable" because dealers were unable to sell cars at Stellantis's high price point. Former employees and other dealers confirmed that these key concerns of unsustainably high prices and ballooning inventory were constantly discussed with Stellantis executives, including during national meetings with dealers. When Stellantis employees in the U.S. advocated for pricing concessions after reporting to Stellantis that demand indicators were all trending down

3

immediately following the Company's price increases, they were repeatedly and emphatically denied.

9. Indeed, the National Dealership Council, a national body representing independent Stellantis dealers in the United States, later stated in an open letter to Defendant Tavares issued shortly before the end of the Class Period – that *for two years* dealers had been "*sounding the alarm*" to Stellantis executives that their "short term" "engineering" of profitability was unsustainable and had resulted in the accumulation of overpriced inventory, loss of market share, and "degradation" of the Company's brands. Instead of heeding the dealers' warnings and adjusting prices and inventory to appropriate levels, Defendants implemented a series of unusual incentives and illegal repricing actions designed to hide the truth about Defendants' failing strategy and force dealers – over their objections – to take even more inventory. Defendants employed these tactics to perpetuate the false narrative that Defendant Tavares had successfully "transformed" Stellantis and delivered sustainable, double-digit AOI margins.

10. The truth was revealed through a series of partial disclosures beginning on April 30, 2024, when Stellantis disclosed a staggering 20% decline in shipments and significant market share loss in North America and issued margin guidance that was significantly below expectations. Then, on June 13, July 25, and September 30, 2024, Defendants announced further increases in inventories, a steepening decline in revenues and, ultimately, that the Company would not achieve the double-digit AOI margins it had promised investors in 2024.

11. Analysts were "shocked" and "taken aback" by these disclosures, which they understood to represent the death knell of Dare Forward 2030 and Defendant Tavares's purported transformation of Stellantis. For instance, Kepler Cheuvreux lamented on October 1, 2024, "Like us, the market is likely to assume double-digit margins (and [share buy backs]) are history." All

told, these disclosures erased more than $28.6 billion in market capitalization, causing significant damage to investors.

12.    Just weeks after the end of the Class Period, Stellantis announced that Defendant Knight had been replaced with immediate effect. Shortly thereafter, the Company revealed that Defendant Tavares would "retire" at the end of his contract in early 2026, in recognition that his pricing strategy was an abysmal failure that had prioritized short-term profits over the long-term financial health of the Company. By December of 2024, Stellantis's Board of Directors had determined that Defendants Tavares's financial targets were so "unrealistic" and "destructive" that his immediate departure from the Company, without a chosen successor, was necessary. Two months later, Stellantis confirmed AOI margins of a dismal 5.5%.

## II.    JURISDICTION AND VENUE

13.    The claims asserted herein arise under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, promulgated thereunder (17 C.F.R. § 240.10b-5).

14.    This Court has jurisdiction over the subject matter of this action under Section 27 of the Exchange Act (15 U.S.C. § 78aa). In addition, because this is a civil action arising under the laws of the United States, this Court has jurisdiction under 28 U.S.C. §§ 1331 and 1337.

15.    Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa), and 28 U.S.C. § 1391(b). Stellantis common stock is and was listed and traded on the New York Stock Exchange ("NYSE") during the Class Period, and many of the acts and transactions giving rise to the claims in this action took place in this District, including the dissemination of many of the false statements at issue.

16.    In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

5

including but not limited to, the United States mail, interstate telephone communications, and the facilities of the national securities exchange.

### III.   PARTIES

#### A.   Lead Plaintiff

17.   Lead Plaintiff Boston Retirement System is a governmental defined benefit plan that provides retirement benefits for employees, and their beneficiaries, of the City of Boston, Boston Planning & Development Agency, Boston Housing Authority, Boston Public Health Commission, and Boston Water & Sewer Commission. As of December 31, 2023, Lead Plaintiff managed more than 9 billion dollars in net assets on behalf of over 35,000 members and their beneficiaries. Lead Plaintiff purchased Stellantis securities on U.S. exchanges and in domestic transactions during the Class Period and was damaged thereby, as set forth in the attached certification.

#### B.   Defendants

18.   Defendant Stellantis N.V. ("Stellantis" or the "Company") designs, engineers, manufactures, distributes, and sells vehicles across 14 brands, including, among others: Dodge, Ram, Jeep, and Chrysler. The Company is a Dutch corporation which maintains its corporate headquarters at Taurusavenue 1, 2132 LS Hoofddorp, The Netherlands. During the Class Period, the Company's common stock traded on the NYSE, which is an efficient market, under the symbol "STLA."

19.   Defendant Carlos Tavares ("Tavares") was the Executive Director and Chief Executive Officer of Stellantis from January 17, 2021, until he "resigned" on December 1, 2024. Prior to assuming his role as CEO of Stellantis, Tavares served as the CEO of the PSA Group from 2014 until 2021, and from 2011 to 2014 as COO of Renault under the infamous Carlos Ghosn. Defendant Tavares made misstatements during the Goldman Sachs Global Automotive

Conference, held on December 6, 2023, the Company's February 15, 2024, earnings call, and the July 25, 2024, earnings call.

20. Defendant Natalie M. Knight ("Knight") was the Executive Vice President and Chief Financial Officer of Stellantis from July 10, 2023, until Stellantis announced that Knight would leave the Company on October 10, 2024. Defendant Knight made misstatements during or in: the Company's October 31, 2023 sales and revenue call; the Company's February 15, 2024 earnings call; the Company's April 30, 2024 Shipments and Revenues Press Release attached to the SEC Form 6-K; the Company's April 30, 2024 earnings call; the Company's June 13, 2024 Investor Day; the Company's July 25, 2024 earnings call; and the Bank of America European Autos and Future Car Conference, held on September 23, 2024.

21. Defendants Tavares and Knight are collectively referred to as the "Executive Defendants." The Executive Defendants directly participated in the management of Stellantis's operations, had direct supervisory involvement in Stellantis's day-to-day operations, and had the ability to control and did control Stellantis's statements to investors and financial reporting. The Executive Defendants possessed the power and authority to control the contents of Stellantis's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Because of their positions and access to material non-public information available to them, each of the Executive Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations that were being made were then materially false and/or misleading. The Executive Defendants were involved in drafting, reviewing, publishing, and making the false and misleading statements and omissions alleged herein.

7

22.     Stellantis is liable for the acts of the Executive Defendants, and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

## IV.     SUMMARY OF THE FRAUD

### A.     Defendant Tavares Promises Investors That He Will Maintain Double-Digit Adjusted Operating Income Margins And "Transform" Stellantis

23.      Stellantis is a multinational automotive manufacturing company formed from the merger in January 2021 of the Italian–American conglomerate Fiat Chrysler Automobiles and the French PSA Group. Stellantis designs, engineers, manufactures, distributes and sells a portfolio of vehicles across 14 brands, including, among others, Jeep, Dodge, Ram, Chrysler, Fiat, Peugeot, Alfa Romeo, and Maserati. At the start of the Class Period, approximately half of the Company's net revenues and more than half of its profits were generated through sales in the United States. On January 16, 2021, upon completion of the merger, Defendant Tavares assumed the role of CEO, having previously served as head of the PSA Group.

24.     Defendant Tavares is known in the industry as an "iron-disciplined executive" who is "obsessed with work, demanding, cold, fast and with a tremendous efficiency." Tavares took pride in this reputation, describing himself as a "performance psychopath," with a "Darwinist" vision of the automotive world in which "only the best will survive."

25.     Tavares promised investors that he would deliver "transformative" success at Stellantis through aggressive pricing measures and cost cutting that would maintain double-digit Adjusted Operating Income (AOI) margins. Specifically, on March 1, 2022, Tavares announced the Company's "Dare Forward 2030 Plan," which was Stellantis's strategic plan over the 2022-2030 period. A key component of the plan was its "financials pillar," which committed Stellantis

8

to creating shareholder value through "doubling the net revenue and keeping a double-digit AOI margin as a floor."

26. As Stellantis explained in its annual SEC filings including its Form 20-F for the fiscal year 2023 filed during the Class Period, the Company first calculates its AOI by subtracting rare or discrete expenses from its net profits. Stellantis then calculates the AOI margin by dividing AOI by net revenues. The AOI margin is thus a key measure of Stellantis's profitability because it fuels cash flows which, in turn, allow the Company to fund dividends and stock buybacks. Stellantis's competitors, such as Ford and GM, have historically maintained single-digit margins.

27. The Company's ability to maintain a high, double-digit AOI margin was directly tied to its pricing strategy. As Stellantis explained in its annual SEC filings before and during the Class Period, its "ability to maintain or increase pricing has impacted, and will continue to impact" its profitability and thus its AOI margins. Actions that Stellantis takes to increase its AOI margins can also impact inventory levels. For example, lowering prices tends to increase demand and lower inventory as customers buy more cars, but it also decreases AOI margin. Conversely, raising prices tends to decrease demand and increase inventory, but also increases profits and therefore AOI margin.

28. Analysts met Defendant Tavares's "Dare Forward 2030 Plan" and key profitability target with excitement. Immediately after Tavares announced Dare Forward, analysts at Goldman Sachs recommended that investors buy Stellantis stock, noting that the Company had just announced "unprecedented margins" and that it would "double revenues by 2030." The next day, on March 2, 2022, analysts at Société Générale wrote that "Dare Forward 2030 paves the way for Stellantis' ambition to be second to none in value creation." That same day, analysts at Intensa Sanpaolo referred to the plan as a "Daring Vision," stating that "we are more confident on the

9

group's ability to meet its AOI margin targets." Similarly, Berenberg analysts noted as part of their investment thesis that "Stellantis's commitment to maintain double-digit [AOI] margins through the coming decade appears credible to us."

29. Stellantis's AOI margin was thus highly material to investors. Indeed, prior to and during the Class Period, Defendant Tavares reiterated the importance of reporting "record high" double-digit AOI. Tavares cited that metric as providing true visibility into his execution of the pivotal "transformation" of Stellantis and the Company's ability to not only survive but thrive in a "Darwinist" automotive market. For instance, on February 22, 2023, Tavares told investors, "It's important that we state those simple numbers so that we understand that we are talking about transformation at Stellantis. We are doing it."

30. Analysts were encouraged by these representations. Later that same day, an analyst from Kepler Cheuvreux wrote that Stellantis's expected adjusted margin for 2022 made them "comfortable with" their estimates of "double-digit margin for 2023-24E." Société Générale similarly observed Stellantis's "class-leading margins" for 2022 and noted Defendants' "confiden[ce] of maintaining a double-digit adjusted operating margin in FY23." These analysts wrote, "We are hard pressed to identify a management team with greater credibility."

31. Maintaining a double-digit AOI margin was also a critical component of Defendant Tavares's compensation, as described further in Section VIII below. Notably, during the Class Period, Tavares's ranking as the highest paid traditional automotive executive in the world was secured through the achievement of double-digit AOI margins and inflating Stellantis's stock price through the first half of 2024.

**B.** **Prior To The Start Of The Class Period, Defendant Tavares Reports Double-Digit AOI Margins, But The Market Begins To Question Whether Stellantis's Pricing And Inventory Levels Are Sustainable**

32. In the months preceding the start of the Class Period, Stellantis consistently reported double-digit AOI margins to investors fueled by the strength of the Company's North American operations. For example, for 2022, Stellantis reported a record Company-wide 13% AOI margin that was itself enabled by a record 16.4% AOI margin for North America based on higher "vehicle net price and content."

33. Analysts celebrated the Company's results, noting that "Stellantis is seeing very strong top line trends with volume and price," but also questioned whether Stellantis could continue its strong performance given present inventory levels. For example, Berenberg reported on May 3, 2023, "We continue to view Stellantis's commitment to maintaining double-digit margins through the coming decade as credible, given its consistently strong execution and despite well-flagged pressure on industry pricing. . . . [W]orries about Stellantis missing its 'double-digit' margin floor may be exaggerated." Morgan Stanley similarly noted in a May 3, 2023, report, "With inventories rising . . . the key question will be what happens to [Stellantis's] pricing power."

34. Effective on July 10, 2023, Defendant Tavares brought in Defendant Knight as his new CFO. During her first conference call as CFO on July 26, 2023, Knight reaffirmed her personal commitment to executing on Tavares's Dare Forward 2030 strategic plan. Knight stated, "Let me start by saying how excited I am to join Stellantis. I see it as my job to help execute, accelerate and communicate our bold strategic plan, Dare Forward 2030." Knight later told investors that Stellantis's AOI margin was, in part, "propelling the execution of [their] Dare Forward 2030 strategy."

35. Thus, immediately prior to the Class Period, the market was closely scrutinizing whether Defendants Tavares and Knight could continue to execute on their bold strategic plan to

deliver double-digit AOI to investors and looking for reassurance that Stellantis's pricing strategy and inventory levels were healthy and sustainable.

> **C.** **At The Start Of The Class Period, Defendants Assure Investors That Stellantis Has A "Carefully Calibrated" Pricing Strategy That "Has Been Working" To Support "Healthy" Profitability And "Significantly Tightened" Inventory**

36. The Class Period begins on October 31, 2023, when Defendants announced Stellantis's "3Q 2023 Shipments and Revenues" prior to market open. In its press release, Stellantis disclosed revenues of €45.1 billion, up 7% over the prior year, which the Company attributed principally to "improved volume and consistent pricing." Specific to its North American segment, Stellantis disclosed that shipments had increased by 7% and net revenues by 2% compared to Q3 2022, highlighting ongoing "positive net pricing and positive mix," as reflected directly below.



37. However, the Company also flagged an increase in inventories to approximately 1.4 million units compared to just 0.9 million units in the prior year, as reflected in the chart below.



# 3-Month Comparisons
## 000 units

| | Sep 30 '23 | Jun 30 '23 | Mar 31 '23 | Dec 31 '22 | Sep 30 '22 |
|---|---|---|---|---|---|
| Total | 1,387 | 1,374 | 1,302 | 1,074 | 926 |
| (top) | 388 | 320 | 384 | 230 | 275 |
| (bottom) | 999 | 1,054 | 918 | 844 | 651 |

38.     Analysts generally applauded these results, which BNP specifically noted were generated through "solid pricing," but they remained concerned about consistently increasing inventories in advance of the Company's conference call that same day. For example, Morgan Stanley wrote immediately prior to the October 31 call that "we ultimately expect shares to also be ***more sensitive to the management commentary around inventories on the call***, given these have risen QoQ." In the same report, Morgan Stanley summarized investors' concerns around inventories, writing:

> **Inventories rise again**: Total inventories rose ~13k QoQ units to 1,387k (vs. 1,374k in 1H23). Within this, dealer inventories fell 55k units from 1H23 to 999k units and company inventory rose 68k units from 1H23 to 388k units. The change implies that total inventory is now ~700k units higher than the lows of Sep 2022 of ~689k. ***We sense some investor bearishness about the overall level of inventory within the network and the potential for greater incentives/discounting going forward***. Our view is that STLAM will need to right-size the inventory into a potential slower demand backdrop in 2024, but that this process should be manageable for the company.

39. During the related earnings call, which began at 9 a.m. ET on October 31, and in response to this pressure from the market, Defendant Knight sought to assuage investor concerns about growing inventories and the sustainability of the Company's elevated pricing. Specifically, Defendant Knight represented that Stellantis had "*significantly tightened*" its inventory levels and that investors could expect additional "inventory improvement as we go towards the end of this year." Defendant Knight elaborated that "we've got a good plan in terms of the products, the flow of cars that are coming out that we will be able to show progress there."

40. With respect to pricing, Defendant Knight stated that Stellantis had "positive pricing increases in both North America and Europe," and that Stellantis's pricing was "*carefully calibrated*" and "*moving really positively for us*." In response to analysts' questions about the sustainability of the Company's pricing, Knight further reassured investors that "pricing, we think, will be largely stable."

41. Defendant Knight also specifically assured investors that Stellantis's AOI margin would remain high and in the double digits, stating that Stellantis was "very proud" to have the industry's "highest margin in terms of AOI" and touting the Company's "high and *healthy* profitability level." In response to analysts' questions about whether Stellantis would confirm financial guidance it had issued that called for double-digit AOI margins both in Q4 and for the entire year, Knight stated she was "confirming the guidance we have out there."

42. Analysts were encouraged by Defendants' representations. For instance, ESN reported on November 1, 2023, that it had "improved [its] assumptions . . . to factor in a reduction in the North American and European inventory." Similarly, Société Générale noted that Stellantis had successfully "counter[ed] the narrative that pricing must turn negative" and admiringly described Stellantis's "class-leading North American (NA) and global adjusted operating

margins." RBC also specifically noted the link between the Company's AOI guidance and share price appreciation stating, "The company also maintained its double-digit margin guidance for 2023, which continues to buck the trend vs what we have been hearing from F[ord]/GM. We suspect this is partly behind STLA's substantial share price outperformance vs GM/F[ord] (STLA +26% YTD vs F -16% and GM -19%). Pricing continues to be strong."

43. Indeed, in direct response to Defendants' positive representations concerning inventory, the sustainability of pricing, and their confirmation of "healthy" profitability and double digit AOI guidance, the Company's stock price increased by more than 11 percent, from $18.00 at close on October 30, the day prior to the statements, to $20.11 at close on November 3.

44. Analysts continued to seek reassurance regarding Stellantis's inventory levels, and Defendants continued to assuage the market's concerns. On December 6, 2023, at the Goldman Sachs Global Automotive Conference, in direct response to continued analyst questions about "[h]ow can you make sure that your independent dealers are disciplined on pricing with inventory rising," Defendant Tavares similarly represented that inventories had increased ***not*** because of the Company's pricing strategy, which "***has been working***." Instead, Tavares attributed Stellantis's inventory levels to lackluster logistics, stating, "We all know that having too much inventory at dealer level is not a good thing. We all know that. ***What I see is that we need to do a better job at delivering the cars.*** I think the delivery lead time is not very good."

45. Thus, investors understood from Defendants that high inventory levels at independent dealerships were caused primarily by the time it took Stellantis to deliver cars that dealers had "already sold." As Tavares explained, "I'm talking about the cars that [dealerships] already sold, you just have to take the car and deliver the car" to reduce inventory.

**D.  Defendants Continue To Tout Sustainable Pricing And The Stability Of Inventories When Stellantis Reports Its Full Year 2023 Results**

46.     On February 15, 2024, Stellantis reported its full year 2023 results. The Company reported AOI of €24.3 billion with 12.8% margin globally and 15.4% in North America, which it attributed to the "[h]ighest U.S. ATP" (average transaction price) . . . of $53.3k/unit" and "remain[ing] disciplined on pricing." Because of its high AOI margin, the Company also increased its dividend by 16% and *doubled* its share buyback. The Company's earnings presentation represented that inventory was "*relatively stable*" and affirmed a "[m]inimum commitment of double-digit AOI" for 2024.

47.     Along with Defendants' positive representations above, the Company also announced a loss of market share in North America. Analysts thus remained keenly focused on inventories prior to the scheduled earnings call later that day. For example, that same day, BNP Paribas noted as a key question for management: "Inventories: Inventories still look relatively high. With which measures and how quickly can you address this?" Morgan Stanley similarly noted that "[w]e believe there is also a deterioration in North American product mix that could limit investor enthusiasm in these results, given the importance of the region and in the context of market share losses in North America."

48.     Defendants hosted a conference call at 8:00 a.m. in the morning of February 15, 2024, to discuss the Company's 2023 results and 2024 guidance. During the call, Defendant Tavares touted Stellantis's "*great results, robust results in North America*," adding that "*we have been protecting the value of what we are doing in our company, which is translated by the fact that we have the best US average transaction price of the industry*."

49.     Also on February 15, 2024, Defendants attended the Wolfe Research Global Auto and Auto Tech Conference. There, an analyst bluntly asked Defendant Knight, "There are people

16

in this room who know Stellantis and there are people who are not as familiar candidly with your company. Everyone sees the profitability that you're achieving. Many attribute that to this pricing environment, which a lot of people can conclude is aberrational. I wanted to ask you, first, maybe why do you think you've been able to achieve this profitability and what are investors underestimating when they tell you, well, this is aberrational?" In response, Defendant Knight sought to counter the narrative that current industry pricing levels were aberrational and to reassure investors about the sustainability of the Company's pricing, margins, and AOI guidance, stating:

> When you ask about this piece of, hey, what is it that people don't get about us in the US and the profitability and why is it sustainable? . . . I think *we have shown a lot of success in being able to really drive sustainable pricing differentiation vis-à-vis our peers*. And that's something – *if you look at it in the US* where we've got the highest prices in the different categories that we play, *we're really showing something where I think we've been able to bring value that the consumer also recognizes.* And when we match that up with everything on the synergies we've created, our focus on the cost discipline, it's something where we see lots of opportunity to continue to generate as we go forward.

50. Analysts continued to be assuaged by Defendants' reassurances about the sustainability of the Company's pricing, inventory levels, and profitability. For example, Kepler Cheuvreaux reported that "Stellantis posted another set of strong results for FY 2023, marked by . . . signs of management's confidence in the balance sheet and *sustained returns*." RBC specifically called out Defendant Knight's statements about inventory as supportive of sustainable inventory and pricing, writing, "Importantly, Knight noted that STLA '*does not expect further inventory increases of any materiality in 2024*.' This is of critical importance as higher inventories are usually indicators of weaker pricing to come."

      **E.**     **In Truth, Defendants Knew By The Start Of The Class Period That Stellantis's Prices Were Not "Sustainable" Or "Carefully Calibrated" As Inventory Ballooned At U.S. Dealers' Lots**

51. Defendants' statements that pricing was "*carefully calibrated*," that Stellantis had achieved "*sustainable pricing differentiation*" and had been "*protecting the value*" of its brands,

and that Stellantis had "***significantly tightened***" its inventory levels, which were "***relatively stable***," were false and misleading and omitted material facts. As corroborated by (i) multiple Former Employees interviewed in Lead Counsel's investigation; (ii) an open letter issued to Defendant Tavares by the National Dealer Council shortly before the end of the Class Period on September 10, 2024 (the "Dealer Council Letter"); and (iii) Defendants' own admissions, Stellantis priced its vehicles at unsustainably high prices, thereby reducing demand and hurting sales of "iconic American brands" such as Jeep, Dodge, Ram, and Chrysler. Stellantis also made vehicle inventory balloon to unsustainable levels by stuffing its dealers with excess inventory through the use of unusual incentives and illegal repricing actions. The combination of high pricing and stuffing the channel with overpriced inventory allowed Stellantis to report increased AOI metrics in the short term and maintain its AOI guidance which, in turn, inflated Stellantis's stock price and favorably impacted Defendant Tavares's compensation.

        **1.**     **To Meet Defendant Tavares's AOI Targets, Defendants Employ An Unsustainable Pricing Strategy And Stuff The Channel With Inventory Levels That Are Out Of Control**

52. FEs 1, 2, 3, 4, 5, 6, and 7 confirmed that Stellantis implemented an unsustainable pricing strategy and stuffed its U.S. dealerships with inventory to temporarily achieve the double-digit AOI metrics that Defendants promised investors, thereby creating a misleading impression of the Company's financial health and prospects. Unknown to investors, Stellantis's pricing strategy and inventory-stuffing tactics had created unprofitable and unhealthy conditions for Stellantis and for its dealers, whose customer demand plummeted and whose inventory ballooned to unsustainable levels.

53. Former Employee ("FE") 1 has been the Founder and President of the All Star Dodge Chrysler Jeep dealership in Bridgeton, Missouri, from 1979 through the present, and he also served as the President of the Illinois and Missouri Auto Advertising Organization for 15

years. In addition, FE 1 was a member of the St. Louis Treasury Reserve for approximately eight years. FE 1 confirmed that (i) Stellantis priced its traditional buyers out of the market through pricing that manipulated dealership owners, and (ii) Stellantis dealers, including himself, repeatedly warned Stellantis that overpriced inventory was ballooning at U.S. dealerships. FE 1 further confirmed that the pressure to keep the prices high and keep inflating inventory came from Defendant Tavares and Stellantis's executives in Europe.

54. According to FE 1, it was a fabrication and a lie that Stellantis had its inventory under control. FE 1 explained that 50% to 60% of dealers across the country were not profitable and put themselves on a finance hold so that they would not get more cars shoved down their throats by Stellantis. FE 1 confirmed that he knew this was the case for 50-60% of dealers because his son-in-law, who ran the day-to-day operations of FE 1's dealership, was part of a group of 20 or "20-Groups." As FE 1 explained, 20-Groups is a group of 20 automotive dealers from all over the country that are all the same size, and they meet four times per year to talk about issues they are facing, exchange financial statements, and work with each other to improve their situations and better understand the markets. There are hundreds of such groups throughout the country.

55. FE 1 further explained that he built a separate Jeep store because Jeep promised him incentives if he did so. According to FE 1's dealership's social media account, this Jeep store opened on or about September 15, 2023. FE 1 described how Stellantis required specific types of stores, which caused cost overruns, but the Company promised 60 additional units per month for sale, and a specific amount of money would be paid to him for every unit he sold in order to make up the overrun costs and the $3 million that he invested in this standalone store.

56. After FE 1 opened his standalone Jeep dealership, Stellantis began to send his dealership vehicles at an unbelievable rate. This was a problem for FE 1. As FE 1 explained, every

19

dealership has a floor plan limit that dictates the amount of new, used and rental vehicles they can carry. FE 1's dealership had reached its limit, but Stellantis forced $27 million in inventory on his dealership anyway. This went far beyond the restrictions in place for FE 1's floor plan and the inventory allotment that he could carry. In FE 1's opinion, Stellantis created the misimpression that everything was going to be okay, and that Stellantis was going to sell these vehicles and make a lot of money. Instead, FE 1 confirmed, Stellantis shipped large amounts of vehicles to dealers while also increasing the price.

57. FE 1 confirmed the vehicles sent to his Jeep dealership were priced too high to sell. For example, Stellantis began sending the new Jeep Wagoneer, and those cars were priced at $125,000 and $135,000. The people FE 1 knew who wanted one of these cars were priced out of buying a new one. Even though Stellantis made Wagoneers that it priced at $85,000, Stellantis only sent FE 1's dealership Wagoneers that were more expensive, and he could not sell those. FE 1's dealership became stacked with inventory that they could not sell due to the high prices imposed by Stellantis. This was not an isolated situation; this was a nationwide problem for dealers of Stellantis products.

58. Corroborating FE 1's account, Bob Broderdorf, the head of Jeep, confirmed in an interview published on or about January 15, 2025, that Stellantis intentionally delivered only the highest trim Wagoneers to dealers, stating "Wagoneer, it's [gone] too far . . . . Some of the moves that we've done, I even call it 'taking content hostage.' There are some things [we] locked away in previous strategies that made the really cool stuff you're looking for too hard to get."

59. FE 1 further confirmed that it was widely known among dealers and at Stellantis that these pricing dynamics existed, but that was not something known to the public because Stellantis put out misleading press releases.

20

60.     FE 1 reiterated that the Company recognized that dealers had too much inventory and he believed that Defendant Tavares directed the pressure to force vehicles on dealers. In sum, FE 1 confirmed that the consumer saw that vehicles were priced way out of the market, and it became an inventory nightmare.

61.     FE 2 corroborated information provided by FE 1. FE 2 worked at Stellantis from December 2015 until March 2024, starting in Regulatory Compliance, moving to Engineering, and most recently, as a Jeep Grand Cherokee Product Planning Manager from November 2022 until March 2024. In his most recent role, FE 2 was responsible for the management of the Jeep Grand Cherokee name plate, including branding, complexity, product cost, product actions (e.g., updates to the vehicle), future product plans, and product configuration (e.g., how the product gets built in various ordering and inventory systems). As Product Manager, FE 2 reported to Ron Frank, then senior manager for Grand Cherokee and Jeep Compass, and present director at Stellantis. FE 2 confirmed that while he was at the Company, Stellantis was intent on increasing prices as much as they could for margin profitability.

62.     FE 2 explained that everything at the Company used to be a single digit operating margin, but now under the leadership of CEO Tavares, everything needed to be 12-14%, and the only way to do that quickly was to drive up the price of cars and drive out the cost. FE 2 explained that he knew that the order for double-digit operating margins was coming from Defendant Tavares because these were internally communicated targets that executive leadership was demanding, and this is what Tavares is known for in the business. FE 2 also knew about the Company's price increases and pricing strategy because he worked directly with the Jeep Brand team who was responsible for setting prices and he had multiple conversations about it. For instance, FE 2 had conversations with Karen Madill, the senior manager for Jeep Grand Cherokee on the Brand team

about how they could not believe how high the prices were, but that Madill knew what she had to do to maintain a certain margin level.

63. FE 2 reiterated that the mandate to achieve double-digit operating income came from the top down, and, in particular, Defendant Tavares. FE 2 explained that Tavares's target started around the time that the Company officially turned into Stellantis. FE 2 described how Stellantis would increase prices while they cut costs and explained that both practices became more frequent and day-to-day when the Company became Stellantis. FE 2 further confirmed that the pricing being sustainable clearly was not consistent with what he was seeing internally at the time. The main points being made were that eventually pricing was reaching a point where it was unpalatable for the customer, meaning that a customer might come to the dealer, see the lease rates and purchase rates, and find it was uncompetitive, so they would just leave and get a car from a different manufacturer.

64. FE 3 corroborated information provided by FE 1 and FE 2. FE 3 worked at Stellantis from January 1994 until September 2024, most recently as Director – Collision Portfolio from August 2022 until September 2024, and Senior Manager – Demand Planning & Inventory Management from September 2019 until July 2022. FE 3 confirmed that the Company knew that they were producing vehicles at an extremely high price point and that dealers were unable to sell the vehicles in the marketplace at that price point, but Stellantis kept pushing vehicles and parts out to the marketplace to make sure that they did not miss targets over the past 2 – 2.5 years.

65. FE 3 further confirmed that there was a target set by the CEO at the time that Stellantis would have the highest gross margin in the industry and there was a fixation on this that the North American arm of the Company was not comfortable with. FE 3 explained that the North American arm has traditionally had big market share at a reasonable margin, but CEO Tavares had

fixations of a 14-16% margin on operations. According to FE 3, double digits were unheard of until COVID hit. FE 3 confirmed that when Stellantis employees in North America started to see those numbers that the CEO wanted, everybody got a little uneasy. FE 3 further described how people who were uneasy were replaced with people who would not buck the system.

66. FE 3 elaborated that dealers could sell a lot of vehicles at 7% margins, but if there was an innate decision to operate at margins in the low teens, they would not be able to sell as many. FE 3 confirmed that CEO Tavares was insisting that they had to keep low-teens margins. It was no secret internally that it was coming from the CEO, and the CEO's mandate was that they had to hit this number.

67. To facilitate hitting Defendant Tavares's double-digit margin, FE 3 explained that Stellantis employees were getting quarterly and then monthly targets. FE 3 confirmed that Stellantis took robust pricing actions simply because they had a number they had to hit.

68. FE 3 also confirmed that there was too much inventory at dealers, and he could see the inventory build over time. FE 3 explained that when dealer inventory gets high, Stellantis has already sold the vehicles and collected the money, so the inventory was now the dealer's problem. FE 3 described how the battle was that if dealers are stuck with vehicles, they cannot take more vehicles because they have no room on their lots and because they are paying lot interest on all of those vehicles sitting there.

69. FE 4 corroborated information provided by FEs 1, 2, and 3. FE 4 worked as a Sales Manager at Orlando Dodge Chrysler Jeep Ram from August 2023 until September 2024. FE 4 confirmed that, by the end of 2022, price increases were causing Stellantis's sales to decline. According to FE 4, Stellantis increased prices by approximately 15% to 20% on brands across the board, which reduced customer demands. FE 4 explained that dealers knew that Stellantis's price

23

increases were not sustainable. Notwithstanding the price increases and reduction in demand, FE 4 confirmed that Stellantis continued to flood dealerships with inventory.

70. FE 5 corroborated the information provided by FEs 1-4. FE 5 held various sales and marketing roles at Stellantis from 2005 through August 2023. Most recently, from 2022 through the end of his tenure, FE 5 was a Senior Product Marketing Manager at the national level for Jeep Grand Cherokee and, for the last two to three months of his tenure, Wagoneer and Jeep Recon. In that role, FE 5 was responsible for maintaining the profitability of the vehicle. FE 5 was involved with Supply Chain and balancing the incentives on the vehicle to maintain the desired profit margins. FE 5 reported directly to Jim Morrison, the then-Head of Jeep North America.

71. FE 5 confirmed that Stellantis's pricing strategy did not reflect industry needs and was not responsive to declining customer demand. FE 5 described how starting in February 2023, sales were declining for all of Jeep and were down considerably. FE 5 raised his concerns about the impact of elevated pricing on demand to Morrison and suggested that the Company should lower prices, but Morrison informed FE 5 that lowering prices was not an option and to just find an alternative. Morrison told FE 5 that the instruction not to lower prices came from Morrison's superiors, Christian Meunier, the CEO of Jeep, or Defendant Tavares. FE 5 explained that the entire brand team—all of Jeep, including all the senior product manager—knew they needed to cut prices, but that just was not an option.

72. FE 5 explained that Morrison was in monthly executive Commercial Committee meetings with Defendant Tavares and disseminated the information from those meetings to his direct reports, including FE 5. FE 5 recalled that the monthly Commercial Committee meetings included discussion of inventory levels, sales numbers, and demand. According to FE 5, Tavares, Morrison, Tavon Brooks, senior manager Mauricio Lopez, and Christian Meunier each attended

these meetings, along with representatives and VPs of each brand (Dodge, Jeep, Chrysler, Ram). FE 5 described how each regional VP would be defending or explaining their region's numbers, including why they were down, and the bottom three regions were in the hot seat. FE 5 confirmed that Morrison was responsible for the Jeep brand and, as such, was in the hot seat several times in 2023 as sales declined.

73. FE 5 confirmed that in 2023 Stellantis operated on the idea that there is never too much inventory. FE 5 further confirmed that multiple brands, including Jeep Grand Cherokee, were experiencing a similar trend at the same time, with sales declines throughout the year 2023. FE 5 noted that while the industry standard could be 40-60 days' supply, he saw reports that showed that days' supply for Stellantis dealers was in the triple digits several times in 2023—a sure sign of too much inventory.

74. FE 6 worked at Stellantis from June 2015 until December 31, 2023, most recently as a Senior Manager for Electrification and New Product Strategy for the Jeep Brand from March 2021 until December 2023. FE 6 confirmed that he saw inventory increasing and sitting on the dealer lots and days' supply going up. According to FE 6, the increased inventory was a result of the higher pricing, which put them out of competition. FE 6 reiterated that profits were the driving force for the price increases.

75. FE 6 described how the Company's profits ultimately declined due to market share degradation from the Company's overall pricing increases in key segments and the chasing of profits that led to a lot of bad loss in revenue. FE 6 explained that the Company started taking a lot of pricing actions in 2022, about a year after the official merger between PSA Group and FCA to become Stellantis. FE 6 confirmed that they got the mandates for these pricing actions from Europe, which was where all the finance and all the decisions were made on a global level. FE 6

described how prior to this time, the Company typically did pricing actions twice a year, but after that, they started taking pricing actions quarterly and sometimes more often than that.

76. According to FE 6, the mandate from Europe was that the brand team was given a percentage for the price increase for a particular brand, which included all models of that brand. For instance, FE 6 explained, they may get a 1.5% pricing task, meaning a 1.5% pricing increase, across their lineup, and then the brand team would figure out where they wanted to increase the pricing to get to that number. The impact of these pricing actions on Jeep was a soft share loss because brand considerations and demand all started to trend down. For instance, FE 6 described how Jeep used website visits to assess their demand and all of those metrics were trending down. FE 6 explained that the decrease in demand began not long after the pricing actions were taken. FE 6 and his team urged a cut in the prices of vehicles to remain competitive, but they were told that this was not an option.

77. When read Defendant Knight's statements in ¶40 above, FE 6 said that was the Company position, but he was not in agreement with that. FE 6 explained that his group felt that they were pricing themselves out of the market they wanted to be in. FE 6 believed that was the uniform conclusion throughout his organization. FE 6 further confirmed that he believed Tavares and others in the C-suite were aware of the pricing concerns.

78. FE 7 held positions with Stellantis from April 1999 until December 2023, including most recently as a Senior Manager Parts and Service Aftersales Channel – Powertrain at Stellantis (August 2022 – December 2023) and a Mopar Supply Chain Senior Manager (August 2018 – August 2022). As Senior Manager Parts and Service Aftersales Channel for Powertrain, FE 7 had a team of five to seven people who looked at setting up budgets for the year. FE 7 explained that his team worked with Finance cross-functionally to establish profit and margin budgets for the sale

of parts. Among other things, FE 7 looked at demand capacity and created marketing programs to promote sales for all the vehicle brands.

79. According to FE 7, it got to the point where the Company was taking pricing actions just to get to revenue targets and the dealers had to absorb those costs. FE 7 explained that the pricing actions became a problem in late 2022 and throughout the year of 2023. FE 7 said that it was challenging. There was a lot of concern that if Stellantis continued to take additional pricing actions, it would deteriorate the Company's sales performance.

80. FE 7 described how (after he transitioned to his recent role around August 2022) there was a pricing action taken in Q3 2022 (September or October), and a minimum of three pricing actions taken in 2023. FE 7 confirmed that these pricing actions were taken across the board, not just on a couple of vehicle lines. FE 7 explained that the Company has to do a pricing analysis, look at competitive parts, look at how it is performing, and based on revenue projections/targets, take an increase on pricing. Depending on the portfolio of parts they are targeting, FE 7 explained that the pricing actions could be increasing prices on parts by 10-30% over the course of the year. FE 7 reiterated that in order to meet revenue targets, for instance if Stellantis was short a certain amount of money in the budget, the Company would simply take a pricing increase to make that up. FE 7 explained that this practice is not conducive to a solid business plan.

81. FE 7 described how there was an entire finance team driving the pricing increases based on leadership direction. FE 7 reported that several people who were direct reports of Tavares were driving the pricing actions. He clarified that this would have been directed by people in Europe; the North American side of the business was saying that this is ridiculous. FE 7 elaborated

that the U.S. finance people were pushing back on the pricing actions, saying we cannot do this anymore.

82. FE 7 reiterated that the price increases were coming down from Stellantis leadership and global team members were driving those price increases within North America. FE 7 described how there was a lot of pushback from Finance and North America Operations, especially after round 2 or 3 of the pricing requests in the second half of 2023. FE 7 explained that North America Operations was pushing back because eventually you saturate the marketplace, and your demand goes completely down if you continue to price parts at unsustainably high prices. People then look for alternative options with competitors. FE 7 reiterated that many leaders and management staff within North America were very concerned with the pricing increases but, at the end of the day, they got a directive and had to follow it and figure out how to deal with it. FE 7 confirmed that he saw price increases resulting in the volume of sales declining in certain areas of the business.

### 2. Defendants' Pricing Tactics, Incentives, And The Resulting Pile Up Of Inventory Causes A "Mutiny" Among Dealers

83. Multiple FEs, including FEs 1, 3, 4, 5, and 7, described how Defendants' pricing tactics, incentives, and the resulting pile up of inventory caused a mutiny among U.S. dealers who reported those concerns to Stellantis executive leadership. According to FE 3, dealers brought up significant concerns by early 2023 about price points and having too much inventory. FE 3 described how dealers need a full range of prices and vehicles to ensure that they are meeting the needs of the marketplace, and with Stellantis's shift to selling fewer cars at higher price points, even Stellantis's entry level models were priced above the midlevel models at other manufacturers.

84. FE 3 confirmed that dealers with excess inventory told Stellantis that they needed the Company to help them sell the vehicles and then they would buy more, but Stellantis told

dealers that was their problem. FE 3 knew from being in meetings and working with dealers and the National Dealer Council that the topic of the price point going up on vehicles was constantly discussed and an issue of concern for dealers.

85. FE 3 further confirmed that he was on calls with Kevin Farrish, the Chairman of the National Dealer Council, and other Dealer Council members, and they were adamant that the issue of unsustainably high prices and ballooning inventory was a significant issue that had to be addressed. FE 3 explained that the conversations at the National Dealers Council (the "NDC") meetings became heated over time, building in 2023. By the end of 2023, according to FE 3, relations were very heated, and in 2024, the wheels came off.

86. FE 1 confirmed that dealers regularly reported to Stellantis through a variety of channels, including inventory reports and in-person meetings with district managers, where they expressed concerns about unsustainable prices and ballooning inventory, and Stellantis did not react appropriately. FE 1 described how Stellantis's high-pricing tactics and the resulting pile up in inventory caused a mutiny among the dealers of Stellantis vehicles.

87. According to FE 1, 20-Groups and other dealers had reported concerns about high pricing and ballooning inventory regularly in the latter half of 2023 and in 2024. FE 1 explained these concerns would have been reflected in monthly reports that the manufacturers received from dealers, which reflected sales by each dealership. FE 1 further confirmed that each dealer got a copy of this report through Company emails, and this is how Stellantis kept track of what it sold. FE 1 reiterated that every month there is a sales report showing what the dealerships sold, and district managers would use these reports to then go to stores and encourage dealers to buy more cars from Stellantis.

88. FE 7 confirmed that the dealers were frustrated by the Company's price increases. FE 7 described how the NDC would consist of the top 20-25 dealers that represent the entire dealer body. FE 7 explained that a couple of times per year, his group would make presentations to the NDC regarding strategies of improving capacity on certain parts, and that FE 7 would occasionally participate in calls with the NDC. It was a select grouping of dealers from different geographic regions across the country that would provide a representation of what was going on in the different business centers. FE 7 described how twice per year – typically in March or June and then again in September – the NDC would create an Excel document and highlight the challenges and concerns the dealers had. According to FE 7, Stellantis would then use that list to develop what it was working on internally to address dealer complaints, including creating Q1 actions for the rest of the year, and then as it headed into Q4, addressing how the Company had performed for the year and what the Company was working on for the future. FE 7 described how typically, there would be a list of the top 3-4 complaints that came from the NDC that the CEO of North America was already well-informed of. Most of the time, FE 7 explained, one or two of the top issues would be known at CEO Tavares's level as well.

89. FE 4 also explained that he participated in monthly sales calls with Stellantis's Southeastern regional business center. FE 4 recalled that dealers of Stellantis cars and representatives of Stellantis, including Stellantis brand managers, participated in the calls. According to FE 4, the purpose of the calls was to review the prior month's sales and discuss incentives for the next 30-60 days. FE 4 described how, during these monthly sales calls, beginning in late 2023, dealers started voicing strong frustrations about Stellantis's pricing strategy. According to FE 4, the dealers were screaming and talking about how the Company needed to make changes to its pricing strategy. FE 4 explained how even the Stellantis brand managers on

the calls said that they understood that the pricing was out of whack, but this is what they were going to do anyway. *In response, FE 4 explained Stellantis stopped allowing dealers to ask questions or make comments on the calls*. FE 4 further confirmed that dealers told their Stellantis representatives when they would come into the stores, including his store, that the price increases Stellantis implemented were not sustainable.

90. FE 5 also confirmed that he would repeatedly hear that dealers were pushing back, saying that they have too much inventory and do not want any more, from weekly meetings with the various regions across the country. Usually, FE 5 met with the VPs of the regions, the senior marketing manager of the region, or the level below, which was the Jeep brand manager of that region. FE 5 confirmed that those complaints increased in frequency as 2023 progressed; dealers became more vocal.

### 3. Defendants Hide The Truth About Inventory And Force Dealers To Accept Even More Inventory Through Unusual And Illegal Incentives

91. FEs 1, 3, 4, 8, 9, and 10 confirmed that instead of appropriately adjusting pricing, Defendants obfuscated the truth about the extent of the inventory accumulation and forced dealers – over their objections – to accept even more inventory through unusual incentives. Defendants' incentive tactics included (i) a CTP incentive which paid dealers to hide inventory in a "Courtesy Transportation Program"; (ii) a coupon incentive designed to punish dealers who would not take on additional inventory; (iii) an illegal sticker-repricing tactic; and (iv) ultimately paying dealers to take on even more inventory that they could not sell. These tactics, in turn, allowed Stellantis to continue to report double-digit AOI to investors and paint a misleading picture of its financial health and prospects.

**a.  Stellantis Uses The CTP Play To Hide Excess Inventory And Misleadingly Record It As Sales**

92.   FE 8 worked in various roles as part of the Sales team at Stellantis from 2016 to December 2023. From 2019 to February 2022, FE 8 served as a Metro Area Sales Manager at Chrysler, Dodge, Jeep, Ram, and Fiat. In February 2022, FE 8 became a Sales Manager for the Ram team, covering all of Central and South Texas. He held this role until September 2023, when he again became a Metro Area Sales Manager for Chrysler, Dodge, Jeep, Ram, and Fiat until he left the Company in December 2023. FE 8 confirmed that the issue of too much inventory became a problem starting in 2023. FE 8 described an incentive that Stellantis employed to hide the truth about its excess inventory called the old school CTP play.

93.   In 2023, FE 8 explained, Stellantis had no real incentives or rebates to advertise and sell the cars. After a couple months of the vehicles sitting there and people asking what they should do now, instead of offering a discount that the customers would see and that would help advertise and draw customers' attention, in approximately September to November 2023, Stellantis offered this CPT incentive to dealers.

94.   Specifically, FE 8 explained, Stellantis told the dealers that if they put cars into the Courtesy Transportation Program or "CTP," Stellantis would give the dealers an extra $2,000 cash for the car. Stellantis offered cash to the dealers to put the vehicles in the CTP, which allowed the dealers to mark the cars down. FE 8 described how the car would be recorded as a sale, and the result was that it would be off the dealer's inventory from Stellantis's perspective. FE 8 further explained that Stellantis chose to offer this back-end money that customers would never see or know about. FE 8 confirmed that this would also create the appearance of lower dealer inventories, even though the CTP cars would still be sitting on dealer lots.

95.     FE 8 reiterated that the issue of days' supply and having too much inventory became concerning in 2023. FE 8 further confirmed that the dealers were full, but the manufacturer only makes money when they build and ship cars. As a result, according to FE 8, Stellantis continued to send cars to the dealers even though dealers had to find extra lots to take cars because they were so full.

96.     FE 9 corroborated FE 8's account. FE 9 worked at dealerships that sold the Maserati, Alfa Romeo, and Fiat brands, including as the General Manager at Van Nuys Maserati Alfa Romeo from November 2023 to September 2024. He sold Maserati for 12+ years at various locations in the country, sold Alfa Romeo for around 7.5 years at various places, and sold Fiat for approximately 5 years. With respect to the CTP program, FE 9 explained that with Alfa Romeo, if the dealer put the cars into their CTP program, Stellantis said they would qualify for a $3,000 CTP incentive. The Alfa Romeo had to remain in the program for a minimum of 30 days and have 500 miles on it. If the dealer pulled it out before it reached that, the manufacturer would charge them back for that incentive.

97.     FE 9 explained that in the past a CTP car had to be in service for six months, and the dealer actually had to use it, but the criteria changed in the last approximately 2.5 to 3 years. A lot of dealers were using the CTP program and putting in approximately 20 cars into CTP, rather than the normal 3 cars, and qualifying for the $3,000. Those cars would be moved from available inventory into the courtesy transport vehicle inventory. According to FE 9, this program was a way to kick the can down the road. FE 9 explained that this was another way to move cars out of inventory so that the dealer would order more cars.

98.     FE 9 reiterated that the cars in the CTP play were not sold off the lot; they were still at the dealership, but they were moved into a different category. FE 9 confirmed that this benefits

Stellantis because it makes it look like the dealer inventory is going down and it makes it look like they will be able to sell more cars to the dealers.

99. FE 4 similarly confirmed how Stellantis began to incentivize dealers just to take inventory, which started in November 2023, and ramped up in 2024. For instance, FE 4 explained that Stellantis would give a dealer an extra $1,000 if they took a certain amount of cars and told the dealerships that once they got the cars, they could simply dump them in their rental fleet. FE 4's dealership agreed to do this because they had to (to get incentives and sell the cars), and as a result, they have over 500 cars on the ground, which is more than double the appropriate amount.

**b.   Stellantis Offers A Coupon Incentive Designed To Punish Dealers Who Would Not Take On Additional Inventory**

100. FE 8 described additional incentives that effectively punished dealers who did not take on additional inventory. FE 8 explained how dealers started pushing back and not ordering cars because they were not able to take their full allocations. In response, FE 8 described how Stellantis offered coupons for taking inventory. FE 8 learned from dealers after he left Stellantis in December 2023 that if they ordered cars or ordered their allocation, they received coupons. FE 8 confirmed that the coupons were each for about $250 for Dodge and $500 for Ram.

101. FE 8 further explained that if the dealer took the allocations, they would get the coupons and had the option of stacking a certain amount of coupons per deal. For instance, if a customer was buying a Ram that cost $50,000 and the dealer had stacked 4 coupons of $500 each, the dealer could apply $2,000 off of the price of the car. The coupons only lasted a month, so the dealer had to use them or lose them.

102. FE 8 reiterated that this program acted like a punishment for dealers who could not take more cars because, for instance, their bank would not allow them to.

### c. Stellantis Illegally Puts New Stickers On Its Cars, Instead Of Offering Customer Facing Rebates

103. FE 1 described another unusual – and even illegal – pricing tactic Stellantis engaged in after it priced itself out of the market, and in the face of dealer complaints which Stellantis had received since it first began increasing prices. According to FE 1, instead of putting a big rebate on vehicles for the general public, the Company reacted by manufacturing new window stickers for the vehicles, and made the dealers put these new stickers on the vehicles showing a reduction in the Manufacturer's Suggested Retail Price or "MSRP." The problem with this approach was that the dealerships, including FE 1's dealership, lost all the customers that had come onto the lots and had seen the old stickers with the shocking prices. In addition, seeing the new stickers on the same cars would make the customers question the honesty of a dealership.

104. Further, FE 1 questioned whether this was even legal per the rules of Monroney stickers. The Monroney rules provide in relevant part that "[a]ny person who willfully removes, alters, or renders illegible any label affixed to a new automobile . . . prior to the time that such automobile is delivered to the actual custody and possession of the ultimate purchaser . . . shall be fined not more than $1,000, or imprisoned not more than one year, or both." 15 U.S.C. §§ 1231-1233. FE 1 explained that you may occasionally see a manufacturer change a sticker on a vehicle if there is a misprint in something like the axel ratio. However, FE 1 confirmed that in his 45 years in the business, he had never seen a window sticker change in price until Stellantis implemented this measure.

105. FE 1 further explained that Stellantis could have just easily put a rebate of $4,000 or put the APR at 0% for 72 months on these vehicles, and reduced inventory dramatically. Stellantis chose not to do this, and the result was that dealerships, including FE 1's dealership, were stuck with ballooning inventory. In response to this problem created by Stellantis, FE 1's

dealership's financier, Allied Financial, put a finance hold on the dealership when it reached $27 million and did not allow FE 1's dealership to receive any more vehicles. This put FE 1's dealership in a situation where he was loaded with inventory that he could not sell and did not want, and he also could not order what he needed for his actual customer base.

106. FE 1 reiterated that Stellantis overpriced vehicles and forced the inventory to dealers who could not sell the vehicles, and that this caused Stellantis to lose profits. FE 1 explained that this was a nationwide problem that Stellantis created.

107. FE 4 confirmed that in the spring of 2024, Stellantis lowered the MSRP of some of their cars instead of offering rebates. As a result, FE 4 explained that some customers who had bought the same car the month before got angry when they saw that it was now $3,000 to 4,000 cheaper. FE 4 confirmed that Stellantis sent out new Monroney stickers, and that if cars were on their lot, dealers had to replace the stickers on the cars. In his 24 years of experience at dealerships, FE 4 had never seen a manufacturer send a new sticker just to change the price of a car on the lot.

108. FE 10 corroborated information provided by FE 1 and FE 4. FE 10 is and was during the Class Period the General Manager of a CDJR ("Chrysler Dodge Jeep Ram") dealership in Florida. FE 10 also confirmed that Stellantis belatedly lowered the price or MSRP of cars, instead of offering incentives or rebates to customers. According to FE 10, this was an awful decision. FE 10 explained that customers have been conditioned over the last 30 to 40 years with large incentives and discounts. Therefore, according to FE 10, when a dealer had to tell a customer that a vehicle was already discounted from a manufacturer and try to tell them that last year the sticker price was $5,000 higher, the dealer would lose credibility with the customer because the customer would not believe the dealer, and the customer would not want to pay the sticker price

36

because in the customer's mind, they did not view the car as a deal even though it was cheaper. When FE 10 spoke with other dealers, they complained to each other about this decision.

109. FE 3 also confirmed that Stellantis changed Monroney stickers on cars as part of their pricing efforts at one point, and it is not something that is traditionally done.

> **d.** **In Spring 2024, Stellantis Pays Dealers To Take On Even More Overpriced Inventory That They Cannot Sell, And Meets With Dealers Regarding Dealers' Concerns**

110. The issues with inventory became so bad that Stellantis was forced to *pay* dealers to accept cars. FE 1 confirmed that there was an incentive program launched in March or April 2024 where Stellantis paid dealers when they took on additional inventory from Stellantis. FE 1 explained that Stellantis was in crisis mode and if a dealer bought a certain number of cars, the Company would give the dealer a certain amount of money up front.

111. *The Wall Street Journal* similarly reported on the spring 2024 incentive program, in a May 24, 2024, article titled, "Jeep and Ram Dealers Gripe to Stellantis as Cars Sit on Lots: Automaker cuts prices and launches unusual incentive program following meeting with retailers," writing:

> In early May [2024], Stellantis unveiled the new sales program for dealers, which provides cash awards for hitting aggressive monthly targets. Under such programs, dealers typically are paid bonuses for hitting a monthly sales target. This one came with an unusual twist: ***Stellantis has structured the program so that the bonuses are tied to the number of cars shipped to their store***, according to company documents reviewed by The Wall Street Journal. ***The intent, dealers have said, is to funnel them money that could be used to sweeten deals and move more cars, while at the same time enticing them to continue taking more***.

112. As reported by *The Wall Street Journal*, in the spring of 2024, Stellantis invited dealers to discuss sales with executives. However, the dealers expressed serious concerns to Stellantis about the company's inventory and pricing strategy. According to the *Journal*:

> Many attendees were frustrated with unsold cars and trucks piling up on their lots, people familiar with the meeting said. Inventory levels had increased to a three-

month supply of vehicles, well above the industry average.

Dealers told executives that the company's resistance to lower prices was to blame, the people said. Prices remained high at Jeep and [R]am, Stellantis's two top-selling U.S. brands, as rivals were offering deeper discounts and as higher interest rates were inflating customers' monthly payments.

113. Commenting on the progress of the unique incentive programs, an unidentified spokesperson for Stellantis quoted in the article stated, "We are seeing solid improvement over last month with these programs," reassuring the market and echoing Defendant Knight's misleading statements from April 30, 2024 that inventories were "*in the healthy range*."

114. FE 1 described the spring 2024 meeting reported in *The Wall Street Journal* as a reactionary crisis mode meeting after the horse was already out of the gate because the dealers had already reported their concerns to Stellantis, as discussed in Section IV.E.2 above.

115. FE 9 confirmed that Stellantis changed the incentive structure and how it was giving rebates in the spring of 2024. The new incentive structure was based on ordering cars, not necessarily what the dealer sells. He explained that most manufacturers do incentives based on the volume that you sell. Stellantis changed this because dealers were not building as many cars because they had more than enough in inventory. FE 9 clarified that by 'building' cars, he meant the dealers ordering which brands, models, etc. they want so that Stellantis builds them. The new incentive was based on the building or ordering of cars; the manufacturer gets paid when it wholesales cars to dealers. The only benefit to the manufacturer for the car being retailed is that then the dealers would order more cars.

116. FE 9 further confirmed that this change in the incentive structure was for all CDJR dealers in the U.S. According to FE 9, the Company said that dealers were now going to get incentives based on what orders they order, not when they sold the car retail as they did in the past. He confirmed that dealers had more than enough inventory, so Stellantis incentivized them to take

more cars in order to get the wholesale sales. FE 9 confirmed that some dealers had a 2 to 4-year supply, but supply differed a lot by dealer. There are a lot of dealers that had more than enough inventory based on the current rate of sale. There are a lot of dealers that had more than enough inventory based on the current rate of sales. The dealers needed consumer incentives and rebates that Stellantis was not putting on the cars. At the same time, Stellantis was showing that it was still wholesale selling to dealers, so the stock ramped up to an almost all-time high.

117. FE 9 reiterated that Stellantis changed the rebates so that dealers got incentives based on them ordering what was allocated to them so that Stellantis could make money by selling cars to dealers. He further confirmed that the dealers did so, and then when those cars came in, the rebates still were not where they used to be, so dealers were stuck, and inventory levels increased again. With the new incentive structure, if the dealer built 100% of their allocation, which is what Stellantis thought they should be ordering, they hit a certain bonus level. If a dealer did not build enough because they already had enough on the ground, then they would not get incentive money, so they could not sell as many vehicles. The dealer had to decide whether to sit on the inventory or buy more to try to get out of it.

118. FE 9 agreed that Stellantis was channel stuffing because they knew dealers did not need cars and were trying to sell to them anyway. He confirmed that Stellantis created incentives to get dealers to order cars they did not need because that was the way dealers could qualify for incentive and rebate programs to get rid of the cars they already had without taking a substantial loss. FE 9 further confirmed that this incentive was rare, and no one had ever seen it before.

119. FE 10 confirmed that Stellantis's receipt of complaints from the dealers regarding the high prices and ballooning inventory prompted Stellantis to offer incentives in 2024. FE 10 explained that the objective of those incentives was to get the dealers to take on volume. FE 10

confirmed that the pricing and lack of incentives had made Stellantis dealers non-competitive. According to FE 10, Stellantis was worried because Stellantis was building vehicles and dealers were not ordering, so Stellantis had to get rid of the surplus. FE 10 explained that this was a volume-based incentive that was based on a percentage of MSRP (i.e., manufacturer's suggested retail price) of the vehicles the dealer ordered. Thus, FE 10 confirmed, the more expensive the vehicles a dealer ordered, the more incentive the dealer received.

120. FE 10 confirmed that the incentive that Stellantis was offering to dealers for ordering a certain volume of vehicles was unique. Typically, a manufacturer would not incentivize dealers simply to order vehicles.

**F.** **Defendants Disclose Declining Sales For The First Quarter Of 2024, But Continue To Falsely Assure Investors That Inventory Is At "Healthy" Levels**

121. On April 30, 2024, Stellantis held its Q1 2024 earnings call, where the truth surrounding Stellantis's inventory and pricing was partially revealed. During the call, Defendants disclosed that unit sales in North America had declined 10% quarter-over-quarter and projected that AOI margin would drop to a range of between 10% and 11% in 2024. However, Defendants continued to reassure investors that inventory was normalized, and that demand would continue to be strong despite Stellantis's high pricing. For example, Knight claimed that inventories were "***in the healthy range***" and Stellantis would "continue[] to make progress on inventories."

122. Analysts reacted negatively to Defendants' disclosure of reduced revenues and lowered margin. For example, Morgan Stanley stated on April 30 that the revenues were "below consensus" and could lead to a "negative market reaction." Similarly, on May 3, Barclays noted, "STLA missed consensus by -4% on 30 April. High US inventory, a 10% cut to H1'24 EBIT cons, EU market weakness, concern about US price normalisation and weak April US retail/inventory data on 1 May contributed to a 14% two-day drop."

123. As a result of these disclosures, the price of Stellantis's stock dropped approximately 10.5% on April 30, from $24.92 to $22.30 on heavy trading volume.

124. However, analysts were nonetheless assuaged by Defendants' reassurances of strong pricing discipline and inventory management. Jeffries pointed to an "[e]ncouraging -5% q/q inventory drop," while BoA noted that "inventory reductions create headroom for higher shipments."

**G.      Defendants Disclose In June 2024 That Inventory Is Rising And Admit That They Were "Arrogant," But Downplay The Rise In Inventory As Not Indicative Of Any Pattern**

125. On June 13, 2024, Stellantis held an investor day where the truth surrounding Stellantis's inventory and pricing was partially revealed. Stellantis reported rising inventory and declining revenue. Specifically, Stellantis reported that inventory relative to demand was ballooning in the U.S., noting in a presentation that "US DAYS SUPPLY TOO HIGH," up 33 days year-over-year.

126. During the related conference call that day, Defendant Tavares admitted that an inventory problem had been apparent to Stellantis for some time, noting that "*things were visible in fall 2023. . . . Then what happened next is that the market conditions deteriorated by the end of 2023, and we ended up 2023 with too much inventory. And you were the first ones to spot that, and you were right. . . . I am responsible and we were arrogant. No excuse*."

127. While analysts had previously noted the Company's rising inventory levels, they had been repeatedly reassured by Defendants that Stellantis's pricing was "carefully calibrated" and "sustainable," that Stellantis had "significantly tightened" its inventory levels, and that the Company's U.S. profitability was "healthy," when Defendants knew or were reckless in not knowing that those statements were false and/or misleading because, among other reasons, Defendants had stuffed the channel with inventory that dealers were unable to sell, as summarized

in Section VIII below. As a result, analysts reacted with surprise and alarm to the June 13, 2024, disclosures. Barclays noted on June 14 that the recent lack of sales in North America added "to the long-standing market concerns about very high US inventory," and HSBC stated that "High (US) inventories and market share losses have raised questions" about the sustainability of the Company's much touted profit margins. Similarly, Intensa Sanpaolo noted the same day that "the event provided investors with little relief on the short-medium term challenges, especially as for group's margins' evolution in North America amid the need to reduce inventories. . . . [W]e take the opportunity to slightly trim our FY24E estimates and to overhaul our FY25E projections."

128. In response to these revelations, Stellantis's stock price dropped 3.0% on June 13 and another 4.1% on June 14, to close at $20.21 on that day.

129. Despite these admissions, Defendants Knight and Tavares falsely assured investors that these conditions were a temporary aberration. Knight claimed that "we do feel there is important progress that we're making in terms of not only *the levels but the quality of inventory* that will help our revenues as we go forward." And Tavares *again* promised that the AOI margin would remain in the double digits, thus minimizing concern about any incentives needed to reduce inventory, stating that "I would like, today, to confirm that our commitment to deliver a double-digit AOI margin is intact."

**H. Defendants Disclose Market Share And Inventory Issues, But *Again* Reaffirm Double Digit AOI Guidance**

130. On July 25, 2024, Stellantis held its Q2 2024 Earnings Call and issued an associated press release which partially revealed more of the truth to investors. In the press release, Stellantis acknowledged that the first half of 2024 had been an unmitigated disaster, in stark contrast to Defendants' earlier representations. The press release reported adjusted operating income of just €8.5 billion, down €5.7 billion compared to H1 2023, "primarily due to decreases in North

America" as well as AOI margin of 10%, just **_barely_** meeting the Company's double digit commitment. The related fact sheet also disclosed that AOI margins in North America had decreased from 15.4% in 2023 to just 11.4% in the first half of 2024.

131. Stellantis attributed the poor financial performance to "lower volumes and mix, with the challenging volume comparison due to a combination of inventory reduction initiatives, temporary product production gaps due to a generational portfolio transition, and lower market share particularly in North America." During the related earnings call, Defendant Tavares recognized that "[o]ne of the things that we need to say here is that the major topic to be addressed is, of course, the inventory. This is what you have been highlighting, and rightly so. By the end of June, we are at 94 days of supply, quite similar to our closest US competitor, same ballpark of inventory, but still too high."

132. Defendant Tavares also acknowledged that Stellantis had "lost AOI margin as a consequence of the hurdles that we are faced [*sic*]. Our [North American] margins are down to 11.4%. We see that our share is also down to 8.2%." Tavares specifically attributed the problem, in part, to the fact that an "abnormal amount of prospects" were "opting out" of the purchase experience after seeing the high "sticker price" and lack of consumer-facing incentives.

133. As a result of this disclosure, the price of Stellantis stock declined by $2.61 per share, or more than 13%, from $19.60 per share on July 24, 2024, to close at $16.99 per share on July 29, 2024.

134. Analysts such as Deutsche Bank and Wells Fargo viewed these disclosures as catastrophic, telling investors on July 29, 2024, that "this is only the beginning as most of the key issues are just starting to appear: inventory, pricing, lack of model age versus peers . . . . That said, we do not believe that the company will be able to tackle all these issues in a tougher environment

and see guidance at risk." "The stock is already trading down ~7% (vs. FTSE Italy -0.5%) on the miss. Results were worse than consensus in all regions except SA. H2 still looks challenging with inventory still high in the US." Deutsche Bank also specifically called out the potential for Defendants' failed pricing strategy to further impact results, stating, "What also does not help here is that our analysis suggests STLA might have overdone on the pricing side more than others. Looking at the ASP pre covid and semi crisis in 2019, in the US Stellantis had an ASP which was on average 3% below its US peers (STLA: USD33k, GM: USD33.1k, Ford: USD35.3k). This shifted to +8% pointing towards a more aggressive pricing policy than the other US brands in 2023 (STLA: USD49.1k, GM: USD45k, Ford: USD46k)."

135. Banca Arcos similarly reported on July 26, 2024, "We cut our estimates to factor in a bleaker scenario. STLAM released much-weaker-than-expected H1 2024 results yesterday. It seems that the price environment started to deteriorate after several years of very strong growth; inventory levels in North America did not improve and STLAM will have to deal with this issue in the coming months in a slowing market scenario. We have cut our [sic] EPS estimates for 2024-2026 by an average ~21.2% to reflect lower shipments across all the geographies and weaker prices especially in North America and Europe." Kepler Cheuvreux candidly stated, "As bad as it gets? . . . . H1 group AOI came out 5% below expectations, reported EBIT falling 51% YOY while FCF crashed EUR9bn YOY to -EUR400m. 'Humbling and disappointing results in a phase of transition' to quote CEO Carlos Tavares."

136. Defendants nevertheless refused to admit what was inevitable at this point—Stellantis's AOI margin was going to dip well below the promised 10% floor as Stellantis continued to clear independent dealer inventories. To the contrary, on the conference call, Defendant Knight claimed that AOI margin was tracking "*right in line with our full year*

*guidance*" and stated that Stellantis would "like to ***confirm our double-digits AOI margin***." Defendant Tavares similarly downplayed the current situation as a "***bump on the road that we are now fixing***" and stated that he was "personally involved with our North American teams to fix it."

137. Defendant Tavares elaborated, "What I can tell you at this stage is that it is quite obvious from my own personal studies with the dealers and with our teams in the US that the way we have been managing the purchase funnel is suboptimal and a certain number of flaws have been identified in the way we are managing the purchase funnel of our US sales. That is clear. This is what we are now addressing in terms of countermeasure." Defendant Tavares also reassured investors that he would handle the problem personally, stating, "I will go to the US in the next couple of weeks to spend time with my US teams so that together we find the most appropriate reaction to the inventory problem . . . . And this is going to be the number one priority moving forward."

138. Analysts were somewhat reassured that Stellantis, and Defendant Tavares himself, could tackle Stellantis's U.S. inventory problems while nevertheless maintaining the Company's double-digit margins. For example, Intensa Sanpaolo stated that they were "encouraged by Stellantis's reiterated commitment to maintain a double-digit adjusted operating income margin and positive industrial FCF in 2024." Additionally, BNP Paribas continued to profess faith in Tavares, stating that "CEO Tavares remains a master of operational excellence."

**I.      The September 10, 2024 Dealer Council Letter Describes How For The Prior Two Years, Dealers Had "Sounded The Alarm" To Stellantis**

139. The Dealer Council Letter, dated September 10, 2024, was sent to Defendant Tavares and signed by Kevin Farrish (Chairman National Dealer Council), Mike Bettenhausen (Vice Chairman National Dealer Council), Sean Hogan (Secretary National Dealer Council), and Nyle Maxwell (Past Chairman National Dealer Council). The Dealer Council Letter confirmed

that, as discussed by FEs 1, 3, 4, 5, and 7 in Section IV above, *for the prior two years*, the U.S. Stellantis National Dealer Council had been "sounding this alarm" and "warning" senior executives at Stellantis that the Company had priced its "iconic American brands" too high and allowed inventory to pile up at U.S. dealer's lots in order to earn record amounts in executive compensation. As the letter stated:

> For over two years now, the US Stellantis National Dealer Council has been sounding this alarm to your US executive team, warning them that the course you had set for Stellantis in the US was going to be a disaster in the long run. A disaster not just for us, but for everyone involved — and now that disaster has arrived.

140. The Dealer Council Letter further explained that Defendant Tavares had "engineered a record year of profitability for Stellantis" in 2023 that had earned him "record" compensation, but gutted Stellantis's ability to deliver sustainable profits:

> In 2023, you engineered a record year of profitability for Stellantis, earning you the title of the highest-compensated automotive CEO. You personally earned a record amount of almost forty million dollars that year. Unfortunately, the engineering and structuring of that year have led us to exactly where we told your executives we would be today.

141. In addition, the Dealer Council Letter detailed how Defendants' decision to secure record profits in 2023 was at a minimum "reckless" and had severe consequences that were entirely predictable, including Stellantis's U.S. Dealers' inability to sell the Company's most historically successful brands. The letter stated:

> *The reckless short-term decision-making to secure record profits in 2023 has had devastating, yet entirely predictable, consequences in the US market*. Those consequences include the rapid degradation of our iconic American brands – brands like Jeep, Dodge, Ram, and Chrysler that have over a century of history in America. The market share of your brands has been slashed nearly in half, Stellantis stock price is tumbling, plants are closing, layoffs are rampant, and key executives fleeing the company. Investor lawsuits, supplier lawsuits, strikes – the fallout is mounting. Your own distribution network, your dealer body, has been left in an anemic and diminished state . . . *your employees did not create this problem – you created this problem*.

142. Finally, the Dealer Council Letter demanded that Stellantis take action and "do the right thing." The letter concluded:

> It is time to turn production back on and start selling our way back to a respectable market share. Get your employees, our employees, and your suppliers' employees, back to work by building and selling cars that Americans want to buy and can afford. Let us clear out this old inventory now and get the plants working at full capacity. Yes, in the very short term, it will be painful for Stellantis, but mistakes at this level usually are.
>
> We do not want your apology or your resignation – those do not put people back to work. *We simply ask that you do the right thing: write the check, pay your bill, and let's move forward.*

143. Defendants continued to downplay the Company's problems and deny wrongdoing in response to the Dealer Council Letter. For instance, on September 11, 2024, *Reuters* reported in an article titled "Stellantis defends itself after US dealers flag concerns," that the Company had said that "its August sales were up 21% from July and its dealer inventory was reduced for two consecutive months by approximately 10%." *Reuters* further reported that Stellantis had issued a statement saying that it "doesn't believe that 'public attacks, such as the one in the open letter from the NDC president against our CEO, are the most effective way to solve problems.'"

**J.      Defendant Knight Reiterates "North Star" Of 10% AOI Margin And Then, Days Later, Slashes AOI Guidance**

144. On September 23, 2024, Defendant Knight spoke at the Bank of America European Autos and Future Car Conference. Instead of "doing the right thing" as urged by the Dealer Council Letter, Defendant Knight touted that she was "pleased with the progress" on U.S. inventories and that the Company was "off to a solid start" in reducing US inventories. Referring to Defendants' recent reaffirmation of AOI guidance on July 25, 2024, Defendant Knight also touted that the "*North Star*" for the business was "*to deliver this 10% AOI ambition*."

145. Then, on September 30, 2024, Stellantis updated its financial guidance to reflect what it had privately known for at least a year: it was not only no longer able to keep pricing high

and inventory low enough to keep AOI margin in the double digits, but it would report a catastrophic drop of AOI margin down to as low as 5.5%. Specifically, Stellantis disclosed that AOI margin would fall to between 5.5% and 7%, largely driven by corrective actions in North America, as well as a change in projected industrial free cash flow to between -€5 billion to -€10 billion, from prior "Positive." The revision "reflect[ed] decisions to significantly enlarge remediation actions on North American performance issues" and marked a return to historical margin levels not inflated by Defendants' temporary manipulations.

146. The chart below published by *Reuters* after the end of the Class Period shows the operating income margin of Stellantis between 2015 and 2024. As reflected directly below, Stellantis's 2024 AOI margin forecast issued on September 30, 2024, returned the Company to its mid-single digit historical range:



### Stellantis has cut its profit outlook for 2024
European carmaker Stellantis expects its operating income margin to be between 5.5% and 7% for FY2024.

147. As a result of Defendants' September 30, 2024 disclosures, Stellantis's stock price dropped another 12.5%, losing $2.01 per share.

148. Analysts were shocked at the sheer magnitude of the decline, as AOI margins had not merely slipped below double-digits but had fallen precipitously. For instance, Kepler Cheuvreux reported on October 1, 2024, "The magnitude of the implied earnings and FCF cuts shocked investors and analysts." Kepler further lamented that this disclosure signified the end of Stellantis's Dare Forward 2030 plan stating, "Like us, the market is likely to assume double-digit margins (and SBB) are history." Similarly, BoA Securities stated that they were "taken aback by the extent of the cut," and accordingly lowered AOI expectations by at least 25% over the next three years.

149. Barclays noted how the AOI margin drop was in stark contrast to Stellantis's earlier representations, stating that "Natalie Knight had not abandoned the 'double digit' EBIT margin guidance for H2-24 as recently as [September 23]," and candidly reported that it was "stunned by [the] magnitude of the cut in the shortness of time." Prior concerns about inventory and pricing had "very much materialized . . . – and in fact in even greater degree than feared – culminating in [Stellantis's] profit warning." Barclays directly attributed Stellantis's fall to its failure to adjust its strategy, concluding that "in addition to what the CEO called out as 'arrogant' mistake that has caused the issue, STLA's hesitation to take decisive countermeasures has now also caught up with it – with extreme implications on near-term EBIT and FCF – and a correspondingly much lower base to work back from beyond 2024."

## V. POST-CLASS PERIOD EVENTS CONFIRM THE FRAUD

### A. Defendant Knight Is Fired And Defendant Tavares Is "Retired"

150. On October 10, 2024, less than two weeks after announcing a catastrophic revision to 2024 guidance, Stellantis announced in a press release that it had appointed Doug Ostermann

as CFO, replacing Defendant Knight after just 18 months on the job, with immediate effect. Stellantis also disclosed that Defendant Tavares would be departing in early 2026 "when he retires at the conclusion of his CEO term." Analysts immediately linked the firing of Defendant Knight and the supposed retirement of Defendant Tavares to the guidance revision, reporting that "Large management shake-up logically follows major warning."

**B.** **Dealerships Continue To Lament Defendants' Failed Pricing Strategy And Elevated Inventory Levels**

151. Echoing the Dealer Council Letter, other dealers interviewed by the *Detroit News* in October 2024 confirmed the Company's failed pricing strategy and the unconventional channel stuffing incentives that were concealed from investors. For example, the *Detroit News* reported that Stellantis had not responded adequately to changing market conditions:

> Several dealers said Stellantis leadership has moved far too sluggishly to correct the company's market share losses even while testing out several sales strategies to limited effect. Kevin Farrish, who owns a Stellantis dealership in Virginia and leads the nationwide dealer council, said much of the company's focus until recently was incentivizing dealers to order more cars from the factory by giving them bonuses or providing them coupons that could then be used to discount other cars as they saw fit.

152. Similarly, other dealers interviewed by the *Detroit News* noted that Stellantis had failed to price their vehicles in a competitive fashion.

> All the dealers who spoke with The Detroit News in recent days said Stellantis pushed its prices too high during the pandemic, when consumers were more flush with savings and interest rates were low. The Ram 1500 pickup used to be a value play compared to Ford and Chevrolet, noted Kunes, but no longer. Popular Jeeps like the Grand Cherokee have seen their MSRPs steadily rise as well: Adam Lee, chairman of Lee Auto Malls in Maine, said he remembers when a Wrangler could be had for about $20,000, but now they often run $50,000 to $70,000.

**C.** **Defendant Tavares Abruptly "Resigns" Because Of "Unrealistic" And "Destructive" Financial Targets**

153. On December 1, 2024, Stellantis announced that its Board had "accepted Carlos Tavares's resignation today from his role as Chief Executive Officer with immediate effect." That

same day, *Reuters* reported that "tensions grew after the board felt Tavares was moving too quickly and focusing on ***near-term solutions*** to save his reputation, not working in the best interests of the company." Subsequent *Reuters* reporting further revealed that, in truth, Tavares had been forced to relinquish his role as CEO precisely because of the overly aggressive "targets set by Tavares that were deemed ***unrealistic or destructive*** by some board members." *Reuters* reported, "Unhappy with his aggressive targets for sales and cost cuts and his contentious dealings with the giant automaker's suppliers, dealers and unions, ***the board unanimously wanted Tavares to go***."

154. Analysts also attributed Tavares's resignation to the admission that his high-margin approach was not sustainable. For example, Morningstar Equity Research reported on December 3, 2024, that "following the exit of Tavares[,] we now bring Stellantis' metrics more in line with mass-market peers and a return to its historic ratios before the dramatic rise in margins over the last three years." Similarly, HSBC reported on December 5 that "[m]edia reports attributing Mr. Tavares' departure as CEO to clashes with board over his cost focus (source: Reuters, 3 December 2024) raises concerns over the future efficiency and pricing strategy."

155. Subsequent news reporting also directly linked Tavares's departure to his pricing strategy. For example, on December 11, 2024, *CNBC* reported:

> ***Several former or current leaders, as well as other U.S. employees with the trans-Atlantic automaker, said Tavares' relentless focus on cost-cutting, his goal of achieving double-digit profit margins under his "Dare Forward 2030" business plan, and a reluctance, if not unwillingness, to listen to U.S. executives about the American market led to the company's current situation and, ultimately, Tavares' departure last week.***
>
> The sources, who agreed to speak on the condition of anonymity in order to talk freely and avoid repercussions, were interviewed at various times throughout 2024, including several last week.
>
> They described the Portuguese-born executive as being fixated on near-term cost reductions and profits to the detriment of the business as well as to the company's products, employees and relationships with suppliers, unions and dealers.

The problems included a lack of support for new products and sales, squeezing supplier costs, and mismanagement of plants and products in North America, the sources said.

"If you think you know everything, you're not going to listen to anybody else," one source told CNBC, saying the pressure to cut costs felt like having a pistol "to your head."

. . .

***Such issues ultimately led to Tavares' resignation***, with the company saying Dec. 1 that he was leaving immediately because of "different views" with Stellantis' board. French financial newspaper Les Echos reported ***that Tavares' departure was a negotiated resignation that came after the company's board decided to terminate the executive***.

**D.  Stellantis Reports Significantly Reduced Shipments And Confirms 5.5% AOI Margin**

156.  On January 16, 2025, the Company reported its Q4 2024 Consolidated Shipment Estimates, disclosing that North American shipments had decreased a staggering 28 percent compared to the prior quarter, which "reflected inventory reduction initiatives, where production discipline combined with incentive actions resulted in a ~80K units decrease of the U.S. dealer inventory compared to the end of the Q3."

157.  Then, on February 26, 2025, Stellantis reported its full year 2024 results, revealing the impact of the Company's inventory reduction efforts on AOI margins. For 2024, Stellantis reported a 17% decrease in net revenues and AOI margins of just 5.5%, down a staggering 64% from the prior year, caused by the "now-complete inventory reduction initiatives." During the related earnings call, the Company's new CFO Doug Ostermann disclosed, "In the second half of the year, to address excess U.S. dealer inventories, the company dialed up incentives and cut back on production, which, of course, negatively impacted the AOI, which ended up at the bottom of the range that we had provided of 5.5% to 7% AOI margin." Addressing the root causes of the Company's U.S. problems, Ostermann elaborated that the Company had "repositioned MSRPs"

to make the Company's "cars more affordable as we exited 2024" and also candidly noted, "I want to recognize that the inventory reduction actions and the progress repositioning our pricing relative to peers pressured results in 2024, particularly in the second half," during which the Company had operated at just *0.3% AOI margin* in order to clear excess U.S. inventory.

158. As a result of the material reduction in the Company's AOI, Ostermann also disclosed that Stellantis was suspending stock buybacks, would more than halve the Company's dividend, and further anticipated that AOI margins would remain depressed "in the mid-single digits for the full year of 2025."

## VI.    DEFENDANTS' FALSE AND MATERIALLY MISLEADING STATEMENTS

159. Throughout the Class Period, Defendants made a series of materially false and misleading statements and omissions. Specifically, Defendants consistently represented to investors that Stellantis's AOI margins, pricing, and U.S. dealership inventory levels were healthy and sustainable and the foundation for the Company's much touted double digit AOI margins. In truth, Defendants decimated demand for Stellantis's key U.S. brands by aggressively overpricing the Company's offerings, all to inflate Stellantis's key performance metrics and attain executive compensation targets. Unbeknownst to investors, as demand for the Company's overpriced vehicles faltered, Defendants stuffed dealerships with additional overpriced inventory while continuing to mislead investors about Stellantis's financial health and future prospects, including the Company's much touted double-digit AOI margin guidance.

### A.    October 31, 2023: Q3 2023 Sales And Revenue Call

160. On October 31, 2023, Stellantis held a conference call at approximately 9:01 a.m. ET to discuss sales and revenue for the third fiscal quarter of 2023. During the call, Defendant Knight stated, "In the third quarter, we added over €3 billion to the Stellantis top line, thanks to strong shipment growth and *carefully calibrated pricing*." Defendant Knight added that pricing

was "*moving really positively for us*" and on that basis stated, "we feel confident that we're going to be able to control incentives at a good healthy level."

161. The statements identified in ¶160 above were materially false and misleading, and omitted material facts. It was materially false and misleading for Defendant Knight to tout the Company's "*carefully calibrated pricing*" which was purportedly "*moving really positively*." In truth, Defendants had stuffed the channel with overpriced inventory, which decimated demand and created an inventory glut that dealers were unable to sell, such that pricing was not "carefully calibrated" or "moving really positively." As dealerships repeatedly informed Defendants, the Company's "short term" "engineering" of profitability was unsustainable and had resulted in the accumulation of overpriced inventory, loss of market share, and "degradation" of the Company's brands. *See* Sections IV & VIII.

162. During the same call, while discussing new vehicle inventory, Defendant Knight stated that in the quarter, Stellantis had "*significantly tightened*" its inventory levels and that investors could expect additional "inventory improvement as we go towards the end of this year."

163. The statement identified in ¶162 above was materially misleading, and omitted material facts. It was materially misleading for Defendant Knight to tout the Company's "*significantly tightened*" inventory. In truth, Defendants had stuffed the channel with overpriced inventory, which decimated demand and created an inventory glut that dealers were unable to sell, such that inventory levels were not "significantly tightened." As dealerships repeatedly informed Defendants, the Company's "short term" "engineering" of profitability was unsustainable and had resulted in the accumulation of overpriced inventory, loss of market share, and "degradation" of the Company's brands. *See* Sections IV & VIII.

164. During the same call, in response to an analyst question about "headwinds" in the United States, Defendant Knight represented that the "US market" was "a place where we start with a very high and **healthy** profitability level."

165. The statement identified in ¶164 above was materially false and misleading, and omitted material facts. It was materially false and misleading for Defendant Knight to describe the Company's U.S. profitability as "**healthy**." In truth, Defendants had stuffed the channel with overpriced inventory, which decimated demand and created an inventory glut that dealers were unable to sell, such that the U.S. market was not "healthy." As dealerships repeatedly informed Defendants, the Company's "short term" "engineering" of profitability was unsustainable and had resulted in the accumulation of overpriced inventory, loss of market share, and "degradation" of the Company's brands. *See* Sections IV & VIII.

**B.      December 6, 2023: Goldman Sachs Global Automotive Conference**

166. On December 6, 2023, Defendants Tavares and Knight spoke at the Goldman Sachs Global Automotive Conference. During the conference, an investor asked how Stellantis would "make sure that your independent dealers are disciplined on pricing with inventory rising? What's the secret recipe for that?" Defendant Tavares responded that "at the end of the day, they will ask you money to get rid of the metal, right? So it's about controlling their own profitability through the volume bonus and the quality bonus and the dealer margin that you give them. And we are adjusting at each new car launch, we are adjusting in the direction of being more variable in function of quality and in function of volume to make sure that they stay honest on that front. *So far it has been working*."

167. The statement identified in ¶166 above was materially false and misleading, and omitted material facts. It was materially false and misleading for Defendant Tavares to state that the Company's pricing strategy was "*working*" when, in truth, Defendants had stuffed the channel

with overpriced inventory, which decimated demand and created an inventory glut that dealers were unable to sell, such that the Company's pricing strategy was not "working." As dealerships repeatedly informed Defendants, the Company's "short term" "engineering" of profitability was unsustainable and had resulted in the accumulation of overpriced inventory, loss of market share, and "degradation" of the Company's brands, *See* Sections IV & VIII.

168. When asked a follow-up question about inventory levels at Stellantis's dealerships, Tavares stated, "We all know that having too much inventory at dealer level is not a good thing. We all know that. ***What I see is that we need to do a better job at delivering the cars***. I think the delivery lead time is not very good . . . . I'm not talking about selling them. I'm talking about the cars that reach the yard with a customer label and they have to be delivered. So I'm not talking about the cars without customers. I'm talking about the cars that you already sold, you just have to take the car and deliver the car.

169. The statements identified in ¶168 above were materially misleading, and omitted material facts. It was materially misleading for Defendant Tavares to attribute Stellantis's elevated inventory levels to logistical challenges regarding "delivering the cars" while failing to disclose that, in truth, Defendants had stuffed the channel with overpriced inventory, which decimated demand and created an inventory glut that dealers were unable to sell. As dealerships repeatedly informed Defendants, the Company's "short term" "engineering" of profitability was unsustainable and had resulted in the accumulation of overpriced inventory, loss of market share, and "degradation" of the Company's brands. *See* Sections IV & VIII.

C. **February 15, 2024: Full Year 2023 Earnings Call And Press Release, And Wolfe Research Global Auto And Auto Tech Conference**

170. On February 15, 2024, Stellantis hosted a conference call to discuss its full year 2023 earnings. During the call, Defendant Tavares represented that "***North America has delivered***

*a very robust 15.4% AOI margin*" and highlighted the "*great results, robust results in North America*" while touting that "*we have been protecting the value of what we are doing in our company, which is translated by the fact that we have the best US average transaction price of the industry.*"

171. The statements identified in ¶170 above were materially misleading, and omitted material facts. It was materially misleading for Defendant Tavares to tout Stellantis's "*15.4% AOI margin*" in North America as "*very robust.*" In truth, in order to achieve Stellantis's 15.4% AOI margin, Defendants had stuffed the channel with overpriced inventory, which decimated demand and created an inventory glut that dealers were unable to sell. As dealerships repeatedly informed Defendants, the Company's "short term" "engineering" of profitability was unsustainable and had resulted in the accumulation of overpriced inventory, loss of market share, and "degradation" of the Company's brands. Defendants' failure to disclose the practice to investors while touting positive AOI results misled investors into believing that the AOI results they reported were caused by other factors, which, in turn, created an inaccurate misleading impression as to the financial health of the Company. *See* Sections IV & VIII.

172. It was also materially false and misleading, and omitted material facts for Defendant Tavares state that the Company had been "*protecting the value*" of its brands. In truth, Defendants had stuffed the channel with overpriced inventory, which decimated demand and created an inventory glut that dealers were unable to sell, such that Stellantis was not "protecting the value" of the Company's brands. As dealerships repeatedly informed Defendants, the Company's "short term" "engineering" of profitability was unsustainable and had resulted in the accumulation of overpriced inventory, loss of market share, and "degradation" of the Company's brands. *See* Sections IV & VIII.

173. During the same call, in direct response to an analyst question about the pricing assumptions underpinning the Company's AOI guidance, Knight stated, "the thing I would add on the pricing topic is, yes, it is part of our AOI guidance and it's one of those items where you're right, there's positives and negatives to that. When we look at North America, I think what's important to call out is we haven't seen any radical pricing drops. ***People have been pretty disciplined***."

174. The statement identified in ¶173 above was materially false and misleading, and omitted material facts. It was materially false and misleading for Defendant Knight to tout Stellantis's "***disciplined***" prices in North America when, in truth, Defendants had stuffed the channel with overpriced inventory, which decimated demand and created an inventory glut that dealers were unable to sell, such that prices in North America were not "disciplined." As dealerships repeatedly informed Defendants, the Company's "short term" "engineering" of profitability was unsustainable and had resulted in the accumulation of overpriced inventory, loss of market share, and "degradation" of the Company's brands. *See* Sections IV & VIII.

175. The Company's earnings presentation included a slide deck presented by Defendant Knight, which stated that inventory was "***relatively stable***."

176. The statement identified in ¶175 above was materially misleading, and omitted material facts. It was materially misleading for Defendant Knight to present a slide touting the Company's "***relatively stable***" inventory. In truth, Defendants had stuffed the channel with overpriced inventory, which decimated demand and created an inventory glut that dealers were unable to sell, such that inventory levels were not "relatively stable." As dealerships repeatedly informed Defendants, the Company's "short term" "engineering" of profitability was

unsustainable and had resulted in the accumulation of overpriced inventory, loss of market share, and "degradation" of the Company's brands. *See* Sections IV & VIII.

177. On February 15, 2024, Stellantis issued a press release (which it also filed as an exhibit to its Form 6-K filed with the SEC). This press release announced the Company's full fiscal year 2023 financial results and reported that Stellantis had achieved a ***12.8% AOI margin*** for the whole Company. In the press release, Defendant Tavares stated, "***Today's record financial results are proof that we have become a new global leader in our industry and will remain rock solid as we look to a turbulent 2024***." Tavares also reiterated that Stellantis would "***continue delivering on our Dare Forward 2030 targets***."

178. The statements identified in ¶177 above were materially misleading, and omitted material facts. It was materially misleading for Stellantis and Defendant Tavares to represent that the Company's "***record***" AOI margin of 12.8% was "***proof***" that the Company was a "***global leader***" in the industry and would "***remain rock solid***." In truth, in order to achieve the Company's 12.8% AOI margin, Defendants had stuffed the channel with overpriced inventory, which decimated demand and created an inventory glut that dealers were unable to sell. As dealerships repeatedly informed Defendants, the Company's "short term" "engineering" of profitability was unsustainable and had resulted in the accumulation of overpriced inventory, loss of market share, and "degradation" of the Company's brands. Defendants' failure to disclose the practice to investors while touting positive AOI results misled investors into believing that the AOI results they reported were caused by other factors, which, in turn, created an inaccurate misleading impression as to the financial health of the Company. *See* Sections IV & VIII.

179.     Later that same day, Defendant Knight and other Stellantis executives spoke at the Wolfe Research Global Auto and Auto Tech Conference. In direct response to an analyst question about the sustainability of the company's pricing, Knight responded:

> When you ask about this piece of, hey, what is it that people don't get about us in the US and *the profitability and why is it sustainable*? I think it's because it's this really nice match of, on the one hand, we are really strong and well-known for everything when it comes to efficiencies. We are rock hard on everything that has to do with cost discipline. But on the other hand, *I think we have shown a lot of success in being able to really drive sustainable pricing differentiation vis-à-vis our peers*. And that's something – *if you look at it in the US* where we've got the highest prices in the different categories that we play, *we're really showing something where I think we've been able to bring value that the consumer also recognizes*. And when we match that up with everything on the synergies we've created, our focus on the cost discipline, it's something where we see lots of opportunity to continue to generate as we go forward.

180.     The statements identified in ¶179 above were materially false and misleading, and omitted material facts. It was materially false and misleading for Defendant Knight to tout Stellantis's "*success*" in driving "*sustainable pricing differentiation*" in the U.S. and that the consumer recognized the purported "*value*" of Stellantis's brands. In truth, Defendants had stuffed the channel with overpriced inventory, which decimated demand and created an inventory glut that dealers were unable to sell, such that Stellantis's pricing differentiation was not "sustainable" and consumers had not "recognize[d]" the "value" of Stellantis's brands. As dealerships repeatedly informed Defendants, the Company's "short term" "engineering" of profitability was unsustainable and had resulted in the accumulation of overpriced inventory, loss of market share, and "degradation" of the Company's brands. *See* Sections IV & VIII.

**D.     April 30, 2024: Q1 2024 Shipments And Revenues Press Release And Earnings Call**

181.     On April 30, 2024, Stellantis issued its First Quarter 2024 Shipments and Revenues Press Release. In the press release, Defendant Knight stated that "we are delivering clear improvements in key commercial dynamics with customer sales outpacing shipments. We are

reducing inventories to reinforce our ***strong relative pricing*** ahead of our new or mid-cycle product launches this year in key regions."

182. The statement identified in ¶181 above was materially false and misleading, and omitted material facts. It was materially false and misleading for Defendant Knight to tout its "***strong relative pricing***" when, in truth, Defendants had stuffed the channel with overpriced inventory, which decimated demand and created an inventory glut that dealers were unable to sell, such that Stellantis's pricing was not "strong." As dealerships had repeatedly informed the Company, Defendants' "short term" "engineering" of profitability was unsustainable and had resulted in the accumulation of overpriced inventory, loss of market share, and "degradation" of the Company's brands. *See* Sections IV & VIII.

183. Also on April 30, 2024, Stellantis held an earnings call to discuss the Company's first quarter 2024 results. During the call, Defendant Knight touted that inventories in North America were "***in the healthy range***."

184. The statement identified in ¶183 above was materially false and misleading, and omitted material facts. It was materially false and misleading for Defendant Knight to state that the inventory in North America was "***in the healthy range***" when, in truth, Defendants had stuffed the channel with overpriced inventory, which decimated demand and created an inventory glut that dealers were unable to sell, such that inventory levels in North America were not "in the healthy range." As dealerships repeatedly informed Defendants, the Company's "short term" "engineering" of profitability was unsustainable and had resulted in the accumulation of overpriced inventory, loss of market share, and "degradation" of the Company's brands. *See* Sections IV & VIII.

**E.     June 13, 2024: Investor Day Call**

185.     On June 13, 2024, Stellantis hosted its Investor Day. During the call, in response to investor concerns about U.S. inventory levels, Defendant Knight stated that "we do feel there is important progress that we're making in terms of ***not only the levels but the quality of inventory*** that will help our revenues as we go forward."

186.     The statement identified in ¶185 above was materially misleading, and omitted material facts. It was materially misleading for Defendant Knight to tout the purported progress on the "levels" and "quality" of inventory. In truth, Defendants had stuffed the channel with overpriced inventory, which decimated demand and created an inventory glut that dealers were unable to sell, such that inventory "levels" were unsustainably high and of poor "quality." As dealerships repeatedly informed Defendants, the Company's "short term" "engineering" of profitability was unsustainable and had resulted in the accumulation of overpriced inventory, loss of market share, and "degradation" of the Company's brands. *See* Sections IV & VIII.

**F.     July 25, 2024: Q2 2024 Earnings Call And Press Release**

187.     On July 25, 2024, Stellantis held its Q2 2024 earnings call. During the earnings call, Defendant Knight claimed that AOI margin was tracking "***right in line with our full year guidance***" and had been achieved "***thanks to consistent cost reduction initiatives***." Defendant Tavares similarly stated that the "***double-digit margin seems to confirm that we are on the leading pack***."

188.     The statements identified in ¶187 above were materially misleading, and omitted material facts. It was materially misleading for Defendants Knight and Tavares to represent that the Company's AOI margin results had been achieved through "cost reduction initiatives" and that the AOI results "confirmed" that the Company was leading the "pack." In truth, in order to achieve the Company's double-digit AOI margin, Defendants had stuffed the channel with overpriced

inventory, which decimated demand and created an inventory glut that dealers were unable to sell. As dealerships repeatedly informed Defendants, the Company's "short term" "engineering" of profitability was unsustainable and had resulted in the accumulation of overpriced inventory, loss of market share, and "degradation" of the Company's brands. Defendants' failure to disclose the practice to investors while touting positive AOI results misled investors into believing that the AOI results they reported were caused by other factors, which, in turn, created an inaccurate misleading impression as to the financial health of the Company. *See* Sections IV & VIII.

189. Defendant Tavares similarly stated that he would "*like to confirm our double-digits AOI margin*" guidance and described the Company's current U.S. inventory situation as a "*bump on the road that we are now fixing*," and said that he was "personally involved with our North American teams to fix it."

190. The statements identified in ¶189 above were materially misleading, and omitted material facts. It was materially misleading for Defendant Tavares to reaffirm a minimum commitment to double-digit AOI and downplay the current situation as just a "bump on the road." In truth, in order to achieve double-digit AOI, Defendants had and would stuff the channel with overpriced inventory, which decimated demand and created an inventory glut that dealers were unable to sell. As dealerships repeatedly informed Defendants, the Company's "short term" "engineering" of profitability was unsustainable and had resulted in the accumulation of overpriced inventory, loss of market share, and "degradation" of the Company's brands. Defendants' failure to disclose the practice to investors while reaffirming a double-digit AOI target created an inaccurate misleading impression as to the financial health of the Company. *See* Sections IV & VIII.

**G.    September 23, 2024: Bank Of America European Autos And Future Car Conference**

191.    On September 23, 2024, Defendant Knight spoke at the Bank of America European Autos and Future Car Conference. During the conference, referring to the Company's recent reaffirmation of its AOI guidance, Defendant Knight touted that the "***North Star***" for the business was "***to deliver this 10% AOI ambition***."

192.    The statement identified in ¶191 above was materially misleading, and omitted material facts. It was materially misleading to tout AOI of 10% as the Company's North Star. In truth, in order to achieve double-digit AOI, Defendants stuffed the channel with overpriced inventory, which decimated demand and created an inventory glut that dealers were unable to sell. As dealerships repeatedly informed Defendants, the Company's "short term" "engineering" of profitability was unsustainable and had resulted in the accumulation of overpriced inventory, loss of market share, and "degradation" of the Company's brands. Defendants' failure to disclose the practice to investors while touting the importance of a double-digit AOI target created an inaccurate misleading impression as to the financial health of the Company. *See* Sections IV & VIII.

**VII.    LOSS CAUSATION**

193.    Defendants' materially false and misleading statements and omissions, including statements regarding inventory levels, pricing, and sustainability of the Company's margins artificially inflated and/or maintained the price of Stellantis's stock. The artificial inflation in Stellantis's stock price was removed when the conditions and risks misstated and omitted by Defendants were revealed to the market and/or materialized. The information was disclosed to the market through a series of disclosures on April 30, June 13-14, July 25-29, and September 30.

These disclosures reduced the amount of inflation in the price of Stellantis's publicly traded stock, causing economic injury to Lead Plaintiff and other members of the Class.

### A. April 30, 2024: First Quarter 2024 Shipments And Revenues Disclosures

194. On April 30, 2024, Stellantis held its Q1 2024 earnings call starting at 8:04 a.m. ET. During the call and in the associated earnings release, Stellantis disclosed revenues 4% below consensus estimates driven principally by lower shipments. As to Stellantis's North American segment, the Company disclosed that Q1 shipments had plummeted by 20%, with market share declining from 10% in Q1 2023 to 8.4% in Q1 2024. Defendant Knight also disclosed lowered margin guidance for the first half of 2024 between 10 to 11% from a consensus estimate of 11.7%, but otherwise reaffirmed the Company's full year 2024 guidance, representing that 2024 would be backend loaded.

195. Analysts reacted negatively to Stellantis's disclosures on April 30, 2024, but were partially assuaged by Defendants' positive representations concerning inventory and affirmation of AOI guidance. For example, J.P. Morgan reported that "STLA posted a slight topline miss to estimates with volume and mix impact more than offsetting pricing; management remains confident of achieving the previously outlined guidance though." J.P. Morgan elaborated that "Despite the macroeconomic uncertainties, management reiterated their guidance for a double-digit adj. operating income and positive FCF . . . . EBIT margin in 1H is expected at 10-11%, with potential for improvement in 2H . . . . Moving forward, inventory development will be aligned with the new launches and shipment evolution." Piper Sandler similarly reported that "Revenue & Margins are Down - but for the Right Reasons . . . . Overweight-rated STLA is trading lower by about 10%, following this morning's conference call related to Q1 shipments and revenues. Commentary from the call suggests modest downside vs. consensus in 1H24, and we're nudging our 2024 estimates downward as a result. Understandably, some investors may bristle at the

65

prospect of buying a stock when estimates are moving lower. But in STLA's case, we think that's precisely what they should do. 1H24 revenue downside is due to intentional de-stocking, in preparation for a new product offensive in 2H."

196. In response to these disclosures, the price of Stellantis's stock dropped approximately 10.5% on April 30, from $24.92 to $22.30, on heavy trading volume. This decline caused Lead Plaintiff and Class members to suffer losses as the artificial inflation in Stellantis's stock price was partially removed.

197. Defendants' April 30, 2024 disclosures partially corrected Defendants' prior materially false and misleading statements and omissions about inventories, pricing, and the sustainability of the Company's margins. However, the full truth about those issues was not disclosed, and Stellantis's stock price remained artificially inflated.

### B. June 13, 2024: Stellantis Investor Day Disclosures

198. On June 13, 2024, Stellantis held an investor day, where the truth surrounding Stellantis's inventory and pricing was partially revealed when Stellantis reported rising inventory and declining revenue. Specifically, Stellantis reported that inventory relative to demand was ballooning in the U.S., noting in a presentation that "US DAYS SUPPLY TOO HIGH," up 33 days year-over-year.

199. During the related conference call that day, in response to an analyst question regarding the "North American business and the issues" Stellantis had experienced there over the last six to twelve months, as well as the Company's "aggressive" pricing, Tavares admitted that an inventory problem had been apparent to Stellantis for some time, noting that "things were visible in fall 2023 . . . . Then what happened next is that the market conditions deteriorated by the end of 2023, and we ended up 2023 with too much inventory. And you were the first ones to spot that, and you were right . . . . I am responsible and we were arrogant. No excuse."

200.    While analysts had previously noted the Company's rising inventory levels, they had been repeatedly reassured by Defendants that Stellantis's pricing was "carefully calibrated" and "sustainable," and that the Company's U.S. profitability was "healthy" when Defendants knew or were reckless in not knowing that those statements were false because, among other reasons, Defendants had stuffed the channel with overpriced inventory that dealers were unable to sell, as summarized in Section VIII below. As a result, analysts reacted with surprise and alarm to these disclosures. Barclays again noted on June 14 that the recent lack of sales in North America added "to the long-standing market concerns about very high US inventory," and HSBC stated that "[h]igh (US) inventories and market share losses have raised questions" about the sustainability of the Company's much touted profit margins. Similarly, Intensa Sanpaolo noted the same day that "the event provided investors with little relief on the short-medium term challenges, especially as for group's margins' evolution in North America amid the need to reduce inventories . . . . [W]e take the opportunity to slightly trim our FY24E estimates and to overhaul our FY25E projections."

201.    An analyst from Wolfe Research wrote that he did "not think STLA did enough to assuage investors' concerns" and that while Stellantis "acknowledged that NA dealer inventories, particularly for Ram pickups, are too high," they "lacked a specific strategy to improve market share and work down inventory level." Similarly, analysts from Deutsche Bank wrote, "Lacking a commitment to meaningfully address THE key short-term issue of US inventories, [they] do not believe that this was the clearing event the stock needs to turn around."

202.    In response to these disclosures, Stellantis's stock price dropped 3% on June 13 and another 4.1% on June 14, to close at $20.21 per share.

203.    Defendants' June 13, 2024 disclosures partially corrected Defendants' prior materially false and misleading statements and omissions about inventories, pricing, and the

sustainability of the Company's margins. However, the full truth about those issues was not disclosed, and Stellantis's stock price remained artificially inflated.

**C.      July 25, 2024: First Half 2024 Results Disclosures**

204.      On July 25, 2024, Stellantis held its Q2 2024 Earnings Call at 8:00 a.m. ET and issued an associated press release. In the press release, Stellantis admitted that 2024 had been an unmitigated disaster for investors, in stark contrast to Defendants' earlier representations. The press release reported adjusted operating income of just €8.5 billion, down €5.7 billion compared to H1 2023, "primarily due to decreases in North America," as well as AOI margin of 10%, just barely meeting the Company's double digit commitment (and key executive compensation metric). The related fact sheet also disclosed that AOI margins in North America had decreased from 15.4% in 2023 to just 11.4% in the first half of 2024.

205.      Stellantis attributed the poor financial performance to "lower volumes and mix, with the challenging volume comparison due to a combination of inventory reduction initiatives, temporary product production gaps due to a generational portfolio transition, and lower market share particularly in North America." During the related earnings call, Defendant Tavares recognized that "[o]ne of the things that we need to say here is that the major topic to be addressed is, of course, the inventory. This is what you have been highlighting, and rightly so. By the end of June, we are at 94 days of supply, quite similar to our closest US competitor, same ballpark of inventory, but still too high." Defendant Tavares also admitted that Stellantis had "lost AOI margin as a consequence of the hurdles that we are faced [*sic*]. Our [North American] margins are down to 11.4%. We see that our share is also down to 8.2%" and specifically attributed the problem, in part, to the fact that an "abnormal amount of prospects" were "opting out" of the purchase experience after seeing the high "sticker price" and lack of consumer facing incentives.

206. In response to this disclosure, the price of Stellantis stock declined by $2.61 per share, or more than 13%, from $19.60 per share on July 24, 2024, to close at $16.99 per share on July 29, 2024.

207. Analysts such as Deutsche Bank viewed these disclosures as catastrophic, telling investors that "this is only the beginning as most of the key issues are just starting to appear: inventory, pricing, lack of model age versus peers. . . . That said, we do not believe that the company will be able to tackle all these issues in a tougher environment and see guidance at risk." "The stock is already trading down ~7% (vs. FTSE Italy -0.5%) on the miss. Results were worse than consensus in all regions except SA. H2 still looks challenging with inventory still high in the US." Deutsche Bank also specifically called out the potential for Defendants' failed pricing strategy to further impact results, stating, "What also does not help here is that our analysis suggests STLA might have overdone on the pricing side more than others. Looking at the ASP pre covid and semi crisis in 2019, in the US Stellantis had an ASP which was on average 3% below its US peers (STLA: USD33k, GM: USD33.1k, Ford: USD35.3k). This shifted to +8% pointing towards a more aggressive pricing policy than the other US brands in 2023 (STLA: USD49.1k, GM: USD45k, Ford: USD46k)."

208. Banca Arcos similarly reported, "We cut our estimates to factor in a bleaker scenario. STLAM released much-weaker-than-expected H1 2024 results yesterday. It seems that the price environment started to deteriorate after several years of very strong growth; inventory levels in North America did not improve and STLAM will have to deal with this issue in the coming months in a slowing market scenario. We have cut our EPS estimates for 2024-2026 by an average ~21.2% to reflect lower shipments across all the geographies and weaker prices especially in North America and Europe." Kepler Cheuvreux candidly stated, "As bad as it gets? . . . H1

69

group AOI came out 5% below expectations, reported EBIT falling 51% YOY while FCF crashed EUR9bn YOY to -EUR400m. 'Humbling and disappointing results in a phase of transition' to quote CEO Carlos Tavares."

209. Defendants' July 25, 2024 disclosures partially corrected Defendants' prior materially false and misleading statements and omissions about inventories, pricing, and the sustainability of the Company's margins. However, the full truth about those issues was not disclosed, and Stellantis's stock price remained artificially inflated.

**D.      September 30, 2024: Full Year Updated Financial Guidance Disclosures**

210. On September 30, 2024, at approximately 1:33 a.m. ET, Stellantis updated its financial guidance to reflect a catastrophic drop of AOI margin down to as low as 5.5%. Specifically, Stellantis reported that AOI margin for 2024 would fall between 5.5% and 7%, largely driven by corrective actions in North America. The revision "reflect[ed] decisions to significantly enlarge remediation actions on North American performance issues" and marked a return to historical margin levels not inflated by Defendant Tavares's temporary manipulations of the Company's AOI margin.

211. Analysts were shocked at the sheer magnitude of the decline, as AOI margins had not merely slipped below double-digits but had fallen precipitously. For instance, Kepler Cheuvreux reported on October 1, 2024, "The magnitude of the implied earnings and FCF cuts shocked investors and analysts." Kepler lamented that this disclosure signified the death knell of Stellantis's Dare Forward 2030 plan stating, "Like us, the market is likely to assume double-digit margins (and SBB) are history." Similarly, BoA Securities stated that they were "taken aback by the extent of the cut," and accordingly revised AOI expectations by at least 25% lower over the next three years.

212. Barclays noted how the AOI margin drop was in stark contrast to Stellantis's earlier representations, stating that "Natalie Knight had not abandoned the 'double digit' EBIT margin guidance for H2-24 as recently as September 23," and candidly reported that it was stunned by the magnitude of the cut in the shortness of time. Prior concerns about inventory and pricing had "very much materialized . . . and in fact in even greater degree than feared- culminating in [Stellantis's] profit warning." Barclays directly attributed Stellantis's fall to its failure to adjust its strategy, concluding that "in addition to what the CEO called out as 'arrogant' mistake that has caused the issue, STLA's hesitation to take decisive countermeasures has now also caught up with it – with extreme implications on near-term EBIT and FCF – and a correspondingly much lower base to work back from beyond 2024."

213. In response to this disclosure, on September 30, 2024, Stellantis's stock price dropped another 12.5%, losing $2.01 per share.

## VIII. ADDITIONAL SCIENTER ALLEGATIONS

214. As set forth above and further below, numerous facts demonstrate that Defendants knew or were reckless in not knowing that Defendants' statements identified in ¶¶159-192 above were materially false and misleading when made. The scienter of Stellantis as a corporate entity is derived from the scienter of its executives, including Defendants Tavares and Knight. The Executive Defendants' scienter is imputed to Stellantis.

215. ***First, Defendant Tavares admitted that Defendants knew by the start of the Class Period that Stellantis's pricing was unsustainable and that its inventory levels were out of control.*** On June 13, 2024, at Stellantis's 2024 Investor Day, a Citigroup analyst asked Tavares, "[I]f you look at the North American business and the issues that we've had . . . how did that happen?" In his response, Tavares explained, "[W]e were arrogant. That's all. Arrogant. . . . And we saw it, but we were arrogant." Tavares further explained that "things were visible in fall 2023"

71

and that "by the end of 2023" Stellantis "ended up [] with too much inventory," which meant that "by the beginning of 2024," the Company "had to readjust the inventory." Tavares was clear that Stellantis and its management were to blame, stating, "I am responsible and we were arrogant. No excuse." Defendants also acknowledged in their annual reports on Form 20-F filed during the Class Period, that sales incentives and "the expected incentive cost needed to facilitate the sales of the inventory by the dealers" were "reviewed monthly." The fact that Tavares admitted that Defendants "saw" Stellantis's pricing and inventory issues as early as the fall of 2023 and frequently reviewed those issues but were "arrogant" about the Company's ability to get its pricing and inventory under control, supports a strong inference of scienter.

216.     ***Second, dealers reported to Defendants that the Company's pricing was unsustainably high, and that overpriced inventory was at unsustainably high levels.*** As discussed in ¶¶139-43, on September 10, 2024, the National Dealer Council sent a letter to Defendant Tavares confirming that, for the prior two years, the National Dealer Council ("NDC") had been "sounding this alarm" and "warning" senior executives at Stellantis, including the "US executive team" that the Company had priced its "iconic American brands" too high and allowed inventory to pile up at U.S. dealer's lots in order to earn record amounts in executive compensation. As the letter stated:

> In 2023, you engineered a record year of profitability for Stellantis, earning you the title of the highest-compensated automotive CEO. . . . Unfortunately, the engineering and structuring of that year have led us to exactly where we told your executives we would be today. . . . The reckless short-term decision-making to secure record profits in 2023 has had devastating, yet entirely predictable, consequences in the US market. Those consequences include the rapid degradation of our iconic American brands – brands like Jeep, Dodge, Ram, and Chrysler that have over a century of history in America. The market share of your brands has been slashed nearly in half, Stellantis stock price is tumbling, plants are closing, layoffs are rampant, and key executives fleeing the company. Investor lawsuits, supplier lawsuits, strikes – the fallout is mounting. Your own distribution network, your dealer body, has been left in an anemic and diminished state . . . your

employees did not create this problem – you created this problem.

217. Further, as discussed in ¶¶83-90, multiple former employees, including FEs 1, 3, 4, 5, and 7, confirmed that by the start of the Class Period, the NDC and other dealers, including 20-Groups, began warning Defendants about Stellantis's unsustainably high prices and ballooning inventory. In addition, FE 3 confirmed that he was on calls with the Chairman of the NDC and other NDC members in which they expressed that Stellantis's unsustainably high prices and ballooning inventory were significant issues that had to be addressed. FE 3 further confirmed that Stellantis executives, including the head of sales Jeff Kommor, attended quarterly NDC meetings, and that former COO Carlos Zarlenga also occasionally attended these meetings. FE 3 additionally confirmed that senior executives would report the top three issues raised by dealers at NDC meetings to former COO of North America Mark Stewart. FE 7 explained, one or two of the top issues would be known at CEO Tavares's level as well. FE 3 further confirmed that Stellantis executives would discuss operational issues in small working groups comprised of Stellantis executives and car dealers, and that pricing and inventory issues at regional and national levels were discussed at dealer council meetings.

218. FE 4 also explained that he participated in monthly sales calls which dealers of Stellantis cars and representatives of Stellantis, including Stellantis brand managers, attended. FE 4 described how, during these monthly sales calls, beginning in late 2023, dealers started voicing strong frustrations about Stellantis's pricing strategy and were screaming and talking about how the Company needed to make changes to its pricing strategy. In response, FE 4 explained Stellantis stopped allowing dealers to ask questions or make comments on the calls. FE 4 further confirmed that dealers told their Stellantis reps when they would come into the stores that the price increases Stellantis implemented were not sustainable.

219. Defendant Tavares's statement during the Class Period that he was "personally involved with our North American teams to fix" the Company's inventory issues and the *CNBC*'s December 11, 2024 report that Defendant Tavares was reluctant, if not unwilling, to listen to his U.S. executives, corroborates that Defendant Tavares knew about or recklessly disregarded the warnings from Stellantis dealers that the Company's prices were unsustainably high and inventory levels were ballooning.

220. The fact that, throughout the entire Class Period, the NDC and other dealers repeatedly warned Defendants and their direct reports, in quarterly meetings and in a formal letter, about Stellantis's unsustainably high prices and ballooning inventory, and that dealers voiced their strong frustrations with the same issues on monthly calls and in weekly meetings with Stellantis representatives, supports a strong inference of scienter.

221. ***Third, Defendants closely-tracked pricing and inventory metrics in reports and databases, conducted pricing studies, and held meetings that revealed the truth.*** FEs 1, 2, 3, 5, 6, 8, and 9 each confirmed that Defendants closely tracked and discussed inventory and pricing metrics that were inaccessible to investors. For example, as FE 2 explained, throughout the Class Period, Defendants conducted formal evaluations and pricing studies to determine the impacts of Stellantis's pricing, including potential pricing bubbles, and looked at pricing impacts all the time. FE 3 corroborated FE 2's allegations that Stellantis conducted pricing studies to understand the impacts of potential pricing decisions.

222. Additionally, FE 1 explained that Stellantis tracks inventory at dealerships and tracks when each Stellantis dealership sells a car. As FE 1 confirmed Defendants knew – on a daily basis – where sales took place, what the daily sales rate was, and what models were selling.

223. FE 8 further confirmed that Stellantis actively tracked inventory in daily reports, which included days supply, inventory, and sales, and that the directors who ran these reports regularly communicated with Stellantis's management. According to FE 8, Stellantis could run an analysis on ground day supply, what is in transit, and what is being built through an internal database called the "Hub," which was accessible to senior executives. FE 8 recalled that Stellantis tracked information regarding inventory in the CTP program and regarding the coupon program in DealerConnect. FE 8 recalled that Stellantis tracked information regarding inventory in the CTP program and regarding the coupon program in DealerConnect. FE 8 confirmed that any employees of Stellantis, which would include the Executive Defendants, had access to days' supply and could see how long a vehicle had been sitting on a dealer's lot. FE 9 likewise confirmed that Stellantis monitors inventory and days' supply in real-time and that Stellantis could view the number of vehicles not reported as sold in DealerConnect.

224. FEs 2, 3 and 6 similarly described the Company's robust reporting. FEs 2, 3 and 5 similarly described the Company's robust reporting. For example, FE 2 received monthly Jeep reports, which showed declining sales due to high prices. According to FE 2, the reports showed sales by segment and by state and included the specific monthly and annualized numbers. FE 2 confirmed that the same report also showed sales to end customers (both leases and car sales). Likewise, FE 3 explained that monthly dealer financial reports contained information regarding the number of vehicles on a dealer's lot and the sale price and that this information was reported throughout the Company. FE 3 also specifically confirmed that the information in the monthly dealer financial reports was provided to senior executives, including the top of the house. In addition, FE 3 described a daily C-1 report that provided sales by vehicle line and inventory

positions of dealers, and expected that the CEO and CFO received these daily reports because it is the bloodline of the business and the C-1 reports were a focus for the Company.

225. FE 5 confirmed that the Company had a variety of reports at a national level that would break out day supply by region, and that these reports were on everyone's radar. FE 5 confirmed that he had access to the national numbers and breakdowns, and that those same numbers and breakdowns were used at the monthly Commercial Committee meetings attended by Defendant Tavares. FE 5 recalled that these reports came from a system called BusinessObjects, which everyone utilized. FE 5 stated that the reports from BusinessObjects would show market share, sales, and inventory on a daily basis.

226. FE 5 also explained that Stellantis had day supply reports known as BEKG reports, which showed the current sales, current stock, what is in the pipeline, and current day supply, and that they would show sales in terms of both cars shipped to the dealer and dealer sales. FE 5 further confirmed that these reports showed current sales for the month, what they had retailed to the customers, and also what dealers currently had in stock and what was in the pipeline/what was coming. FE 5 explained that all the senior managers and above, including the CEO and CFO, got the reports in daily email and that CEO Tavares and CFO Richard Palmer would also receive those emails.

227. FE 5 also reported that he received demand reports that were being looked at on a daily basis at the Company and were discussed in brand manager meetings multiple times each week. FE 5 explained that the tougher times got, the more information the executives would look at. According to FE 5, declining demand was an issue that was top of mind for the brand managers in all of their meetings in 2023 and was something that was constantly discussed from February 2023 until he left the Company.

228. The fact that Defendants had access to and did access information revealing the Company's unsustainably high pricing and inventory levels that was contained in reports and databases, as well as the fact that Defendants conducted studies and attended meetings where the impacts of Stellantis's unsustainably high pricing were discussed, and acknowledge in their annual reports that sales incentives and "the expected incentive cost needed to facilitate the sales of the inventory by the dealers" were "reviewed monthly," strongly support a strong inference of scienter.

229. ***Fourth, Defendants repeatedly touted their personal knowledge of the Company's pricing and inventory levels.*** Throughout the Class Period, Defendants publicly confirmed to investors that they had ready access to and personally reviewed information regarding Stellantis's pricing and inventory. For example, on October 31, 2023, Defendant Knight affirmed that Stellantis "had been very thoughtful" about "ensur[ing] we have the right [inventory] levels." On December 6, 2023, Defendant Tavares spoke at length about the supposed root causes of the Company's inventory increases. Similarly, on a February 15, 2024, call with investors, Knight assured the market of the Company's "continued focus on pricing discipline" and professed to have analyzed the sustainability of the Company's pricing compared to peers stating, "I think we have shown a lot of success in being able to really drive sustainable pricing differentiation vis-à-vis our peers." On that same call, Knight told another analyst that inventory was "one of the big focus areas we have looked at." Then, on April 30, 2024, Knight told investors that "when we look at our [inventory] position in North America . . . it is in the healthy range." As another example, on a May 29, 2024, investor call, Knight assured investors that "our focus has really been all about how do we get our inventories down." Then, on a July 25, 2024, investor call, Defendant Tavares stated that "inventory discipline is, in the US market right now, the biggest point of focus," and that he was "personally involved with our North American Teams to fix it." The fact that

Defendants explicitly represented to investors that they had personal knowledge about the Company's pricing and inventory issues strongly supports a strong inference of scienter.

230. ***Fifth, Defendants forced dealers to accept inventory to inflate the Company's AOI by any means necessary, including secret incentives.*** FEs 1, 3, 4, 8, 9, and 10 each reported that, unknown to investors, Stellantis had a series of secret incentives it used to get dealers to accept more inventory, thereby inflating the AOI. As discussed in ¶¶91-120 above, Stellantis employed incentive tactics, including (i) a CTP incentive which paid dealers to hide inventory in a "Courtesy Transportation Program"; (ii) a coupon incentive designed to punish dealers who would not take on additional inventory; (iii) an illegal sticker-repricing tactic; and (iv) ultimately paying dealers to take on even more inventory that they could not sell. Defendants intentionally employed these unusual and even illegal tactics to allow Stellantis to continue to report double-digit AOI to investors and paint a misleading picture of its financial health and prospects.

231. These incentives were known to the Executive Defendants. As the Company acknowledged in its annual SEC filings before and during the Class Period, signed by Defendants Tavares and Knight, Stellantis calculated a "key estimate" of "contentive rates" which used multiple inputs, including "the current incentive programs in the market." The Company further assured that the "estimated incentive rates are ***reviewed monthly*** and changes to planned rates are adjusted accordingly, thereby impacting revenues."

232. The fact that Defendants employed and directed systematic efforts—including potentially illegal measures—to offload excess inventory and compel dealers to take on even more inventory that they could not sell, particularly combined with their monthly review of incentives, supports a strong inference of scienter.

233.     ***Sixth***, ***Defendants made several false and misleading statements close in time to the dates on which the truth was revealed to investors.*** For example, on July 25, 2024, Defendant Knight claimed that AOI margin was tracking "***right in line with our full year guidance***" and Defendant Tavares stated that Stellantis would "***like to confirm our double-digits AOI margin***" which "***seems to confirm that we are on the leading pack***." On September 23, Defendant Knight touted double-digit AOI margins as the Company's "***north star***." Just seven days later, on September 30, 2024, Stellantis revealed a massive cut to its AOI guidance from double-digits to as low as 5.5%, representing a negative revision of more than 40% percent. The magnitude and timing of the decline bolsters the inference that Defendants knew that their statements were misleading when made, and with the magnitude of the revision that large, Defendants plausibly had data and information to suggest the decline was taking place.

234.     ***Seventh, Defendants' misrepresentations concern Stellantis's core business operations.*** As discussed in ¶¶23-31, Stellantis's profitability—and thus its achievement of double-digit AOI margins—depended heavily on its ability to competitively price its vehicles, which, in turn, required the Company to maintain healthy inventory levels. Indeed, in its annual SEC reports filed during the Class Period, signed by Defendants Tavares and Knight, Stellantis acknowledged the central importance of its pricing power, stating that its "ability to maintain or increase pricing has impacted, and will continue to impact, our results of operations and profitability." Given that the Company's financial performance depended on its pricing power and inventory levels, it would be absurd for Defendants not to be aware of the ballooning inventory in the Company's largest and most profitable market segment and that its pricing strategy was unsustainable.

235. ***Eighth, ruling with an iron fist, Defendant Tavares set and imposed draconian targets to hit double-digit AOI margins and retaliated against anyone who did not comply with his mandates.*** FEs 1, 2, 3, 6, 7, and 8 each confirmed that Tavares and his team directed and knew about the fraud. FEs 3 and 6 confirmed that the mandate to achieve double-digit AOI came from Tavares. Both FEs 3 and 6 also confirmed that the tactics employed by the Company to achieve the double-digit AOI raised alarms internally. Further, as FE 2 stated, it was known that the pricing reached a point where Stellantis's prices would be unpalatable for the customer. FE 3 similarly noted that Stellantis employees became uneasy when they saw the numbers Tavares wanted.

236. FE 1 further reported that Tavares himself directed the pressure to force vehicles onto dealers, even as the Company recognized that dealers had too much inventory. FEs 7 and 8 confirmed that the directives driving price increases came from Tavares's direct reports. FE 7 reported that, in order to meet revenue targets—*e.g.*, if Stellantis was short a certain amount of money in its budget—the Company would simply increase prices, sometimes by 10 to 30% over the course of a year, to make that amount up. FE 7 recalled that an entire finance team in Europe was driving these price increases in the U.S., even as North America Operations pushed back and there was Company-wide concern that such price hikes would deteriorate the Company's sales.

237. Despite the widespread concern throughout the Company with the issues of ballooning inventory and unsustainably high prices, Stellantis employees were punished for disagreeing with Tavares's strategy. According to FE 3, Tavares ran the entity with an iron fist, and forced out anyone who disagreed with his positions. FE 3 confirmed that Knight went along with Tavares's direction instead of pushing back. Tavares created a culture of absolute fear at Stellantis, retaliating against anyone with a differing opinion—so much so that FE 3 said employees shared an ongoing joke that if Tavares came to town, someone was getting fired.

238. This culture of retaliation and fear is corroborated by, among other things, *CNBC*'s December 11, 2024 article which reported, based on interviews with "several former and current leaders, as well as other U.S. employees with [Stellantis]," that Tavares was "fixated on near-term cost reductions and profits to the detriment of the business," and that Tavares's directives "felt like having a pistol 'to your head.'"

239. Further, at the June 13, 2024 Investor Day conference, an analyst questioned Tavares about the Company's inventory and pricing issues, noting that "you're very well-known for your execution, the control you have over the company," and "I know you control these things really, really closely, right." Defendant Tavares admitted that he closely controlled the Company, telling the analyst in response, "[Y]ou are absolutely right." Tavares's admission of close control over Stellantis's inventory and pricing, particularly in combination with his efforts to silence serious concerns about Stellantis's ballooning inventory and unsustainably high prices support a strong inference of scienter.

240. ***Ninth, while not required, Defendant Tavares was highly motivated to conceal the Company's problems and inflate AOI margins through channel stuffing, particularly through the first half of 2024, as he stood to profit immensely from maintaining double-digit AOI margins and inflating Stellantis's stock price.***

241. Specifically, for 2023, Tavares received total renumeration valued at €36.5 million (valued as of the grant date of Performance Stock Units), making Tavares the highest paid traditional automotive executive in the world, as reflected in the chart directly below:

| Base Salary | Fringe Benefits | Short-term incentive | Long-term incentive | Post-retirement benefits | Total |
|---|---|---|---|---|---|
| €2,000,000 | €634,697 | €5,786,00 | €26,125,828 | €1,946,700 | €36,494,025 |

242. In 2023, Tavares's short-term incentive award of €5,786,00 was determined by multiplying his base salary by 200% and applying a further multiplier that was heavily influenced by the Company's key profitability metrics, AOI margin, and industrial free cashflows. Together, those metrics accounted for 50% of the multiplier. Each of these factors was temporarily inflated by Defendants' channel stuffing, which allowed Tavares to achieve a multiplier of 144.67%, resulting in a cash payment of €5,786,00 under the Company's short-term incentive plan.

243. In 2023, Tavares's long-term incentive award, which covered the period from 2021-2023, included 845,526 PSUs from the Company's Equity Incentive Plan. The Equity Incentive Plan for 2021-2023 awarded Tavares 845,526 PSUs, which were secured ***primarily*** (80% out of 138%) by increasing Stellantis's stock price relative to peers. The PSUs were valued at a staggering $19,717,666.32 as of the end of 2023.[1] But for Defendants stuffing the channel with overpriced inventory to temporarily inflate AOI margins and thereby fund record buybacks and dividends, Tavares's PSU grant would have been materially and substantially reduced.

244. In 2024, the Shareholder Return Incentive triggered a maximum 200% payout, as the Company's stock price had more than doubled since the merger over the period from February 2024 to August 2024, as Defendants' misrepresentations concerning Stellantis's financial health and prospects peaked. As a direct result of Defendants' misrepresentations and Stellantis's inflated stock price, Tavares was scheduled to receive 2,000,000 PSUs, valued at more than €33.3 million as of July 31, 2024. In recognition of the fact that the Company's share price had been temporarily inflated by Defendants' channel stuffing and short-term prioritization of profits, the settlement agreement between Defendant Tavares and Stellantis reduced this award to just 800,000 PSUs.

---

[1] Stellantis does not disclose precise targets for its 2022-2024 and 2023-2025 Long Term Incentive plans for strategic purposes. However, 40% of the 2022-2024 incentive plan is determined by comparing Stellantis's stock price performance vs. peers. Similarly, 30% of the 2023-2025 Long Term Incentive plan is determined by comparing Stellantis's stock price vs. peers, and a further 40% of the award is determined by AOI performance.

245. In sum, had Defendants not artificially and temporarily inflated AOI margin and cashflows, which created the false and misleading impression that the Company's record stock buybacks and dividends were sustainable, Tavares's awards would have been materially and substantially reduced. Instead, in 2023, Tavares earned a staggering €31,912,628 in bonuses on top of his salary and benefits, for a grand total of €36,494,025—more than 518 times the amount of an average Stellantis employee and any other traditional automotive executive. And, despite the precipitous decline of Stellantis's stock price during the Class Period and Tavares's premature departure from the Company, Tavares *still* collected an astounding €20,514,494 in performance-based bonuses on top of his salary and other benefits, for a total of €23,085,718—earning more than 350 times the amount of an average Stellantis employee.

246. ***Tenth, Defendants' abrupt and forced departures support a strong inference of scienter.*** On October 10, 2024, less than two weeks after disclosing a catastrophic revision to 2024 guidance, Stellantis announced Defendant Knight would be replaced—after just 18 months on the job—with immediate effect. Analysts immediately linked the firing of Defendant Knight to the guidance revision, reporting, "Large management shake-up logically follows major warning." On December 1, 2024, just two months after the end of the Class Period, when the truth concerning Defendants' misrepresentations was revealed, Stellantis announced that the Board had accepted Tavares's "resignation," effective immediately. Though Tavares reportedly "resigned," news reports emerged revealing that, in truth, Tavares had been forced out of his CEO role because the overly aggressive "targets set by Tavares were deemed unrealistic or destructive by some board members." *Reuters* further reported that "[u]nhappy with his aggressive targets for sales and cost cuts and his contentious dealings with the giant automaker's suppliers, dealers and unions, the board unanimously wanted Tavares to go." The market similarly attributed Tavares's abrupt

departure to his unsustainable pricing strategy, as did subsequent news reports, which noted that Tavares's "goal of achieving double-digit AOI margins" and "reluctance, if not unwillingness" to listen to concerns about his strategy led to Tavares's departure. The fact that Defendants Tavares and Knight were both forced out of Stellantis shortly after the truth concerning Stellantis's inventory and pricing was revealed, and that members of Stellantis's Board viewed Defendant Tavares's financial targets as "unrealistic" and "destructive" creates a strong inference that Defendants' departures were associated with the alleged misconduct described in this Complaint.

247. ***Eleventh, Defendants specifically dismissed analysts' concerns about Stellantis's inventory and pricing power or provided evasive answers on the topic.*** For example, on an October 31, 2023, earnings call, an analyst asked Defendant Knight how she "would react with regards to midterm production volumes if inventories kept going up across your regions in the coming months." Knight responded that Stellantis "had been very thoughtful" about "ensur[ing] we have the right [inventory] levels." On the April 30, 2024 Sales and Revenue call, an analyst from Bank of America noted, "There still seems to be significant inventories of the older model at dealers." Defendant Knight pushed back stating that inventories in North America were "in the healthy range."

248. Additionally on the April 30 call, an analyst from Barclays asked, "[D]oes that basically mean you're happy with now the absolute inventory level in the US and we shouldn't be expecting any destocking going forward at all basically? And in that context, if I can just ask you again about how that reconciles with the 10% to 11% margin in the first half, because if there's no US destocking, volume shouldn't be that bad. . . . It doesn't quite want to reconcile for me with a margin level of at least the bottom end of the range." Defendant Knight took issue with the question, stating, "Are we satisfied with the absolute level? I think your language was a little

provocative with would we never change the number again or would we be satisfied with that number forever. And I think the answer is, when we look at our position in North America, I believe we are in a spot where it is in the healthy range."

249. Then, on June 13, 2024, shortly after Stellantis revealed that its inventory was rising and revenue was declining, Defendant Tavares appeared on *CNBC*'s Power Lunch with Phil LeBeau. During that interview, after noting that he had heard Tavares's Investor Day disclosures, LeBeau asked Tavares, "You're confirming your guidance for this year . . . but this second half is going to be challenging. . . . Given your inventory levels . . . are you going to have to increase your incentives in discounting in order to clear out what are really high inventory levels?" Tavares did not answer LeBeau's question and provided instead a highly evasive response:

> You are right to say that we will have a very unbalanced year. 2024 is a transition year as we are now ramping up our electrification offensive in the market so we have many new products coming in the second half, starting with the Wagoneers and the new Dodge Charger and all of this. It's going to come in the second half so we have a very unbalanced year so far, and you are right to say that there are plenty of opportunities for our consumers to grasp our leadership right now on all of our brands, and we are going to manage that on a progressive and thoughtful manner in the end of the year.

250. On a conference call on September 23, 2024, an analyst from Bank of America opined that the "topic of pricing is probably . . . one of the most important ones in the sector at the moment" and that the "the lack of growth in retail sales is . . . telling you that cars have become unaffordable." The analyst asked, "[H]ow much do you think is there may be an element that is just structurally too high and you've got to take a choice whether or not you're happy to live indefinitely with a lower volume level?" Defendant Knight disagreed, "I would frame it a little differently, which is I think there's a short term issue which is operationally driven mostly North America driven, where we need to look at what's the best way we bridge the gap to getting to that point where we're at a healthier level." Knowing that analysts and investors were acutely focused

on the Company's inventory levels and pricing power throughout the Class Period, it would be reckless, at a minimum, for Defendants to speak about Stellantis's inventory levels and pricing power—especially in response to direct analyst questions—without reviewing data concerning the same.

## IX. THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

251. The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading statements pleaded in this Complaint. The statements complained of herein: (i) were historical statements or statements of purportedly current facts and conditions at the time the statements were made; (ii) were mixed statements of present and/or historical facts and future intent; and/or (iii) omitted to state material current or historical facts necessary to make the statements not misleading.

252. Further, to the extent that any of the false or misleading statements alleged herein could be construed as forward-looking, the statements were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by the Defendants were not sufficient to insulate them from liability for their materially false and misleading statements.

253. Alternatively, to the extent the statutory safe harbor otherwise would apply to any forward-looking statements pleaded herein, the Defendants are liable for those false and misleading forward-looking statements because at the time each of those statements was made, the speaker knew the statement was false or misleading, did not actually believe the statements, had no reasonable basis for the statements, and/or was aware of undisclosed facts tending to seriously undermine the statements' accuracy.

## X. THE PRESUMPTION OF RELIANCE

254. The Class is entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material facts that there was a duty to disclose.

255. The Class is also entitled to a presumption of reliance on Defendants' materially false and misleading statements and omissions pursuant to the fraud-on-the-market doctrine because, during the Class Period, among other things:

(a) Defendants made public misstatements or failed to disclose material facts;

(b) The omissions and misstatements were material;

(c) The Company's stock was traded in an efficient market;

(d) The misrepresentations alleged would tend to induce a reasonable investors to misjudge the value of the Company's securities; and

(e) Lead Plaintiff and other members of the Class purchased Stellantis securities between the time Defendants made material misstatements or failed to disclose material facts and the time that the true facts were disclosed without knowledge of the misstatements or omitted facts.

256. At all relevant times, the market for Stellantis common stock was efficient for the following reasons, among others:

(a) Stellantis stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a regulated issuer, Stellantis filed periodic public reports with the SEC; and

(c) Stellantis regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

257. Accordingly, Lead Plaintiff and other members of the Class relied, and are entitled to have relied, upon the integrity of the market prices for Stellantis's securities, and are entitled to

a presumption of reliance on Defendants' materially false and misleading statements and omissions during the Class Period.

## XI. CLASS ACTION ALLEGATIONS

258. Lead Plaintiff brings this action as a class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons or entities who purchased or otherwise acquired Stellantis securities between October 31, 2023 and September 27, 2024, inclusive (the "Class Period"), in domestic transactions or on U.S. exchanges, and were damaged thereby (the "Class"). Excluded from the Class are Defendants and their immediate families, the officers and directors of the Company at all relevant times, members of their immediate families, and Defendants' legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

259. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of February 25, 2025, there were approximately 2,896,073,567 shares of Stellantis common stock outstanding.

260. Lead Plaintiff's claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal laws as complained of herein.

261. Lead Plaintiff will fairly and adequately protect Class members' interests and has retained competent counsel experienced in class actions and securities litigation. Lead Plaintiff has no interest that conflicts with the interests of the Class.

262. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of fact and law common to the Class are:

(a) whether Defendants' misrepresentations and omissions as alleged herein violated the federal securities laws;

(b) whether Defendants made false or misleading statements or omissions during the Class Period;

(c) whether Defendants' alleged false and misleading statements and omissions were material;

(d) whether Defendants made their alleged false and misleading statements and omissions with scienter;

(e) whether Defendants Tavares and Knight are personally liable for the alleged misrepresentations and omissions described herein;

(f) whether Defendants Tavares and Knight were controlling persons of Stellantis;

(g) whether Defendants' misrepresentations and omissions as alleged herein caused the Class members to suffer a compensable loss; and

(h) whether the members of the Class have sustained damages, and the proper measure of damages.

263. A class action is superior to all other available methods for the fair and efficient adjudication of this action. Joinder of all Class members is impracticable. Additionally, the damage suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation make it practically impossible for such members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XII.  CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT I
### For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5
### (Against All Defendants)

264. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

265. This Count is asserted on behalf of all members of the Class against all Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.l0b-5.

266. During the Class Period, Defendants disseminated or approved the false and misleading statements specified above, which they knew, or were reckless in not knowing, were false or misleading in that they contained misrepresentations and/or omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

267. During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; and (ii) cause Lead Plaintiff and other members of the Class to purchase Stellantis securities at artificially inflated prices.

268. Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Stellantis securities.

269. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiff and the Class; made various untrue and/or misleading statements of material facts and omitted to state material

facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with recklessness; and employed devices and artifices to defraud in connection with the purchase and sale of Stellantis securities, which were intended to, and did: (a) deceive the investing public, including Lead Plaintiff and the Class, regarding, among other things, the health and sustainability of the Company's pricing, inventory, and margins; (b) artificially inflate and maintain the market price of Stellantis securities; and (c) cause Lead Plaintiff and other members of the Class to purchase Stellantis securities at artificially inflated prices and suffer losses when the true facts became known and/or the risks materialized.

270. Stellantis and the Executive Defendants are liable for all materially false and misleading statements made during the Class Period, as alleged above.

271. As described above, Defendants acted with scienter throughout the Class Period, in that they acted either with intent to deceive, manipulate, or defraud, or with recklessness. The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers or sellers of Stellantis stock, were either known to the Defendants or were so obvious that the Defendants should have been aware of them.

272. Lead Plaintiff and the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for Stellantis securities, which inflation was removed from its price when the relevant truth concealed by Defendants' misrepresentations and omissions became known.

273. Defendants' wrongful conduct, as alleged above, directly and proximately caused the damages suffered by Lead Plaintiff and other Class members. Had Defendants disclosed complete, accurate, and truthful information concerning these matters during the Class Period,

Lead Plaintiff and other Class members would not have purchased or otherwise acquired these securities at the artificially inflated prices that they paid. It was also foreseeable to Defendants that misrepresenting and concealing these material facts from the public would artificially inflate the price of Stellantis securities and that the ultimate disclosure of relevant truth concealed by Defendants' misrepresentations and omissions, or the materialization of the risks concealed by Defendants' material misstatements and omissions, would cause the price of Stellantis securities to decline.

274. Accordingly, as a result of their purchases of Stellantis securities during the Class Period, Lead Plaintiff and the Class suffered economic loss and damages under the federal securities laws.

275. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule l0b-5, promulgated thereunder.

276. This claim is brought within the applicable statute of limitations.

**COUNT II**
**For Violations of Section 20(a) of the Exchange Act**
**(Against Defendants Tavares and Knight)**

277. Lead Plaintiff repeats, incorporates, and realleges each and every allegation contained above as if fully set forth herein.

278. This count is asserted on behalf of all members of the Class against the Executive Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

279. Defendants Tavares and Knight acted as controlling persons of Stellantis within the meaning of Section 20(a) of the Exchange Act, as alleged herein.

280. By reason of their high-level positions of control and authority as the Company's most senior officers, Defendants Tavares and Knight had the authority to influence and control, and did influence and control, the decision-making and activities of Stellantis and its employees,

and to cause the Company to engage in the wrongful conduct complained of herein. Defendants Tavares and Knight were able to influence and control, and did influence and control, directly and indirectly, the content and dissemination of the public statements made by Stellantis during the Class Period, thereby causing the dissemination of the materially false and misleading statements and omissions of material facts as alleged herein. Indeed, Defendants Tavares and Knight were the Stellantis officers who communicated with investors on earnings calls and at investor conferences on the Company's behalf. Defendants Tavares and Knight were provided with, or had unlimited access to, copies of the Company's press releases, public filings, and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were made and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

281. Defendants Tavares and Knight spoke to investors on behalf of the Company during the Class Period. Therefore, Defendants Tavares and Knight were able to influence and control, and did influence and control, directly and indirectly, the content and dissemination of the public statements made by Stellantis during the Class Period, thereby causing the dissemination of the materially false and misleading statements and omissions of material facts as alleged herein.

282. In their capacities as the most senior corporate officers of Stellantis, and as more fully described above, Defendants Tavares and Knight had direct supervisory involvement in the day-to-day operations of Stellantis and therefore are presumed to have had the power to control and influence the particular transactions giving rise to the securities law violations as alleged herein.

283. As set forth above, Stellantis violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint.

284. By virtue of their positions as controlling persons of Stellantis and as a result of their own aforementioned conduct, Defendants Tavares and Knight were liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiff and the other members of the Class who purchased or otherwise acquired Stellantis securities.

285. As a direct and proximate result of Defendants Tavares's and Knight's conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchase or acquisition of Stellantis securities.

286. This claim is brought within the applicable statute of limitations.

## XIII. PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment as follows:

(a) Declaring that this action is a proper class action and certifying Lead Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Lead Plaintiff and the other members of the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

(d) Awarding such other and further relief as the Court may deem just and proper.

## XIV. JURY DEMAND

Lead Plaintiff hereby demands a trial by jury.

Dated: March 31, 2025

Respectfully submitted,

By: /s/ *Rebecca E. Boon*
**BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP**

Salvatore J. Graziano
Rebecca E. Boon
Alec T. Coquin
1251 Avenue of the Americas, 44th Floor
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
Email: salvatore@blbglaw.com
Email: rebecca.boon@blbglaw.com
Email: alec.coquin@blbglaw.com

*Counsel for Lead Plaintiff Boston Retirement System*

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Timothy J. Smyth, on behalf of the Court-appointed Lead Plaintiff Boston Retirement System ("Boston"), hereby certify, as to the claims asserted under the federal securities laws, that:

1.  I am the Executive Officer of Boston. I have reviewed the Amended Class Action Complaint, and Boston has authorized its filing by counsel.

2.  Boston did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3.  Boston is willing to serve as a lead plaintiff and representative party on behalf of the class, including providing testimony at deposition and trial, if necessary. Boston fully understands the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act of 1995, including the selection and retention of counsel and overseeing the prosecution of the action for the class.

4.  Boston's transactions in the Stellantis N.V. securities that are the subject of this action are set forth in the chart attached hereto.

5.  Boston has sought to serve and was appointed as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification:

    *Long v. Stellantis N.V.*, No. 24-cv-6196 (S.D.N.Y.)
    *Baxter v. PDD Holdings Inc. f/k/a Pinduoduo Inc.*, No. 24-cv-5653 (E.D.N.Y.)
    *Lemm, Jr. v. New York Community Bancorp, Inc.*, No. 24-cv-903 (E.D.N.Y.)
    *Vazquez v. Masimo Corporation*, No. 23-cv-1546 (S.D. Cal.)
    *In re Silvergate Capital Corporation Securities Litigation*,
    No. 22-cv-1936 (S.D. Cal.)
    *In re Barclays PLC Securities Litigation*, No. 22-cv-8172 (S.D.N.Y.)
    *Shapiro v. TG Therapeutics, Inc.*, No. 22-cv-6106 (S.D.N.Y.)

6.  Boston has sought to serve as a lead plaintiff and representative party on behalf of a class in the following action under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew its motion for appointment as lead plaintiff or was not appointed lead plaintiff:

    *City of Fort Lauderdale Police and Firefighters Retirement System*
    *v. Pegasystems Inc.*, No. 22-cv-11220 (D. Mass.)

7. Boston is currently seeking to serve as a lead plaintiff and representative party on behalf of a class in the following action under the federal securities laws filed during the three-year period preceding the date of this Certification:

*Shannahan v. FTAI Aviation Ltd.*, No. 25-cv-541 (S.D.N.Y.)

8. Boston will not accept any payment for serving as a representative party on behalf of the class beyond Boston's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 31 day of March, 2025.

Timothy J. Smyth
Executive Officer
Boston Retirement System

**Boston Retirement System**
**Transactions in Stellantis N.V.**

| Transaction | Date | Shares | Price |
|-------------|------|--------|-------|
| Purchase | 4/9/2024 | 66,663 | 27.2087 |
| Purchase | 5/9/2024 | 104,999 | 21.7933 |
| Sale | 9/25/2024 | (46,801) | 15.3697 |