UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------X
                                               :

STEVEN LONG, individually and on behalf of all    :
others similarly situated,
                                               :

                                Plaintiffs,    :

                                               :               24-CV-6196 (VEC)

     v.                                   :

                                               :             OPINION & ORDER

STELLANTIS N.V., CARLOS TAVARES, and    :
NATALIE M. KNIGHT,
                                               :

                                Defendants.   :

                                               :
---------------------------------------------------------------------X

VALERIE CAPRONI, United States District Judge:

Defendant Stellantis N.V. (the "Company") allegedly engaged in a "channel stuffing" scheme pursuant to which it overloaded retailers with excessive inventory, leading to short-term sales increases but long-term sales declines.  Plaintiff alleges that various statements made by the Company and two of its executives, Defendants Carlos Tavares and Natalie Knight, were false or misleading in light of the undisclosed channel stuffing scheme.  Plaintiff brings claims pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.  *See* Amended Class Action Complaint, Dkt. 49 (the "Amended Complaint" or "Am. Compl.") ¶¶ 264–86.

Defendants moved to dismiss the Amended Complaint.  Motion to Dismiss the Amended Complaint, Dkt. 54 (the "Motion to Dismiss" or "Mot. to Dismiss").  Plaintiff opposed, *see* Opp. to Mot. to Dismiss, Dkt. 60 (the "Opposition" or "Opp."), and moved to strike certain exhibits that Defendant cited in its Memorandum of Law in Support of the Motion to Dismiss, *see* Mot.

to Strike, Dkt. 61.  The Motion to Dismiss is GRANTED, and the Motion to Strike is DENIED

AS MOOT.

**BACKGROUND**[1]

**I.    Factual Background**

Defendant Stellantis N.V. manufactures cars and trucks.  Am. Compl. ¶ 23.  In January

2021, following a merger, Defendant Carlos Tavares became CEO of Stellantis.  *Id.*  Shortly into

his tenure, Tavares announced the "Dare Forward 2030 Plan," an eight-year strategy that aimed,

among other things, to double Stellantis's net revenue and maintain double-digit Adjusted

Operating Income ("AOI") margins.  *Id.* ¶¶ 23, 25.  Stellantis calculated AOI "by subtracting

rare or discrete expenses from its net profits," and calculated AOI margins by "dividing AOI by

net revenues."  *Id.* ¶ 26.  AOI margins are considered a key indicator of profitability in the

automotive industry.  *Id.* ¶¶ 26–29.

Tavares's tenure as CEO started strong.  In 2022, Stellantis reported a record company-

wide AOI margin of 13%, with a 16.4% AOI margin in North America.  *Id.* ¶ 32.  Analysts were

impressed with the Company's profits, despite concerns about its high prices and high inventory

levels.  *Id.* ¶ 33.  On October 31, 2023 (the start of the proposed class period), Stellantis

announced rising revenues, which it attributed to its "improved volume and consistent pricing."

*Id.* ¶ 36.  During an earnings call that same morning, Defendant Natalie Knight, Stellantis's

CFO, assured investors that the Company had "significantly tightened" its inventory levels and

that there would be further "inventory improvement as we go towards the end of this year."  *Id.*

¶ 39.  She also represented that the Company's prices were "carefully calibrated" and "moving

---

[1]    At the motion to dismiss stage, the Court accepts as true all well-pled factual allegations in the Amended Complaint and draws all reasonable inferences in the light most favorable to Plaintiff.  *See Gibbons v. Malone*, 703 F.3d 595, 599 (2d Cir. 2013).

2

really positively for us." *Id.* ¶ 40. She noted that Stellantis had the "highest margin in terms of AOI" and that the Company boasted a "high and healthy profitability level." *Id.* ¶ 41.

In the months that followed, Defendants continued to report positively on Stellantis's AOI margins and overall profitability, notwithstanding concerns about inventory and pricing. At a December 6, 2023, conference, for example, an analyst asked Tavares how he would "make sure that [his] independent dealers are disciplined on pricing with inventory rising"; Tavares responded that the Company's pricing strategy "has been working" and suggested that problems with surplus inventory could be related to dealers' failure to deliver cars that had been sold to customers in a timely manner. *Id.* ¶¶ 44–45.

Stellantis continued to report double-digit AOI margins at the beginning of 2024, and representatives of the Company continued to attribute its financial health in part to, as Knight put it at a February 15, 2024, conference, its "sustainable pricing differentiation vis-à-vis [its] peers." *Id.* ¶ 49. In press releases about the Company's 2023 results and in 2024 guidance published that same day, the Company announced 15.4% AOI margins in North America. *Id.* ¶ 46. Tavares stated that the results were "proof that we have become a new global leader in our industry and will remain rock solid as we look to a turbulent 2024." *Id.* ¶ 177. In an associated conference call that morning, Tavares attributed the "robust results in North America" in part to the fact that "we have been protecting the value of what we are doing in our [C]ompany, which is translated by the fact that we have the best US average transaction price of the industry." *Id.* ¶ 48. Market analysts took notice of Stellantis's strong AOI margins, and its stock price increased. *Id.* ¶¶ 48–50.

But problems were brewing. Stellantis had set prices higher in North America than market conditions allowed; that "made vehicle inventory balloon to unsustainable levels by

stuffing its dealers with excess inventory." *Id.* ¶ 51.  According to anonymous former employees, Stellantis's efforts to "stuff the channel" with inventory was deliberate: by overloading dealers with more cars than they could sell, Stellantis was able to report strong AOI margins in the short term, causing Stellantis's stock prices (and Tavares's compensation, which was closely tied to the Company's stock price) to rise.  *Id.* ¶¶ 51–82.  One former employee reported that "50% to 60% of [Stellantis] dealers across the country were not profitable and put themselves on a finance hold so that they would not get more cars shoved down their throats by Stellantis." *Id.* ¶ 54.  Another former employee stated that he had seen reports indicating that Stellantis dealers maintained over 100 days' worth of supply at several points in 2023, even though the industry standard was to maintain just 40 to 60 days' supply.  *Id.* ¶ 73.  Various former employees said that dealers with excess inventory reported the problem to Stellantis at various points throughout the class period, "including inventory reports and in-person meetings with district managers, where they expressed concerns about unsustainable prices and ballooning inventory." *Id.* ¶ 86.  Stellantis responded dismissively.  *See generally id.* ¶¶ 83–90 (describing various ways that former employees report they attempted to raise concerns about pricing and inventory strategy with Stellantis).

To convince dealers to purchase more inventory than they could sell, Defendants offered various incentives.  First, Stellantis revised its "Courtesy Transportation Program."  Historically, that program offered dealers $2,000 to $3,000 to use vehicles for six months or more as part of their courtesy transportation fleet, effectively removing them from the inventory they had available to sell.  *Id.* ¶¶ 93–94, 96–97; *see also* Opp. at 34–35.  From late 2023 and into 2024, however, Stellantis relaxed the requirements, allowing dealers to enroll cars in the Program for just thirty days, rather than six months, while still qualifying for the $2000 to $3000 incentive.

Am. Compl. ¶ 96.  Second, Stellantis offered coupons to dealers who ordered additional inventory; the dealers, in turn, could use the coupons to discount the price of a vehicle to the customer.  *Id.* ¶¶ 100–01.  Third, Stellantis "manufactured new window stickers" that showed a reduction in the Manufacturer's Suggested Retail Price ("MSRP") for dealers to affix to vehicles in their inventory.  *Id.* ¶ 103.  Fourth, in March or April 2024, Stellantis began paying dealers directly for them to take additional inventory.  *Id.* ¶ 110.  According to one former employee, that decision turned the ordinary incentive structure in the auto industry on its head; typically, manufacturers pay incentives based on the volume that dealers sell, not the volume they order.  *Id.* ¶ 115.

The consequences of inflated pricing and excess inventory began to show during an April 30, 2024, earnings call.  During that call, Stellantis disclosed reductions in its AOI margins (although it barely maintained the double-digit margins for which it aimed).  *Id.* ¶ 121.  Knight continued to represent that inventories were "in the healthy range" and that the Company would "continue[] to make progress on inventories."  *Id*.  In a press release issued on the same day, Knight referred to Stellantis's "strong relative pricing."  *Id.* ¶ 181.

On June 13, 2024, Stellantis acknowledged its declining margins and surplus inventory when Tavares said, in a conference call with investors,

> [T]hings were visible in fall 2023. . . . Then what happened next is that the market conditions deteriorated by the end of 2023, and we ended up 2023 with too much inventory.  And you were the first ones to spot that, and you were right. . . . I am responsible and we were arrogant.  No excuse.

*Id.* ¶ 126.  In a presentation to investors at an event that same day, Stellantis noted that its inventory supply in the United States was "too high."  *Id.* ¶ 125.  Stellantis's share price dropped that day and the following day, although Knight and Tavares continued to assert that they were

making progress on right-sizing inventory and that the Company would maintain double-digit AOI margins. *Id.* ¶ 129.

More bad news followed on July 25, 2024, when Stellantis reported a 4% decrease in AOI margins in North America during the first half of 2024, down to 11.4% from 15.4%. *Id.* ¶ 130. Tavares attributed the decline in part to "the inventory," which he noted investors "have been highlighting, and rightly so." *Id.* ¶ 131. The stock price declined again. *Id.* ¶ 133. Nevertheless, Knight and Tavares reaffirmed their commitment to maintaining double-digit AOI margins, with Knight claiming the AOI margin was tracking "right in line with our full year guidance," and Tavares describing the inventory issue as a "bump on the road that we are now fixing." *Id.* ¶ 136.

In September 2024, the U.S. Stellantis National Dealer Council sent Tavares a letter sharply criticizing the Company's pricing and inventory strategies. *Id.* ¶¶ 139–43. The letter called the situation a "disaster" and noted that the Council "had been sounding this alarm to [Stellantis's] US executive team" for more than two years. *Id.* ¶ 139. On September 23, 2024 — less than two weeks after the letter — Knight stated at a conference that Stellantis was "pleased with the progress" it had made on U.S. inventories and reiterated its intention to deliver double-digit AOI margins as its "North Star." *Id.* ¶ 144. Just a week later, on September 30, 2024 (the final day of the proposed class period), however, Stellantis released revised 2024 guidance indicating that its AOI margins would fall to between 5.5% and 7%, due in part to "decisions to significantly enlarge remediation actions on North American performance issues." *Id.* ¶ 145. Stellantis's stock price declined by 12.5% following the revised guidance. *Id.* ¶ 147.

Less than two weeks after the revised 2024 guidance, Stellantis announced that Knight would be leaving her post as CFO, effective immediately, after just eighteen months on the job.

6

*Id.* ¶ 150.  That same day, the Company also announced that Tavares would be retiring as CEO at the end of his term in early 2026.  *Id*.  Less than two months after that, Tavares resigned.  *Id.* ¶ 153.

In January 2025, approximately a month after Tavares's resignation, the Company disclosed that it had reduced North American shipments by 28% from the previous quarter, reflecting "industry reduction initiatives."  *Id.* ¶ 156.  The following month, Stellantis disclosed its full year 2024 results, reporting AOI margins of just 5.5% for the year (and only 0.3% for the second half of the year).  *Id.* ¶ 157.

## II.   Procedural Background

This action began in August 2024.  *See* Compl., Dkt. 1.  In December 2024, the Court appointed Plaintiff Boston Retirement System as lead plaintiff pursuant to the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(a)(3)(B)(i), and its counsel, Bernstein Litowitz Berger & Grossman LLP, as lead counsel.  *See* Dec. 30, 2024, Order, Dkt. 40.  Plaintiff filed an Amended Complaint in March 2025, *see* Am. Compl., which Defendants moved to dismiss, *see* Mot. to Dismiss.  Plaintiff opposed, *see* Opp, and concurrently moved to strike various exhibits contained in Defendants' Memorandum of Law in Support of its Motion, *see* Mot. to Strike, 61.   The case was reassigned to the Undersigned in November 2025.

DISCUSSION

## I.   Legal Standard

On a motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), the court considers "whether the complaint contains 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'"  *Gamm v. Sanderson Farms, Inc*., 944 F.3d 455, 462 (2d Cir. 2019) (quoting *Ashcroft v. Iqbal*, 556 U.S.

662, 678 (2009)). "The court accepts as true all well-pleaded factual allegations in the complaint, draws all reasonable inferences in favor of the nonmoving party, and considers, in addition to the complaint, and written instruments attached, statements incorporated by reference, and public disclosure documents filed with the SEC." *Id.* (citations omitted). Although the Court must draw all reasonable inferences in favor of the non-moving party, the Court need not credit conclusory allegations or allegations that are contradicted by documents incorporated in the complaint or publicly filed with the SEC. *See In re Optionable Sec. Litig.*, 577 F. Supp. 2d 681, 690–92 (S.D.N.Y. 2008).

Because Section 10(b) and Rule 10b–5 claims sound in fraud, a heightened pleading requirement applies. Pursuant to Federal Rule of Civil Procedure 9(b) and the PSLRA, the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (citing *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000)); *see also* 15 U.S.C. § 78u–4(b)(1)(B).

## II.    Analysis

Section 10(b) of the Securities Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). The SEC's implementing rule, Rule 10b–5, makes it unlawful to "make any untrue statement of a material fact" or to "omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5. To state a claim pursuant to these provisions, a plaintiff must plead "(1)

a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Pac. Inv. Mgmt. Co. v. Mayer Brown LLP*, 603 F.3d 144, 151 (2d Cir. 2010) (quoting *Stoneridge Inv. Partners v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)).

Defendants argue that Plaintiff has failed to plead the first two elements, material misrepresentations or omissions and scienter. The Court will consider those elements in turn.

### A.    Most, if Not All, of the Misrepresentations and Omissions Plaintiff Attributes to Defendants Cannot Give Rise to a Securities Fraud Claim

"A violation of Section 10(b) and Rule 10b-5 premised on misstatements cannot occur unless an alleged material misstatement was false [or misleading] at the time it was made." *Robeco Cap. Growth Funds SICAV - Robeco Glob. Consumer Trends v. Peloton Interactive, Inc.*, 665 F. Supp. 3d 522, 540 (S.D.N.Y. 2023). Whether a statement is false or misleading for purposes of Section 10(b) and Rule 10b-5 is "evaluated not only by literal truth, but by context and manner of presentation." *Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019) (internal quotation marks omitted). To base a claim on an omission, a plaintiff must also plead that the defendant had a duty to disclose the omitted fact. *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 167 (2d Cir. 2021). Section 10(b) and Rule 10b–5, alone, "do not create an affirmative duty to disclose any and all material information," *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011), but a duty to disclose may arise if, as relevant here, a statement would be "inaccurate, incomplete, or misleading" without the omitted fact. *Synchrony*, 988 F.3d at 167.

#### 1.    Plaintiff's Theory

Before considering the specific statements by Defendants that Plaintiff alleges were false or misleading, a brief discussion of "channel stuffing" — the practice that forms the foundation

for Plaintiff's fraud claim — is necessary.  Channel stuffing occurs when a company offers its distributors "concessions to accept more product than they need[]."  *Gimpel v. The Hain Celestial Grp., Inc.*, 156 F.4th 121, 128 (2d Cir. 2025).  The practice can create a supply-and-demand problem: "[b]y getting distributors to buy more, [the company is] able to inflate its sales numbers at that moment, but it c[omes] at the expense of future sales because distributors [do not] need to buy more for a long time."  *San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 732 F. Supp. 3d 300, 311 (S.D.N.Y. 2024).  That said, channel stuffing is "not necessarily fraudulent" and "[p]arsing between a certain amount of channel stuffing that could be innocent and illegitimate channel stuffing done to mislead investors has been no easy task for courts."  *Gimpel*, 156 F.4th at 136 (cleaned up).  A plaintiff need not allege that a channel stuffing practice was "fraudulent or otherwise illegal" in order to state a claim pursuant to Rule 10b-5(b).  *In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th 131, 137 (2d Cir. 2021).  Rather, a plaintiff may allege either (1) that the channel-stuffing scheme "result[ed] in improper revenue recognition and, therefore, false financial statements and violations of [Generally Accepted Accounting Principles]" or (2) that "the company made misleading statements" about a material subject, such as "the company's financial success or channel inventory levels," without "disclosing its reliance on channel stuffing."  *Gimpel*, 156 F.4th at 137.

Plaintiff's theory of fraud falls into the second category: according to Plaintiff, Defendants misled investors by failing to disclose that they "had stuffed the channel with overpriced inventory, which decimated demand and created an inventory glut that dealers were unable to sell."[2]  *See* Am. Compl. ¶¶ 161, 163, 165, 167, 169, 171–72, 174, 176, 178, 180, 182,

---

[2]       Defendants argue that the alleged conduct did not constitute channel stuffing because Plaintiff does not allege that Defendants falsified their financials or "offered dealers rights of return, cash-back offers, or extended-payment terms."  Def. Mem. in Support of Mot. to Dismiss, Dkt. 57 at 25–26.  That argument is meritless; as discussed, channel stuffing is not, in itself, "fraudulent or otherwise illegal."  *Gimpel*, 20 F.4th at 136.  Because

184, 186, 188, 190, 192.  As Plaintiff explained in the Opposition, "Plaintiff's theory of liability centers on Defendants' statements concerning the health and sustainability of the Company's pricing, inventory, and margins, which were rendered materially misleading through their failure to disclose their channel stuffing scheme."  Pl. Opp. at 26.  Accordingly, the Court will consider the alleged misstatements to determine (1) whether they are actionable pursuant to Section 10(b) and Rule 10b-5, and (2) if so, whether Defendants' failure to disclose their "channel-stuffing" scheme rendered their statements materially misleading and, therefore, triggered a duty for Defendants to disclose the scheme.  *Synchrony*, 988 F.3d at 167.

### 2.  *The Alleged Misstatements*

Plaintiff argues that statements made by Defendants on seven separate dates were materially false or misleading in light of Defendants' purported failure to disclose the channel stuffing scheme.  *See* Am. Compl. ¶¶ 160–92.  Many of the statements, however, are not actionable for purposes of Section 10(b) and Rule 10b-5.  The non-actionable statements fall into three general (and somewhat overlapping) categories.

*First*, several of the statements, viewed in their complete context, are clearly irrelevant to Plaintiff's claims.  For example, the Amended Complaint cites as misleading Knight's October 31, 2023, representation that Stellantis had "significantly tightened" inventory levels, but it fails to acknowledge that reference was to then-current inventory levels compared to Stellantis's "premerger predecessors."   Dotova Decl., Dkt. 56, Ex. 23 at 6.  Plaintiff has not alleged that Stellantis had not, in fact, reduced inventory levels between the merger in January 2021 and

---

Plaintiff alleges that Defendants offered distributors incentives to accept inventory in an amount that exceeded consumer demand, they have alleged channel stuffing, regardless of whether they have also alleged securities fraud.

11

Knight's statement in October 2023, and it is unclear why a representation to that effect would be relevant to the alleged fraud, which concerns post-merger activity.

Knight's February 15, 2024, statement that "[p]eople have been pretty disciplined" about pricing is likewise irrelevant. Am. Compl. ¶ 173. That statement was made in response to a question about the "pricing environment in Europe and the U.S.," not Stellantis's pricing policies specifically. Dotova Decl. Ex. 26 at 20–21. In context, no reasonable investor would interpret the comment, which was about general market trends, to shed light on Stellantis's particular strategy.

Tavares's December 6, 2023, statement partially attributing Stellantis's inventory problems to its "need to do a better job at delivering the cars" fails for similar reasons. Am. Compl. ¶ 168. Plaintiff argues that this statement was misleading because it "falsely blam[ed] the inventory problem on car delivery issues and minimize[ed] the ballooning inventory crisis," Opp. at 16, but fails to acknowledge that Tavares made the statement immediately after discussing "very significant" changes to Stellantis's distribution model "only in Europe." Dotova Decl. Ex. 25 at 13. He made clear that decisions about similar changes to the delivery model had not been made "for the rest of the world." *Id*. Given that context, no reasonable investor would assume that Tavares's remarks were about Stellantis's inventory problems in North America, which are the subject of the Amended Complaint.

*Second*, many of the statements are mere "expressions of puffery and corporate optimism," which "do not give rise to securities violations." *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004). For example, Knight's October 31, 2023, assertion that the Company's pricing was "healthy" and "carefully calibrated," Am. Compl. ¶¶ 160, 164, as well as Tavares's assessment that Stellantis's approach to pricing "so far . . . has been working," *id.* ¶ 166, amount

to little more than assertions that management was optimistic about its pricing strategy, not statements of fact. *See Rombach*, 355 F.3d at 174 ("People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage."); *In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*, 757 F. Supp. 2d 260, 317 (S.D.N.Y. 2010) (generally, "subjective characterizations" are "too vague and opinion-based for a reasonable investor to rely upon them as a statement of fact"). The various statements in which Defendants characterize the Company's profits as "robust," Am. Compl. ¶ 170, and "sustainable," *id.* ¶ 179, its pricing as "strong," *id.* ¶ 181, and its inventory levels as "healthy," *id.* ¶ 183, are also too general and subjective to form the basis for a securities fraud claim. *See City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser Grp. PLC*, 587 F. Supp. 3d 56, 89 (S.D.N.Y. 2022) (assertions that a company was "solid," "sustainable," provided "growth opportunities," and had "strong culture and discipline" are inactionable puffery).

*Third*, several of the statements are "forward-looking" and "accompanied by meaningful cautionary language," rendering them inactionable pursuant to the so-called "Safe Harbor" provision of the PSLRA. 15 U.S.C. § 78u-5(c)(1)(A)(i). For example, Knight's June 13, 2024, statement that "important progress" was being made in terms of "the levels [and] the quality of inventory that will help revenues as we go forward" was couched with the clarification that such progress "may not be linear every quarter." Dotova Decl. Ex. 31 at 31. Likewise, Knight's September 23, 2024, remark that Stellantis's "10% AOI ambition" was its "North Star" was accompanied by reminders that the target was "ambitious," "not a walk in the park," and "not a done deal." Dotova Decl. Ex. 37 at 4, 16. Because these statements describe long-term

13

objectives rather than objective, contemporaneous assessments, and are tempered by qualifying language, no reasonable investor would rely upon them as statements of fact.

Having excluded statements that are irrelevant, puffery, or forward-looking, only a few remain that are even arguably actionable. The first category of potential material misrepresentations are those that attribute Stellantis's profitability to factors other than channel stuffing. Such statements include: Tavares's February 15, 2024, remark that favorable AOI margins were due to the fact that the Company has been "protecting . . . value," Am. Compl. ¶ 170; Knight's concurrent assessment that Stellantis can maintain its high prices because it delivers "value that the consumer also recognizes," *id.* ¶ 179; and the Company's July 25, 2024, statement that its AOI margins were driven by "consistent cost reduction initiatives," *id.* ¶ 130. Although these statements are arguably puffery or are couched in sufficiently vague and subjective language to render them inactionable, the Court can at least surmise how discussing profitability without disclosing the fact that the profits were being inflated by a short-term channel stuffing scheme could be misleading. Statements in which Defendants acknowledged the inventory problem as a "bump on the road that we are now fixing," *id.* ¶ 189, or touted their "inventory improvement," *id.* ¶ 162, may be similarly misleading if, at the time they were made, Defendants were pushing dealers to accept excess inventory.

The Court, however, need not decide definitively whether those statements are actionable because, even if they are, Plaintiff has failed to plead a strong inference of scienter. *See* Section II.B, *infra*.

### B. Plaintiff Has Not Pled Facts Sufficient to Give Rise to a Strong Inference of Scienter

To satisfy the scienter requirement of the PSLRA, "a plaintiff must plead 'with particularity facts giving rise to a strong inference that the defendant acted with the required state

of mind.'"  *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co*., 553

F.3d 187, 198 (2d Cir. 2009) (quoting 15 U.S.C. § 78u–4(b)(2)).  The requisite state of mind is

either actual intent to defraud or "conscious recklessness—*i.e.*, a state of mind *approximating*

*actual intent*, and *not merely a heightened form of negligence*."  *S. Cherry St., LLC v. Hennessee*

*Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (internal quotation marks omitted) (emphasis in

original).  To create a *strong* inference of scienter, Plaintiff must allege facts that give rise to an

inference of intent or recklessness that is "more than merely plausible or reasonable—it must be

cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs,*

*Inc. v. Makor Issues & Rts., Ltd*., 551 U.S. 308, 314 (2007).  "The requisite scienter can be

established by alleging facts to show either (1) that defendants had the motive and opportunity to

commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness."

*JP Morgan Chase Co.*, 553 F.3d at 198.

The Amended Complaint does not allege facts sufficient to give rise to a strong inference

that Defendants had motive and opportunity to commit fraud, nor does it allege strong

circumstantial evidence of conscious misbehavior or recklessness.  Plaintiff fails, therefore, to

satisfy the scienter requirement, meaning the fraud claim cannot move forward even if some of

the alleged misstatements may have been materially false or misleading.

### 1.  *Motive and Opportunity*

It is generally assumed, for purposes of the motive and opportunity inquiry, that high-

ranking corporate officers have the "opportunity to commit fraud if they so desire[]."  *McIntire v.*

*China MediaExpress Holdings, Inc.*, 927 F. Supp. 2d 105, 120 (S.D.N.Y. 2013) (quoting *Pension*

*Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F. Supp. 2d 163,

181 (S.D.N.Y. 2006)).  A plaintiff may allege "motive" by alleging "concrete benefits that could

15

be realized by one or more of the false statements and wrongful nondisclosures alleged." *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001) (cleaned up).  It is not sufficient to allege a motive common to "virtually all corporate insiders," such as the desire to maintain "the appearance of corporate profitability" or "to maintain a high stock price in order to increase executive compensation." *Novak*, 216 F.3d at 307 (citations omitted).  By contrast, motive can generally be inferred "when corporate insiders [are] alleged to have misrepresented to the public material facts about the corporation's performance or prospects in order to keep the stock price artificially high while they sold their own shares at a profit." *Id*. at 308.

The Amended Complaint does not allege that Defendants had motive to commit fraud. With respect to Knight, the Amended Complaint does not allege, and Plaintiff does not argue in the Opposition, that she had any specific personal motivation to commit fraud, such as a desire to increase stock prices in advance of a personal sale of stock, at any point during the class period.[3] The Amended Complaint likewise does not allege that Tavares sold any stock during the class period; it simply alleges that his compensation package, which supposedly made him the world's highest paid traditional automotive executive in 2023, was closely tied to the stock price.  Am. Compl. ¶¶ 240–45.  But courts in this Circuit have consistently held that an executive's desire to increase a company's stock price in order to increase his or her compensation is not the type of "concrete and personal" benefit that can support an inference that the executive was motivated to commit fraud.[4]  *Shapiro v. TG Therapeutics, Inc*., 652 F. Supp. 3d 416, 425 (S.D.N.Y. 2023)

---

[3]    In fact, Plaintiff asserts that Knight "had *no stock to sell*" because she was appointed CFO just before the beginning of the class period.  Opp. at 52 (emphasis in original).

[4]    The case Plaintiff relies upon for a contrary proposition, *Aldridge v. A.T. Cross Corp*., 284 F.3d 72 (1st Cir. 2002), is inapposite.  There, the plaintiff alleged that the defendants had unusual incentive to exaggerate earnings in a particular year, noting that one of the defendants had allegedly said: "If I can't turn the company around in one year, I won't be here."  *Id.* at 83.  Because increasing the stock price was uniquely "important to [the defendants'] own survival and that of the company," the court concluded that the "financial incentives to exaggerate earnings

(quoting *Novak*, 216 F.3d at 307).  That is particularly true in this case, inasmuch as Tavares remained at the Company throughout the class period and through the financially disastrous end of 2024, at which point he resigned (a move that Plaintiff characterizes as a "forced departure[]").  Am. Compl. ¶ 246.  The Amended Complaint alleges no facts from which the Court can infer that Tavares's motive to maintain a high share price would have been any more pronounced in 2023 than in 2024, such that he would have been motivated to pursue a strategy that prioritized short-term profits over long-term ones.

Indeed, far from alleging that Defendants engaged in stock *sales*, the Amended Complaint alleges that Stellantis engaged in significant share *buybacks* during the proposed class period.  *See* Am. Compl. ¶ 46.  Paradoxically, Plaintiff argues that the fact that the Company bought its own stock at the same time that it defrauded investors is proof of motive because it suggests that Defendants purposefully "stuff[ed] the channel with overpriced inventory to temporarily inflate AOI margins and thereby fund record buybacks . . . ."  *Id.* ¶ 243.  The Court cannot make sense of this assertion.  Presumably, if Defendants knew that they had temporarily inflated Stellantis's share price to artificially high levels, the last thing they would want to do is buy *more* of the overpriced stock.[5]  *Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*, 336 F. Supp. 3d 196, 225 (S.D.N.Y. 2018), *aff'd sub nom. Kapitalforeningen Lægernes Inv. v. United Techs. Corp.*, 779 F. App'x 69 (2d Cir. 2019) ("[S]ubstantial share repurchases tend to

---

[went] far beyond the usual arrangements of compensation based on the company's earnings" and thus "they may be considered among other facts to show scienter."  *Id*.  Plaintiff alleges nothing comparable in this case.

[5]    Plaintiff's only meaningful response to this argument is that, "given the unique stock price trigger embedded in Tavares's compensation, it would be illogical to credit Defendants' stock buyback as *minimizing* an inference of scienter."  Opp. at 52 (emphasis in original).  As the Court has already noted, the fact that Tavares's compensation, like that of most executives, was tied to the Company's share price is not sufficient to give rise to an inference of scienter.  *See Novak*, 216 F.3d at 307.

17

negate a finding of scienter because it would make no economic sense for a company to buy back its stock at a price it knows to be inflated." (internal quotation marks omitted)).

Accordingly, the Court finds that Plaintiff has not alleged facts from which it can infer that Defendants had motive and opportunity to commit fraud.

### 2. *Circumstantial Evidence*

If Plaintiff "cannot make the 'motive' showing, then it could raise a strong inference of scienter under the 'strong circumstantial evidence' prong, 'though the strength of the circumstantial allegations must be correspondingly greater' if there is no motive." *JP Morgan Chase*, 553 F.3d at 198–99 (quoting *Kalnit*, 264 F.3d at 142). "To survive dismissal under this prong, plaintiffs 'must show that they alleged reckless conduct by the [defendants], which is at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 272 (S.D.N.Y. 2009) (quoting *In re Carter–Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000)). "Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them. Thus, allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud." *Novak*, 216 F.3d at 309 (citation omitted).

The circumstantial evidence of scienter alleged in the Amended Complaint undoubtedly suggests that Defendants' strategy when it came to pricing and inventory was ill-advised. It does not, however, support a strong inference that Defendants acted recklessly or with intent to defraud investors.

18

A major piece of Plaintiff's scienter argument is Tavares's statement at a June 2024 Investor Day event when, in response to a question about the problems Stellantis had been having with its North American division, he said:

> [W]e were arrogant.  That's all, arrogant.  There was a conversion of 3 things: The market conditions deteriorated by the end of '23 at the moment where we were trying to deal with a certain number of inefficiencies and we were not good at dealing with those inefficiencies.  And they were specific to a certain number of plants.  And we saw it, but we were arrogant because we gave us too much time to fix it, perhaps somewhere polluted by what happened with UAW in fall 2023.  So perhaps we were to [*sic*] smooth, but the things were visible in fall 2023.
>
> . . . . Then what happened next is that the market conditions deteriorated by the end of '23, and we ended up '23 with too much inventory, and you were the first ones to spot that, and you were right, which means that when we started correcting that, by the beginning of '24.  We already had to fix the manufacturing issues.  We already had to readjust the inventory . . . .

Dotova Decl. Ex. 31 at 44.  In the Amended Complaint and the Opposition, Plaintiff makes much of Tavares's remark that the Company's inventory problems were "visible" by "the end of '23," and that he and the Company were "arrogant" for failing to notice them sooner.  Am. Compl. ¶ 215.  Viewed in its complete context, however, Tavares's statement does not suggest that he intentionally or recklessly misled investors; rather, it reads as an admission that he was overconfident and failed to foresee a downturn in "market conditions" that others had predicted. Plaintiff's attempt to interpret the June 2024 statement as evidence of Defendants' intent *in 2023* is a classic example of "alleging fraud by hindsight," which cannot form the basis for a securities fraud claim.  *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994); *see also In re AppHarvest Sec. Litig.*, 684 F. Supp. 3d 201, 246 (S.D.N.Y. 2023) (statements made "retrospectively with the benefit of hindsight" about a company's problems do not suggest that defendants "knew at the time that these issues existed or their magnitude").

19

Next, Plaintiff cites as evidence of conscious misbehavior the fact that various former Stellantis employees and dealers, as well as the National Dealer Council in its September 2024 letter to Tavares, had warned Defendants that their pricing strategy was unsustainable.  Am. Compl. ¶¶ 216–20.  Similarly, Plaintiff alleges that Stellantis "closely-tracked [*sic*] pricing and inventory metrics in reports and databases, conducted pricing studies, and held meetings that revealed the truth."  *Id.* ¶ 221.  Although these allegations suggest that Defendants were aware that their pricing and inventory strategies were controversial and even risky, there is no reason to believe that Defendants' decision not to heed the dealers' and former employees' warnings or otherwise adjust prices or inventory was rooted in anything more than strategic miscalculation.  Given the lack of motive for any of the Defendants to prioritize short-term profits over long-term financial health, the most plausible explanation for why they ended up doing precisely that is that they simply misread the market, believing erroneously that demand would eventually catch up to supply.

The allegations about Stellantis's response to dealers' inventory-related concerns suggest scienter in conclusory terms only.  For example, Plaintiff alleges that, when dealers informed Stellantis that they had excess inventory, "Stellantis told dealers that was their problem."  *Id.* ¶ 84.  In another instance, Plaintiff alleges that Stellantis acknowledged to dealers that "the pricing was out of whack, but [said that] this is what they were going to do anyway."  *Id.* ¶ 89. Stripping away Plaintiff's paraphrasing, these allegations merely indicate that Stellantis and its dealers were engaged in a classic manufacturer-distributor dispute: Stellantis felt that its dealers were not doing enough to sell inventory, and dealers felt that Stellantis was not doing enough to support sales.  That Stellantis's view turned out to be wrongheaded may support the inference that Defendants were, as Tavares admitted, arrogant, but it does not suggest that they

20

purposefully lined their pockets in 2023 without regard for whether they would lose it all in 2024. *See In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 547 (S.D.N.Y.), *aff'd sub nom. Condra v. PXRE Grp. Ltd.*, 357 F. App'x 393 (2d Cir. 2009) (even if a "Plaintiff's [complaint] might suggest that Defendants should have been more alert and more skeptical," that is insufficient to support the inference that "management was promoting a fraud." (cleaned up)).

Plaintiff also argues that Defendants "employed and directed systematic efforts . . . to force dealers to accept inventory that would enable Stellantis to report double-digit AOI and hide the true facts regarding Stellantis's unsustainable pricing strategy and ballooning inventory levels." Opp. at 48. As an initial matter, the Court is skeptical that the incentives described in the Amended Complaint, *see* Am. Compl. ¶¶ 93–115, "forced" dealers to accept inventory; as Plaintiff himself notes in the Opposition, "dealers could refrain from ordering more inventory" if they wished. Opp. at 34. Dealers who refrained would, of course, not be entitled to the same advantages as those who accepted more inventory — that is the definition of an incentive — but that was a trade-off that they were free to make. Regardless, even assuming Plaintiff is correct that the incentive structures that Defendants adopted were highly unusual and that their purpose was to inflate Defendants' AOI margins, all that would mean is that Defendants engaged in channel stuffing. As the Court has already noted, channel stuffing — like offering incentives to dealers — is "not necessarily fraudulent." *Gimpel*, 156 F.4th at 136; *see In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 566 (S.D.N.Y. 2004) ("Offering incentives to meet sales or earnings goals is a common practice, and, without additional allegations not present here, the allegation that the sales at issue were made pursuant to incentives to meet goals set by management is an insufficient basis on which to infer conscious misbehavior or recklessness.").

Finally, Plaintiff argues that Defendants must have acted with conscious misbehavior or recklessness because Tavares was known as a hands-on CEO and the alleged misrepresentations and omissions concerned Stellantis's "core business operations." Opp. at 49. It is well established that the "core operations theory at most constitutes supplemental support for alleging scienter but does not independently establish scienter." *Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 163 (S.D.N.Y. 2015) (internal quotation marks omitted) (collecting cases). Accordingly, even assuming Plaintiff's "core business operations" argument has merit, it would not move the needle on scienter, given the paucity of other allegations to support the inference that Defendants acted with conscious misbehavior or recklessness.

## CONCLUSION

For the foregoing reasons, the Motion to Dismiss is GRANTED. Because the Court did not rely on any of the exhibits that Plaintiff moved to strike in rendering this decision, the Motion to Strike is DENIED AS MOOT. The Clerk of Court is respectfully directed to TERMINATE all open motions and to CLOSE the case.

**SO ORDERED.**

**Date:  March 13, 2026**
         **New York, NY**

                                        **VALERIE CAPRONI**
                            **United States District Judge**